# IN THE SUPREME COURT OF CALIFORNIA

THE PEOPLE,
Plaintiff and Respondent,
v.
KERRY LYN DALTON,
Defendant and Appellant.

S046848

San Diego County Superior Court
135002

---

May 16, 2019

Justice Liu authored the opinion of the court, in which Chief Justice Cantil-Sakauye and Justices Chin, Corrigan, Cuéllar, Kruger, and Groban concurred.

---

## PEOPLE v. DALTON

### S046848

Opinion of the Court by Liu, J.

Defendant Kerry Lyn Dalton was convicted of conspiracy to commit murder and the first degree murder of Irene Melanie May. (Pen. Code former § 182, subd. (a)(1), § 187, subd. (a), former § 189 (all further undesignated statutory references are to this code).) The jury also found true lying in wait and torture-murder special-circumstance allegations and an allegation that Dalton personally used a deadly weapon in committing the murder. (Former §§ 190.2, subd. (a)(15), (a)(18), 12022, subd. (b).) In a separate proceeding, Dalton admitted a prior serious felony conviction for burglary and a prior prison term. (Former §§ 459, 667, subd. (a), 667.5, subd. (b), 1192.7, subd. (c)(18).) At the penalty phase, the jury returned a death verdict, and the trial court entered a judgment of death. This appeal is automatic. (Cal. Const., art. VI, § 11, subd. (a); § 1239, subd. (b).)

For the reasons below, we vacate as unauthorized the death sentence imposed (and stayed) on the conspiracy to commit murder count (Count I). We further vacate the lying in wait special-circumstance true finding. We remand and direct the trial court to state on an amended abstract of judgment a sentence of imprisonment for 25 years to life, stayed pursuant to section 654, on the conspiracy count (Count I), and to strike the lying in wait special-circumstance true finding. We affirm the judgment, as modified, in all other respects.

1

## I. FACTS

### A. Guilt Phase

On June 26, 1988, Dalton, her boyfriend Mark "TK" Tompkins, and Sheryl Ann "John Boy" Baker murdered 23-year-old Irene Melanie May in Joanne Fedor's trailer located in the Live Oak Springs Trailer Park in Boulevard, California. Her body was never found.

Dalton and her coperpetrators were jointly charged, but Dalton's trial was severed. Tompkins pled guilty to first degree murder. Baker pled guilty to second degree murder in exchange for testifying at the 1995 trial against Dalton. The prosecutor also agreed to other terms, including notifying the Department of Corrections or Board of Prison Terms of Baker's cooperation and her level of culpability in Dalton's case, requesting she serve her prison time out of state, and transporting her to and from court separately from Dalton. Baker had not yet been sentenced at the time of her testimony.

Because Dalton challenges the sufficiency of the evidence for every charged count and special circumstance allegation, we review in detail the evidence in support of the prosecution's case.

#### 1. Prosecution evidence

##### a. Events before the murder

###### 1) Events before arriving at Fedor's trailer

Sheryl Baker, who had been previously convicted of grand theft auto, and in 1988 used crystal methamphetamine several times a day, testified that in June 1988, she was living in Lakeside and had known Irene Melanie May (May) for about two months.

May was married to Bobby May and had three children. On Saturday, June 25, 1988, May had been evicted from her Lakeside apartment, and she and Baker were shooting methamphetamine and moving May's belongings into storage. Bobby May was incarcerated at the time, and a man named George, whom Baker met for the first time that day, and several other individuals helped them. Dalton, whom Baker had known since 1986, and who other testimony established had previously lived with May and Bobby May, also arrived with two women, Patricia Collins and Pamela McGee. Dalton angrily told Baker much of the furniture in the apartment was hers and she wanted it, and she was looking for certain pieces of jewelry. Baker told Dalton she would look for her property, and Dalton left. Collins testified she bought a dresser from May. Collins had not met May before and described her as a "[s]kinny little speed freak."

At about 5:00 p.m., Baker, May, and George went to a convenience store to meet May's connection to obtain drugs. While waiting at the store, Baker called Dalton and told her she had not found her jewelry. Dalton, who lived nearby, arrived at the store a few minutes later with Mark Tompkins in a small yellow pickup truck.

Baker, Dalton, and Tompkins decided to locate and steal a Trans Am that belonged to an individual they knew, and May and George accompanied Baker because they were "partying with" her. May expressed concern about going because she was afraid of Dalton. About 6:00 p.m., the group left the store in two trucks; Dalton and Tompkins were in their truck, and Baker, George, and May followed in George's truck. No plan had been discussed other than to steal the car. They drove for hours, and eventually happened to come upon Dalton's acquaintance Joanne Fedor.

Fedor, who was accompanied by her three- and four-year-old children, testified she had pulled her truck over to the side of the road because of an electrical fire. She encountered Dalton and her group about 11:30 p.m. Dalton offered to drive Fedor's children to Fedor's home in case the fire resumed. Fedor agreed and left, followed by the two trucks. According to Baker, the group following Fedor then lost their way, and the truck carrying Dalton and Tompkins broke down. Dalton, Tompkins, and Fedor's children joined Baker, May, and George in George's truck.

### 2) Events at Fedor's trailer the night and morning of June 26, 1988

Fedor testified that about 2:30 a.m. on the morning of June 26, 1988, Dalton and her companions arrived at Fedor's trailer. Baker recalled Fedor was "freaking out" and thought her children had been kidnapped.

Baker testified that the group and Fedor stayed up all night and some individuals used drugs. Baker used about a gram of methamphetamine "throughout the time of this." By the following morning Baker had been up at least 24 hours.

At some point during the night or the following morning, Dalton and Baker searched through papers in George's truck because they did not know him, and Dalton wanted to be sure he was not connected to law enforcement. Also at some point Dalton emptied May's purse and "found some of her jewelry." Dalton was upset, and "started making [May] her slave and making her clean [Fedor's] trailer," performing chores such as washing dishes and cleaning the kitchen. May told Baker she was "very scared."

Fedor testified she asked her guests several times during the night "to please be quiet, that my neighbor next door was nosey, I didn't need no problems. At one point . . . the neighbor sent somebody over to complain." During the night, Fedor heard Dalton and May arguing, and someone said May was a "snitch, ratting her old man off." Fedor also heard Dalton say that while May thought Dalton was in jail, May had held a yard sale that included Dalton's belongings. During this discussion, Dalton sounded angry, and May sounded "scared to death." At some other point that night, Fedor heard Dalton, Baker, and May using drugs in the bathroom. Dalton and Baker became angry with May when they learned they had all shared a needle and May had hepatitis.

Later that morning, Fedor, like Baker, observed Dalton treat May "like a slave," "[c]ommanding her" to wash dishes, clean the house, and make breakfast for and dress Fedor's children. At one point when Fedor was drying dishes with May, May "had a knife" and "wanted to use it on [Dalton], because she was scared." May asked Fedor "how she could get out." Fedor replied, "if you are afraid, go outside because there [are] mobile homes on both sides, scream," and gave May directions to the freeway. Fedor also, at May's request, left a message for Nina Tucker, the child protective services worker assigned to May's family, that May would be unable to attend a scheduled meeting with Tucker.

Fedor did not see May alone in the trailer. Dalton appeared to tell the others what to do, and Fedor did not observe Baker or Tompkins refusing to do anything Dalton told them to do.

Baker testified that sometime that morning, she, Tompkins, and George left the trailer for about an hour to repair and return with the truck that had broken down.

### 3) Emergency medical technicians

Lona Agnew testified that in June 1988 she was a volunteer emergency medical technician for the Boulevard Fire and Rescue Department and lived in the same trailer park as, and knew of, Joanne Fedor. Early on the morning of June 26, 1988, she responded to a page regarding a person having difficulty breathing and a possible asthma attack at Fedor's trailer. A woman who was not Fedor and a short white man were outside, and the man took Agnew into the trailer.

The trailer was very dirty, and there were clothes and other items "all over." A tall man with long hair appeared and asked Agnew what she was doing there. Agnew said she was from the fire department and they had received a medical call. The man said, "No, there is no problem here." Agnew showed the man the report of an asthma attack. The man again said, "No, there is no problem here." He seemed angry Agnew was there, and instructed the other man to "[g]et her out of here."

Once outside, and as Agnew began walking back to her trailer, Fedor leaned out a window and asked if Agnew had a bronchial inhaler, explaining her son had asthma and was having difficulty breathing. Agnew said no, and that there was nothing she could do unless Fedor let her in to see the patient. Fedor would not let her in, and said, "No, I just need one of those inhal[ers]."

A short time later, Agnew and her supervisor, Lou Faulkner, returned to Fedor's trailer in a marked fire and rescue truck. As Faulkner exited the truck, he was met by three

persons, the man and woman who had been outside earlier, and the tall man who had been inside the trailer. Agnew did not see Fedor. The tall man asked what was going on, and Faulkner said they had "received a report of medical aid." The tall man said, "No, there is no problem here." Agnew and Faulkner left.

Fedor testified that at some point on the morning of June 26, May was having difficulty breathing. Baker and Tompkins went to a nearby convenience store to get May a product that would help her breathe. Afterward, Agnew arrived at Fedor's trailer. Dalton and Tompkins were upset that "911" had been called, and blamed Fedor. Tompkins said: "[W]hen they come here everybody stays inside. I'll go out, tell them it was me that called, that I'm okay." When Agnew arrived, Tompkins went outside. Tompkins told Agnew that the medical report concerned him, but he was all right and she could go. Fedor then asked Agnew for an inhaler.

### 4) Trip to La Cima Honor Camp and Lakeside

Fedor testified that at about 11:30 a.m., just after the emergency medical technicians left, Baker, Tompkins, and George drove Fedor and her two children to visit Fedor's boyfriend, who was incarcerated at La Cima Honor Camp, located about 45 minutes away. Baker, in her testimony and statement to police, said that only Baker and Tompkins — not George — gave Fedor and her two children a ride to the camp.

Fedor testified that Dalton and May stayed in the trailer. Before Fedor left, she had tried to reenter the trailer, but Dalton and May did not let her in. Once Fedor arrived at the camp, the others left. Fedor understood they would pick her up when visitation ended at 3:30 p.m. They did not do so, and so after waiting until about 4:00 p.m., Fedor and her young children

7

hitchhiked home. Fedor did not tell sheriffs at the camp there was a problem at her trailer because "[t]here was no problem at my trailer as far as I was concerned."

Baker testified that after dropping Fedor off at the camp, she and Tompkins went to a home in Lakeside. They left immediately after learning that the police had been there the night before because Fedor had been looking for her children. Baker and Tompkins then went to the home of Baker's dealer so Baker could obtain drugs. Tompkins left the home for about 10 minutes to use a telephone. When he returned, he was "in a panic." He told Baker to get in the truck, "we have to go, something happened. We have to get back up there." Baker was disinclined to go because "[i]t was very boring" at the trailer, but Tompkins was insistent. They drove "[d]irectly back to" Fedor's trailer, which was a "long drive." On the way, Tompkins said "things happen for a reason," and "things just happen and to go with the flow."

Baker agreed with defense counsel that from the time she left the Lakeside area until they reached Fedor's trailer "there was no discussion between [her] and George and [Tompkins] and Kerry Dalton about doing anything to" May. She also agreed she had "no discussions" or "plan to do anything" to May "at any time" from the time that Baker left Lakeside on Saturday, June 25, 1988, all through the time when she left to go to the honor camp with Fedor on Sunday, June 26, 1988.

### b. *Events during the murder*

Baker and Tompkins arrived at the trailer at about 3:30 p.m. George was outside and Dalton was inside the trailer. Baker and Tompkins had been gone from the trailer at least

three hours.  Dalton asked Tompkins why he had brought Baker with him.

A person completely covered by a sheet was seated in a chair in the kitchen.  Rope encircled the sheet and tied the person to the chair.  Dalton was upset, and told Baker that Baker did not "know what happened when [she] was gone, and something had happened, and that they were going to kill" May.  Dalton also said that "[y]ou don't know what we went through" and that May "tried to get away or something."  Dalton led this discussion for 10 to 15 minutes, and Tompkins "was going along with" Dalton.  Baker testified she did not know and was never told what had happened at the trailer while she and Tompkins were gone.

Tompkins joined George outside.  Dalton took Baker to the "back bathroom where there [were] . . . four or five syringes filled with what she told [Baker] was" battery acid.  The content of the syringes resembled methamphetamine or water.  Dalton said, "[W]e were going to shoot her up with battery acid; it would be really quick and easy, that it would be over with."  Dalton also said the battery acid would "kill her instantly."  Dalton told Baker that Baker "had to be a part of it" because Tompkins wanted to kill Baker, and "in order for him not to" kill her, "if [she] helped, that [she] would be guilty, too" and would not "tell on them."

Dalton and Baker returned to the kitchen, and Dalton told May she was going to give her a sedative to calm her.  Dalton asked Baker to try to inject May with a hypodermic needle, but apparently because of May's drug use, Baker could not find a vein.  Dalton was angry, took the syringe, and depressed it once

into May's leg. There was no blood in the syringe, which indicated to Baker that Dalton had not penetrated a vein.

Dalton told Baker that May was not dead and was suffering and that they "had to do something about it." Dalton handed Baker a cast iron frying pan from the stove and told Baker to hit May with the pan. Baker hit May once in the head with the pan. May did not bleed, but the pan broke. Dalton said they were "going to have to get" Tompkins because "[t]his isn't working." Baker told police Dalton "couldn't do it and she didn't wanna tell" Tompkins. When Tompkins came back inside, he "was mad, [and] called us stupid bitches that couldn't handle nothing." Tompkins and Dalton decided to stab May, and Tompkins stabbed May twice. Tompkins may have also hit May with a breaker bar. Baker did not see an extension cord with "bare" ends, nor was such an extension cord used against the person in the chair.

There was no blood on the sheet, but there was a small amount on the floor that Dalton cleaned up. Tompkins and George wrapped May in a carpet, placed her body in the back of George's truck, and left to dispose of May's body. About half an hour passed between the time Baker and Tompkins returned to the trailer and when Tompkins stabbed May.

On cross-examination, Baker testified she never saw the face of the person under the sheet, and the person made no sound or movement. She could not tell if the person was injured in any way. She did not know if the person was alive when she and Tompkins returned to the trailer. On redirect, she agreed that in March 1992 she had told officers May had said, "I don't wanna die," and, "[p]lease don't kill me, I'm sorry." On recross-examination, Baker agreed with defense counsel that in July

1994, during her second interview with law enforcement, she had told officers she had given "the wrong answers" in her first interview in March 1992, not because she had lied but because she did not want to remember what happened. Baker told officers in July 1994 that she did not know whether May was alive when Baker returned to the trailer, and testified at trial that this was the truth.

Donald McNeely testified that for three months, from June to August of 1992, he had shared a cell at the San Diego County jail with Tompkins. During this time, Tompkins told McNeely he was "in on a murder charge" and called it a "torture slaying." Tompkins said the victim was "Melanie May," and the murder occurred in June of 1988 in a "house trailer" in the "Live Oak Springs, Boulevard area." Tompkins said that he was "really into violence," that he "tortured the hell out of her," and that "pain was the name of the game." In McNeely's view, Tompkins "seemed to enjoy it." Tompkins said the "original plan was to give Miss May a hotshot" and that Tompkins did so.

Tompkins also mentioned a screwdriver, knife, and a heavy kitchen skillet, saying "they work wonders on the knees." Tompkins "got tired of it" and "just wanted it to end," so he stabbed May with a knife.

c.   *Events after the murder*

Tompkins told McNeely he put May's body into a vehicle and took it to a nearby Indian reservation. He then dismembered the body so it would be more difficult to locate.

Baker testified that Dalton said Tompkins and George were going to burn the body. Dalton and Baker took showers and cleaned the trailer. Baker collected a breaker bar, screwdriver, and the frying pan; Baker and the others took these

11

items with them when they left Fodor's trailer. Tompkins had the knife. Baker did not see a bloody pillow, pillow case, or bar of soap, or notice any blood outside the kitchen.

When Fedor returned, Baker was in the yard picking up items. Dalton told Fedor that she and May "got in a fight," and May had left. Dalton also told Fedor they were going to the store, and Dalton, Baker, Tompkins, and George left in George's truck.

After leaving Fedor's trailer, the group stopped at an Alpine gas station to get "rid of the stuff that we had with us"; Baker threw away the screwdriver, frying pan, and breaker bar. The group then went to El Cajon where Dalton sold a leather jacket.

Patricia Collins testified she saw Dalton "a couple of days" after the two had attended the yard sale. Dalton tried to sell her a black leather jacket. Dalton seemed scared and nervous because "she kept saying that she needed money, she needed a place to stay."

Baker testified that she, Dalton, George, and Tompkins checked into a hotel in El Cajon. Dalton and Tompkins argued. Tompkins wanted to blow up Fedor's trailer, but Dalton said "he couldn't do that because children were there." George drove Baker to her parents' home for the night. As she was getting out of George's truck she saw in the truck Dalton's knife that Tompkins used to stab May. It was an "old kind of buck knife" with a fixed brown handle.

Sherri Fisher testified that about three days after she saw May leave Fisher's home with Baker, she saw Baker, who was hysterical and crying, and said she had to leave. Baker described a murder, saying the victim had died slowly and

"wouldn't die." Baker left with Fisher's mother. A couple of hours after they left, Dalton came to Fisher's home and asked for May's belongings; Fisher gave her a purse and some papers.

Fisher's mother, Marsha Watson, testified that on June 30, 1988, she traveled with Baker to Watson's home in Yucca Valley. Baker had a purse with papers including May's birth certificate and birth certificates for "[s]ome boys." Baker left the papers at Watson's house when she departed. Watson described Baker as "spun," or someone who had "taken too much" methamphetamine. At this time, Watson was a heroin addict who also used crystal methamphetamine.

Dalton made several statements to Baker at various times after the murder. Dalton told Baker that Tompkins and George had burned May's body and it "would never be found." Dalton observed, "There was no body, there was no case," and said that "if we kill [Tompkins], then if this case ever came up, that we could blame him." Dalton said Baker "should never talk about it," but Baker did speak to several individuals because she was "scared that they were going to kill" her.

On October 31, 1991, Fedor identified Dalton, Tompkins, and Baker from photographic lineups as individuals who had been at her trailer. In 1992, Fedor identified Tompkins in a live lineup.

In 1988, Fedor was using a quarter gram of methamphetamine two or three times a day by injecting it with a syringe, snorting it, or eating it. On June 25, 1988, Fedor used methamphetamine "[p]robably at least two or three" times, and she used this drug at about 8:30 a.m. on June 26, 1988.

### d. *Physical evidence*

#### 1) *Fedor's testimony*

Fedor testified that when she returned to the trailer between 5:00 and 5:30 p.m. on the afternoon of June 26, 1988, it was in disarray. A recliner, bedding, and clothes were missing, and her bed had been moved. The kitchen trash can had been dumped on the children's bedroom floor. Baker was washing the kitchen floor with shampoo.

Dalton was in Fedor's bedroom and asked to borrow clothes so she could take a shower. Fedor noticed clothes, sheets, towels, and blankets she had thrown on her bed were missing. She asked Dalton where these items were, and Dalton explained she had accidentally cut herself, "got blood all over," and the items were taken to be washed. Dalton also said Tompkins and George had taken May back to Lakeside.

After Dalton showered, the soap bar was bloody. The trash can outside of the trailer contained a "dripping wet" bloody pillow. Fedor asked Baker about the pillow, and Baker and Dalton had a discussion in which Dalton became angry.

Tompkins and George arrived at the trailer; Tompkins had white dust on him. Dalton, Baker, Tompkins, and George left in George's truck between 8:00 and 9:00 p.m., when it was starting to get dark, leaving behind their second truck.

Immediately after Dalton and her companions left, Fedor called the Sheriff's Department. Fedor then found a screwdriver with what appeared to be blood, hair, and scalp material on it and a bloody pocketknife. A standup heater was "full of blood spatters." A substance like blood had splattered on her kitchen paneling. Fedor placed the screwdriver, the trash can

containing the bloody pillow, and the bloody knife and soap in her truck.

San Diego County Deputy Sheriff David Wilson responded at about 9:00 p.m. Fedor tried to show him the screwdriver and bloody knife that she had placed in her truck, but he would not let her go outside because it was too dark, and said he would get them in the morning. She did not mention the bloody soap, did not give him the heater, and could not recall whether she mentioned the bloody pillow or the truck her guests had left behind. While they spoke, Dalton and Tompkins called and Tompkins heard the officer's walkie-talkie. Tompkins told Fedor "not to bother the blue truck" and "not to talk to anybody or tell anybody." After this call, Deputy Wilson asked Fedor if she wanted to file burglary charges, and she said no. Deputy Wilson said he would return the following day but "never came back." A day or two later her guests' second truck was gone.

After Deputy Wilson left, Fedor found her bedroom chandelier was gone. One end of the cord to the chandelier had been cut, and the other end was still "plugged in," apparently to an outlet. On the cut end of the cord, part of the plastic protective covering was melted, exposing the electrical wire. Although the record is not entirely clear, Fedor also found at least one extension cord in the shape of a figure eight. Another extension cord was tied in the shape of two figure eights with a different cord connecting the two figure eights. She did not contact law enforcement to inform them of this discovery.

Fedor did not stay in her house for four to six weeks after "things happened" because she was "in fear of [her] life." In July 1988, Fedor gave the heater to Darlene Burns, her child

protective services worker, to help Fedor "find out what happened at my house."

At some point Mike Hissom, an acquaintance of Fedor's, as a joke took the screwdriver and knife from her truck and placed them in a freezer. Fedor never saw them again. The bloody pillow at some point disappeared, and the extension cords and bloody soap were "lost in the shuffle."

On cross-examination, Fedor testified that in September 1988, law enforcement took samples from her bedroom, kitchen, family room, "pop-out" room, and living room. These included samples from the carpet, carpet pad, and kitchen floor. In November 1988, law enforcement officers returned to the trailer and took samples from both inside and outside the trailer. In early 1989, Fedor moved out of the trailer. (Further testimony about the 1988 forensic searches was adduced in the defense case. (See *post*, pt. I.A.2.a.))

### 2) *Deputy Wilson's testimony*

Deputy Wilson testified that on June 26, 1988, at 8:55 p.m. he received a telephone call to go to Fedor's trailer in the Live Oak Springs Trailer Park to investigate a burglary report. There were approximately 30 trailers in the park, and the park was situated in a retirement community "like a little village" that also included homes, A-frame motel units, a store, a restaurant, and a gas station.

Deputy Wilson arrived at Fedor's trailer at 9:02 p.m. Fedor appeared to be under the influence of methamphetamine. She was "very excited," did not "complete her sentences," and seemed "very paranoid." When Deputy Wilson tried to ascertain what Fedor was afraid of, she would speak rapidly, ramble, and

not answer his questions. Deputy Wilson testified, "[I]t was like trying to talk to somebody who was mentally ill."

The lighting inside the trailer was dim, so Wilson also used his flashlight to examine the kitchen, living room, and master bedroom. He saw a stack of dirty clothes in the doorway to the bedroom and dirty clothes piled on the bathroom floor. On a chair were car parts.

Deputy Wilson asked Fedor what had been taken from the house, and she said a yellow trash can and a chair slipcover. Fedor also said she had found a blood-soaked pillowcase on her bed. Deputy Wilson did not observe such an item or any blood on Fedor's bed. Fedor then said "they put it in a box" and it was under the trailer. Deputy Wilson looked under the trailer with his flashlight from five different positions, but did not see a box or pillowcase. Fedor suggested Deputy Wilson look in the trash that was in her pickup truck. Deputy Wilson looked briefly in the back of the truck, but did not see a bloody pillowcase or other bloody item, and the bags of trash and boxes looked undisturbed.

Deputy Wilson did not see any blood in the kitchen, living room, or master bedroom, nor did Fedor point out any blood in the trailer or ask him to look at her heater, carpet, or walls. Nor did Fedor tell him there was a screwdriver with blood and hair on it in the back of her truck or give him a screwdriver, knife, or bar of soap.

At one point Fedor received a telephone call. She asked Deputy Wilson to turn off his portable radio because she did not want "them to hear." Fedor seemed afraid and was crying. She refused to tell Deputy Wilson who "they" were because she was concerned for either her safety or that of a friend who had been

there earlier. Fedor refused to tell Deputy Wilson the name of the friend.

Deputy Wilson did not see any evidence that a burglary had occurred, and therefore did not write a report about the incident until several months later, on September 15, 1988. On that day, he happened to see Sheriff's Department detectives from the violent crimes team at the trailer park, and they requested he write the report. Fedor did not call Deputy Wilson after June 26, 1988.

### 3) *1991 forensic testing*

Gary Dorsett, an evidence technician with the San Diego Police Department Crime Laboratory, testified that on August 12, 1991, at about 6:00 p.m., he and Annette Peer, a DNA criminalist at the same laboratory, went to a trailer (that had previously been Fedor's trailer) in the Live Oak Springs Trailer Park in Boulevard. The trailer was occupied. Dorsett observed "very small" spots on the living room and master bedroom walls, floors, and ceiling that tested positive for the presumptive presence of blood. On August 24, 1991, at about noon, Dorsett returned to the trailer with two law enforcement officers and performed additional testing. He then marked, photographed, and took samples for further testing of the areas of the living room, master bedroom, and "pop-out" room that tested positive for the presumptive presence of blood.

Gary Harmor, a forensic serologist at the Serological Research Institute in Richmond, California, testified that in April 1992 he tested six samples from Fedor's trailer to determine ABO blood type and species origin. He obtained readings of type O on some samples and type A on other samples. Both type A and type O were found on one sample, and

Harmor was of the view that different donors had deposited blood on the sample, although he could not tell if they had done so at the same time. The sample might also have consisted of only type A blood because type A blood contains type O blood. Harmor was unable to determine the age of the samples or whether the six samples were of human or animal origin.

The parties stipulated that May and Tompkins had type A blood, and Dalton and Baker had type O blood. Harmor testified that 50 percent of whites and blacks, 65 percent of Hispanics, and 32 percent of Asians had type O blood. Thirty-six percent of whites, 26 percent of blacks, 31 percent of Hispanics, and 38 percent of Asians had type A blood. Animals, including dogs, rodents, squirrels, and mosquitos carrying blood, also have ABO blood types.

Jennifer Mihalovich, a criminalist at Forensic Science Associates in Richmond, California, testified that the size of most of the samples she examined was about one millimeter or the size of a pinhead. She was unable to obtain DNA results from tested samples because the amount of DNA present was insufficient. Mihalovich also examined a heater received from Investigator Cooksey and did not detect the presence of blood on the heater.

Investigator Cooksey, who was assigned to the case of May's disappearance in July 1991, testified he conducted two unsuccessful searches for her. Both searches involved about 20 individuals and several dogs trained to locate human bodies. One search lasted nearly a day and was conducted north of Fedor's trailer. Another search was performed on the Viejas Indian reservation.

### 4) Fedor "corroboration"

The prosecution presented numerous witnesses in an effort to corroborate Fedor's testimony.

San Diego County Deputy Sheriff Richard Baumann testified that during the night of June 25 to June 26, 1988, he received a call to investigate a kidnapping. He was told to look for Dalton at a house in Lakeside. When he arrived at the house, the dispatcher told him the reporting person had her children.

Alisha Fedor, Joanne Fedor's daughter, testified she was about 12 years old on June 26, 1988, and spent that weekend away from home. When she returned on Monday, she noticed a recliner was missing from the living room, and much of the remaining furniture in the trailer had been moved outside. One corner of the wall-to-wall living room carpet had been pulled up and flipped over. White powder was on the living room windows. The heater appeared to have blood on it. In her bedroom, trash had been "dumped everywhere." In her mother's bedroom, the cord to a hanging lamp had been cut, and the wire was exposed. The cord appeared to have been burned, and the room "smelled." She did not recall seeing bedding on her mother's bed. Small dark brown or reddish-brown spots were on her mother's bedroom carpet, and similar spots were on the floor and wall of the pop-out room. Outside, a large screwdriver with hair and what appeared to be blood, was lying in a space underneath an open truck bed.

Kathy Eckstein testified she knew Joanne Fedor and had visited her trailer. One Sunday between 2:00 p.m. and 3:00 p.m., her son Fred and his friend Mike Howard were dropped off at Fedor's trailer. About a half hour later, Fred called home and asked to be picked up. When Eckstein arrived

at Fedor's trailer about 5:00 p.m., it was dark outside. The trailer was "a mess," and clearly visible nickel and dime sized red spots that appeared to be dried blood were "all over the place," including the carpeting, walls, and blankets on the bed in Fedor's bedroom. Fedor showed Eckstein a bar of soap with teeth marks and a cut extension cord with two loops.

Eckstein did not call law enforcement to report seeing blood in Fedor's bedroom. Eckstein was using methamphetamine occasionally during this time period, but not on the weekend addressed in her testimony. Eckstein was not sure of the year, month, or time of year these events had occurred, but was certain they had occurred on a Sunday. She said it started to get dark in June at about 5:00 p.m., and noted that at the time of her testimony in February it got dark "later around 6:30" p.m.

Fred Eckstein, Kathy Eckstein's son, who in June 1988 was about 14 years old, testified he would stay at Fedor's trailer for several days at a time and often babysat for her. Fedor drove Fred to her trailer "that evening, after it happened." Fedor pointed out spots on the living room carpet and walls that appeared to be blood. Fedor also showed him a rusty screwdriver. Fred saw extension cords on the living room floor that were tied in a knot "like something was bound in them and cut," and a telephone cord. Fedor's bedroom had a pungent odor "like fish after being out all day." About two days later, Fred replaced Fedor's living room carpet and padding and took the old carpet outside.

Fred did not recall the date, month, or the day of the week these events occurred. He did not think it was in June. School

was still in session, although Fred was suspended at the time. "It had to be summer" because the days were long.

At this time, Fred was using methamphetamine two or three times a day. He obtained it from Fedor, and had been using it for "quite awhile." He had used methamphetamine on the day he saw the unusual things in her trailer.

Jeanette Bench testified that one day in the summer of 1988, Bench was speaking with her friend Lacy Grote outside of Grote's home in Santee. Fedor, who was hysterical, walked up the driveway carrying a screwdriver about 12 inches long with what appeared to be skin, hair, and dried blood on the metal part, but not the tip, of the screwdriver. Bench had suffered five prior felony convictions, had used a number of aliases, and in 1988 was injecting methamphetamine "quite a bit."

Patrick Woods testified that in June 1988 his girlfriend was Lacy Grote. Woods recalled at some point — he did not know the year or month — throwing out an "old, odd-ball screwdriver" he found in his garage freezer. The screwdriver was in a dirty paper bag, had grease or blood and lint or dog hair on it, and was "chipped up" and looked old. At this time in his life, Woods was regularly injecting methamphetamine.

Darlene Burns testified that in 1988 she was Joanne Fedor's San Diego County social worker. On August 17, 1988, Burns visited Fedor's trailer. Fedor was distraught and nervous, and showed Burns areas of her carpet. Burns observed dark spots that looked like blood on the living room carpet, and advised Fedor to contact the sheriff. On September 7, 1988, Burns again visited Fedor's home. Fedor gave her a knife and a heater that Burns took to the local sheriff's station.

### e.   Dalton's admissions

Laurie Carlyle testified that in 1992 she had been incarcerated with Dalton.  On one occasion, Carlyle told Dalton their mutual acquaintance Patricia Collins had said hello. Dalton said she did not want to be associated with Collins because Collins could get her in trouble by "run[ning] her mouth."  Dalton asked Carlyle not to mention Dalton in any letters to Collins because "it could cause [Dalton] problems."

Dalton also spoke to Carlyle about Sheryl Baker, whom Dalton called "John-Boy," saying Baker also could cause Dalton problems.  Dalton said she, Baker, and Mark Tompkins were involved in the murder of Melanie May in the "Live Oaks" area. May had been killed by battery acid, and her body was at the bottom of a well on an Indian reservation.  Carlyle exchanged correspondence with Baker in 1993, and at one point told Baker that she, Carlyle, had never met Dalton.  Carlyle did not speak to either Baker or Patricia Collins about the case that she was testifying about, but she did hear "a few things" in 1992 from fellow inmate Sue Aguilar.  Carlyle had suffered prior felony convictions, including a California forgery conviction, a 1993 New Mexico theft conviction, and three or four 1993 New York grand larceny convictions.

Patricia Collins testified that a "couple of months" after Dalton tried to sell Collins the leather jacket, the two were in jail together.  Collins asked Dalton why she killed May, and Dalton said because May "was a rat" who "deserved to die." Dalton gave Collins no details about the murder.  On another occasion, when Dalton visited Collins in jail, she told Collins that if it appeared Collins was going to be "blamed for the murder that [Dalton] would turn herself in."  In a third

23

conversation — Collins did not recall when — Dalton was upset Tompkins was taking credit for "killing somebody that he didn't kill." Dalton also said that she "didn't think that there would be a case because there wasn't a body" and that she wanted to leave town because she did not want to be caught. On cross-examination, Collins recalled Dalton also said that May must be alive and that May was not dead but had left with her boyfriend. On redirect, Collins said Dalton "flopped back and forth all of the time" or apparently gave inconsistent explanations for May's disappearance.

To avoid being blamed for May's murder, and because it was a "sick crime," Collins agreed to cooperate with law enforcement. In November 1988 she engaged in taped telephone conversations with Baker. Collins was released from jail 15 days early as a benefit for this cooperation.

Collins had used methamphetamine intravenously from 1988 to 1991. She had suffered a 1986 felony conviction for conspiracy to manufacture methamphetamine.

Jeanette Bench testified she had been incarcerated with Dalton at Las Colinas Women's Detention Facility (Las Colinas). In 1992, Bench called Dalton a "tramp" or other name, and Dalton "came at" Bench but was stopped by a deputy. This occurred after Bench told authorities about seeing Fedor with the screwdriver. In December 1994, Dalton called Bench a "lying bitch" and said either "I ought to have you killed" or "I ought to kill you." Bench was frightened, contacted law enforcement, and was moved.

On another occasion, Dalton walked by and spat on Bench's window. Investigator Cooksey testified Bench said during an interview that before Dalton spat, she told Bench,

"You don't know anything about this case and that she was dead. She is a dead woman."

At some point, Sherri Fisher was interviewed by Investigator Cooksey about May's disappearance. Immediately after the interview, Fisher went to a park and saw Dalton, who told Fisher "to say I don't know . . . [May], [May] never lived with me, never say the names [*sic*] again." Fisher had sold and occasionally intravenously used methamphetamine in the past, but was not a methamphetamine user when she spoke to Investigator Cooksey.

The prosecution introduced a handwritten note the parties stipulated was written between July 9, 1988, and December 7, 1988, that said: "Look Bud — don't worry, . . . they've got Nothing and will <u>NEVER</u> have anything — dig? I get out February 2, we've got to leave bud — work on that for me, . . . try to find me a place to hide out till you get out and we'll split . . . I'm scared they're not gonna cut me loose — so if they do — I've Got to DISAP[P]EAR! [¶] Help ME — [¶] I Love You, [¶] <u>Lots</u>." Sheryl Baker and Patricia Collins identified the handwriting as Dalton's. David Oleksow, a forensic document examiner, testified he had compared the note to Dalton's known handwriting exemplars and was of the view that Dalton was "probably responsible" for the handwriting on the note.

Judy Brakewood, a drug dealer, testified that in 1988 she was living in El Cajon and knew Dalton. Late one night in May or June 1988, she brought methamphetamine to Steven Nottoli, also known as "Streaker," who was in a green van parked at a 7-Eleven store in Spring Valley. In the van with Nottoli was a woman Brakewood did not recognize. Dalton was about 10 to 15 feet away from the van speaking on a pay telephone. While

Dalton was away from the van and Brakewood was in the van with Nottoli and the unidentified woman, Nottoli told Brakewood "they had shot up this girl with battery acid" and "burned her." When Dalton returned to the van at the "tail end of a conversation," she said, "Yep, we really fucked that girl up." Brakewood described Dalton as "exuberant."

### f. Evidence May was dead

Although May's body was never found, there were several indications she was dead. Bobby May, May's husband, testified May had a daughter from a prior relationship and the couple had two sons. At one point their children were placed in protective custody. May and Bobby attended a parenting class and made great efforts to be reunited with their children. Kandy Koliwer, May's attorney, testified May attended all of the court hearings held before June 30, 1988. Nina Tucker testified that in December 1987, she was the San Diego County Child Protective Services worker assigned to the May family. At that time, May and Bobby had custody of their three minor children under a reunification plan. May made about three court appearances, was present when Tucker visited the May's home, and telephoned Tucker about three times. During a home visit in March or April 1988, May appeared very lethargic and undernourished, and Tucker recommended she seek medical treatment.

On June 10, 1988, Tucker, a social worker, and a law enforcement officer again removed the children from May's home. May subsequently admitted to Tucker she had been abusing drugs and neglecting her children. May appeared with Koliwer at a hearing on June 15, 1988. On June 24, May called Tucker and said she wanted to get her children back, was tired

of being on the street, and wanted to make changes in her lifestyle. Tucker asked May to call her so they could meet at 9:00 a.m. the following Monday (June 27). May seemed pleased, but Tucker did not see or hear from her again. May also failed to appear with Koliwer at a hearing on June 30, 1988, and Koliwer had not seen her since that time.

In Koliwer's view, May's children were the "most important people in [May's] life." May did not indicate she was interested in leaving or abandoning her children, and did not appear to be suicidal. Tucker similarly believed that May loved and was responsive to her children, and gave no indication she would abandon them.

Bobby testified he had not seen May since June 17, 1988, when Bobby was arrested. Bobby also testified, however, that he had seen May after he was released from jail in July 1988.

Phyllis Cross testified that she met Bobby May at some point after May disappeared, and was his girlfriend at times for about three years. Bobby was "very serious" in his efforts to find May. At some point Tompkins told Bobby to stop looking for his wife. Dalton told Cross she thought May was dead; Cross noted, "[T]hat is just what everybody thought."

Sherri Fisher testified that around June 1988, she met May, who was homeless, and invited May to live with her. The last time Fisher saw May, May was leaving the apartment with Sheryl Baker.

Marsha Watson, Sherri Fisher's mother, met Bobby May "months" after she traveled with Sheryl Baker to Yucca Valley in June 1988. He asked for the papers Baker had left at the home. He told Watson he could not find his wife and would like to do so to put her to rest.

Howard Simmons, a document custodian for the San Diego County Department of Social Services (DSS), testified that May and Bobby May received $859 in Aid to Families with Dependent Children (AFDC) and $166 in food stamps each month from April 1986 to June 1987, and from October 1987 to June 1988. May received DSS checks on June 1, 1988, and June 15, 1988, that were cashed by her. The checks stopped in June 1988 because May had not filed the required monthly paperwork by the June deadline. May did not reapply for assistance, and DSS had no further contact with her.

Marla Tottress testified that she was a teletype operator for the San Diego County District Attorney's Office, and in June 1994 and February 1995 she ran a complete records check on the names Irene Louise Clair (May's maiden name), Irene May, Melanie May, and Irene Miller in 50 states and Puerto Rico. In particular, Tottress looked for persons with one of these names on a driver's license or identification card, vehicle registration, arrest warrant, restraining order, "missing persons" report, "criminal history" (meaning if any such individual had been fingerprinted or arrested), and whether such an individual owned real property in San Diego. Tottress found Irene Melanie May had been arrested on June 2, 1988, in San Diego and the case had been dismissed, but Tottress did not otherwise locate a person by any of these names.

### g. *Expert testimony*

Dr. Brian Blackbourne, a pathologist, testified as an expert on the effect of battery acid and electricity on the human body. He explained battery acid is sulfuric acid mixed with water. Sulfuric acid is a corrosive acid that kills "local cells where [it] is placed." The process begins immediately when the

acid contacts the cells. If pain fibers are present, they sense pain until they are destroyed by the acid. If battery or sulfuric acid were injected into a muscle, it would cause a "Charl[ey]-horse type of pain" in that muscle. If the acid were injected into a vein, it would be "much more painful," causing pain for a "short time, seconds" until it was "neutralized by the tissue." Battery acid that had only a local effect would not be lethal. If enough acid were injected to "get into the blood stream to cause the whole body acid base balance to be affected" and "go into acidosis, that could be serious," and would probably take several hours to occur. On cross-examination, Dr. Blackbourne agreed with defense counsel that persons can also die from natural causes, asthma attacks, hepatitis, or methamphetamine overdoses.

The hypodermic syringe generally used by drug users was one cubic centimeter. This amount of acid would have predominantly local effects and not cause death, but Dr. Blackbourne would expect the person to scream and jerk around.

Electricity has "two effects," the first of which effect is local. Skin "has a fairly high resistance to electricity," so as electricity passes through the skin it "causes intense heat to be produced just at that local place." If the voltage is 110V, or normal household current, and the current is sustained for minutes, the electricity would cause a burn. The second effect is electrocution, which occurs when "electricity goes through the body," and "in so doing goes through either the heart or the brain." Combining an injection of battery acid with an electrical contact would result in two sources of pain that were additive.

Only "awfully severe" pain causes unconsciousness. A severe enough blow from a pan could cause unconsciousness. It

was "usually quite certain" that if a person were going to become unconscious as the result of a blow, he or she would "utter some sort of sound."

### 2. *Defense evidence*

#### a. *Physical evidence*

Investigator Cooksey testified that the folding knife Joanne Fedor gave Darlene Burns tested negative for the presence of blood. On September 15, 1988, and November 16, 1988, law enforcement forensic teams unsuccessfully searched Fedor's trailer for the presence of blood.

Randolph Robinson, the supervising criminalist for the San Diego Sheriff's Crime Lab, testified that on September 15, 1988, he and several law enforcement officers searched Fedor's trailer in Live Oak Springs for three hours for the presence of blood. Robinson checked the carpets, baseboards, walls, and ceilings in every room in the trailer, as well as appliances and other items, and did not detect the presence of blood.

Criminalist Walter Fung, who in 1988 worked for the San Diego County Sheriff's Department, testified that on November 16, 1988, he and two law enforcement officers searched Fedor's trailer for two and a half to three hours. Fung visually searched the carpets, ceilings, and walls of the master bedroom and bathroom, living room, and parts of the kitchen and pop-out room for blood. He took three pieces of the carpet pad under a bed in the master bedroom, a piece of carpet from the kitchen and the living room threshold area, and a piece of tile from under the refrigerator in the kitchen back to the Sheriff's Department laboratory for testing. None of the items tested positive for the presence of blood.

Lauren Najor testified her husband was one of the owners of the trailer park in Live Oak Springs, and they lived in space 23. In June 1988, Fedor lived in space 25. Between the time Fedor moved out of the trailer and the 1991 forensic testing, the trailer was occupied by a series of at least three different renters.

### b. Second Baker interview

In its case-in-chief, the prosecution played for the jury the redacted tape of Sheryl Baker's March 4, 1992 interview with law enforcement in which she told officers that May had said, "I don't wanna die," and "[p]lease don't kill me, I'm sorry." The defense played for the jury the tape of Baker's July 5, 1994 interview with law enforcement in which she told police she did not think May was alive when Baker and Tompkins returned to the trailer because May made no sound during the attack, and Baker was not sure whether she had moved. Baker also said she did not recall seeing a bloody pillow or any other bloody object. Baker fell asleep on the way to the honor camp and apparently woke up when Tompkins was dropping Fedor off. At that time, Fedor did not tell them when her visit would end or ask them to pick her up.

### c. Impeachment of prosecution witnesses

As explained more fully in part II.A.1.c., the defense theorized that Mark Tompkins made no statements concerning the murder to his cellmate Donald McNeely, but rather McNeely surreptitiously read materials regarding the case that Tompkins possessed in the cell. Alan Fenton, a defense attorney, testified that in May 1992 he had been appointed to represent Mark Tompkins. By June 1992, Fenton had received two to three thousand pages of case reports related to the

charges against Tompkins. Fenton gave Tompkins documentation of his statements to others regarding his alleged involvement, copies of his codefendants' interviews, and press releases relating to his case. These materials included references to giving someone a "hotshot," placing a body into a car, and cutting up a body, as well as references to the location of the alleged homicide, a skillet, an Indian reservation, and the phrase "to help her out of her misery." They also included references to other locations where the body or parts of the body could be found, as well as conflicting stories as to whether the body had been burned or cut up.

Investigator Cooksey testified that when he interviewed Alisha Fedor on September 12, 1991, she was not sure whether she had seen a screwdriver.

Pamela Aitchison testified that Patricia Collins had a reputation in the community as a dishonest person and a thief.

### d. *Expert testimony*

Apparently to impeach those prosecution witnesses who used methamphetamine and to support a defense theory that May could have died from natural causes, the defense called Dr. Clark Smith, a psychiatrist who served as the medical director of Vista Pacifica, a drug and alcohol treatment hospital, and the clinical director for the drug and alcohol treatment programs at Mesa Vista Hospital and Vista Hill Foundation. Dr. Smith testified as an expert on the effects of methamphetamine use.

Intravenous use of methamphetamine was the most severe form of addiction and had the greatest effect on the person using the drug. Methamphetamine is a type of amphetamine. A quarter of a gram or 250 milligrams of

methamphetamine was 50 times the amount of amphetamine in a typical diet pill and a "dangerous amount" for a person to use.

Intravenous methamphetamine use commonly causes psychosis or "truly believ[ing]" one sees or hears something that is not really there. The possibility of psychosis, including psychotic delusions and visual or tactile hallucinations, increases as the individual uses more amphetamine. Hallucinations are common with methamphetamine abuse, occurring in close to 90 percent of users. Seeing blood that is not in fact present is a common visual hallucination reported by individuals Dr. Smith had treated. If impurities are present in the methamphetamine used, it can cause hallucinations "for protracted periods of time with unexpected severity using what seems to be a small amount of the drug." Psychotic delusions, such as believing that "the police . . . are after you" or persons on the street are discussing you, are also common. Individuals might contact law enforcement because they believe they are victims of a crime that has no basis in fact. Distortion of a person's perception of time and reality is exacerbated by the extreme sleep deprivation that results from methamphetamine abuse.

When a person has used methamphetamine over a period of time and injects a quarter of a gram, eight to 10 hours later the drug remains in the brain and bloodstream, the user is still under its influence, and the user can experience psychosis, paranoia, hypervigilance, and delusions that someone is attacking him or her. Hallucinations and delusions generally cease after a person completely stops using methamphetamine and the drug is cleaned out of his or her system. Dr. Smith had repeatedly observed individuals who were clean of

methamphetamine but "still believe[d] the psychotic delusions" they had experienced because the delusions had been "so vivid."

Methamphetamine use changes the physiology and chemical balance of the brain, often depriving the brain of its "normal neurotransmitter, such as the normal adrenalin that's in the brain." Methamphetamine also constricts vessels and cuts off the blood supply to the brain causing "microscopic strokes" or small portions of the brain to die.

Impurities in methamphetamine can damage the heart, liver, and kidneys. For those who suffer from asthma, impurities can cause a pulmonary embolism and can trigger severe asthma attacks that may result in death. Combining asthma medication and methamphetamine can cause heart attacks or heart fibrillation. If a user has decreased liver function due to hepatitis, a usual dose of methamphetamine can be lethal.

On cross-examination, Dr. Smith testified that if a person were under the influence of methamphetamine and hence more likely to be dehydrated, have poor nutrition, and be in a generally weakened state, electricity "would probably hurt the person."

## B. Prior Convictions

In a separate proceeding outside the presence of the jury, Dalton admitted that in March 1984 she had suffered felony convictions for credit card forgery and petty theft with a prior conviction (former §§ 484, 666), she had served a prison term for these offenses, and she had not remained free of prison and the commission of an offense resulting in a felony conviction for five years after her release from prison. (Former § 667.5, subd. (b).) She also admitted that on June 4, 1985, she suffered a prior

serious felony conviction for burglary. (Former §§ 459, 667, subd. (a), 1192.7, subd. (c)(18).)

## C. Penalty Phase

### 1. Prosecution Case

Cynthia Johnson testified that in February 1992, she was living with her husband in a recreational vehicle in Jamul. Johnson was caring for her mother, who lived in a house on the property and was dying of cancer. Johnson's mother was taking large doses of morphine. About 11:30 on the morning of February 3, 1992, Johnson was alone in the trailer. A man with a white hockey mask and a woman in a ski mask entered through her unlocked screen door. The man hit Johnson repeatedly in the head with a flashlight. While he did so, the woman took Johnson's purse and jewelry case and her mother's medication, and left. Johnson bit the man, and he fled. Johnson ran after them. The man removed his mask, and the woman got into a car. Johnson wrote down the license plate number and called 911. About 15 minutes later, Johnson identified the man, the woman, who was Dalton, and Johnson's purse to police. Johnson suffered a slight concussion and continued to get headaches at the time of her testimony. Two months after the attack, her mother died and Johnson suffered a nervous breakdown. The parties stipulated that Dalton pled guilty to robbery for this offense.

Dawn Crawford testified that in October or November of 1994, she was incarcerated at Las Colinas in room 169 of the B-1 housing area. Each room had a door rather than bars in front. At some point during this time period Dalton was housed next door to Crawford in room 168. Through an emergency call box on the wall, Crawford could hear voices in the next room.

On one occasion, when the doors to both room 168 and room 169 were closed, Crawford heard Dalton speaking with inmate Terry Carbaugh. Dalton said she had participated in a murder. She referred to the victim as "the bitch" and said the victim had owed Dalton $80. The victim was tied and injected with battery acid. Dalton said that "hearing her scream was the greatest high that she has ever experienced." The victim was stabbed in the head and "cut up and mutilated." Dalton mentioned an Indian reservation. Dalton also mentioned a woman named "John-Boy" and said "John-Boy better keep quiet." During the conversation, Dalton was "laughing . . . like it was no big deal."

On cross-examination, Crawford testified it was common knowledge at Las Colinas that conversations could be heard between the rooms through the call boxes. She had taken notes of the conversation when it occurred, but she could not find them. At some point Crawford was housed in the same area as Sheryl Baker and spoke to her. Crawford had "received a lot of death threats from inmates about this case" and was "very concerned about [her] safety."

In October or November of 1994, Crawford was facing an assault with a deadly weapon charge and a weapon enhancement allegation. On November 30, 1994, she pled guilty to assault by means of force likely to produce great bodily injury, and the weapon allegation was dismissed.

Pamela Johnson testified that on September 13, 1993, she was incarcerated at Las Colinas and had been subpoenaed to appear in court regarding Dalton's case. Johnson had previously participated in a taped interview about Dalton's case

with Investigator Cooksey. Apparently as a result, the two women were to be kept separate from one another.

On September 13, Johnson was sitting in the Las Colinas visiting area, a "holding area for inmates going to court," speaking to another inmate. Dalton approached and told the other inmate to leave. Dalton said that Johnson "was a snitch, and that if I snitched out on her I would pay for it." Dalton also said, "[N]o matter where I was, whether I was in jail or out of jail, she could get to me; if I snitch[ed] on her that I would die." Dalton also asked Johnson how it felt "having a son of a junkie, just like me." When Johnson started to get up, Dalton said Johnson could not get away from her, and Dalton elbowed Johnson in her right rib area, bruising her. Dalton said Johnson was going to die, and asked Johnson if she had heard from her husband or son lately. Johnson yelled for Dalton "to get out of my face." Deputies intervened and separated the women.

Johnson and Dalton were subsequently placed on a bus to the courthouse. Dalton told the inmate to whom she was handcuffed that Johnson was a "snitch" and causing Dalton "to serve lots of time." To be called a "snitch" in custody meant "you're turning on your own kind," and "that you have to pay for it." Johnson had suffered prior convictions for welfare fraud and credit card forgery.

The parties stipulated to Dalton's prior convictions and the dates on which she was in custody in state prison.

### 2. *Defense Case*

Victoria Perez, Dalton's sister, testified that Dalton's 12-year-old daughter Hannah had been adopted by Perez. Hannah had lived with Dalton until she was two and a half years old.

Perez had moved to Washington State about a year before her 1995 testimony. Before then, she had lived in San Diego and had visited Dalton at the Las Colinas jail weekly. Perez also wrote to and spoke on the telephone with Dalton and had continued to do so after her move to Washington. Hannah and Perez's other children loved Dalton.

Perez was religiously devout, and her visits with Dalton often were about their shared faith. Perez was impressed by the depth of Dalton's knowledge of scripture and her understanding of Christianity. Dalton was repentant and understood "she hadn't walked the way [the] Lord wants her to." Dalton was enrolled in a theology school and hoped to minister to others in prison, help them to know they were loved by God, and break the cycle of being incarcerated. Dalton had been a blessing to Perez and her family the past three years, and Perez did not want her to die.

Todd Thorpe, Dalton's brother, testified that Dalton had "turned her life around" and was trying to "do good for herself and others." Thorpe loved Dalton and wanted her to live. He believed she could touch other lives in prison and "lead them to make the right decisions in their life and turn things around."

Rosalie Thorpe, Dalton's mother, testified Dalton was born on January 24, 1960. She had two sisters and a brother. Dalton had five children, three girls and two boys, who were six to 16 years old. Two of Dalton's daughters, Brianne and Christiana, lived with and had been adopted by Rosalie. Brianne stopped living with Dalton when she was two months old, and Christiana had gone home with Rosalie after she was born. Dalton's oldest child, David, lived with his father and had not lived with Dalton since he was four and a half years old because

of Dalton's drug use. Her other son, Jason, who was 10, lived with Dalton for about eight months, before living with Dalton's sister Laurie.

Rosalie, Brianne, and Christiana had started visiting Dalton about five months before Rosalie's March 1995 testimony. Rosalie had heard from other family members and Dalton's chaplain that Dalton had changed long before then, but Rosalie could not "comprehend it." Brianne and Christiana loved Dalton "very much." During the visits, the girls sang songs to Dalton over the phone, longed to touch her, and blew her kisses and said "I love you" as they left. At night Christiana, who was six years old, prayed Dalton could rejoin her family.

Rosalie believed Dalton had "completely changed" and knew in her heart, "as her mother, that she is different." In Rosalie's view, "drugs took [Dalton] from our family," "[s]he is now back," and it was "a miracle." Rosalie and the rest of Dalton's family "pray[ed] that she lives." Rosalie did not believe Dalton had "killed anybody."

Keith LaChance, Dalton's father, testified that he left the family in 1966 when Dalton was six years old. He next had contact with Dalton when she was 15 years old, and she came to live with LaChance for a few months in Fairbanks, Alaska. Dalton was well-behaved, and did not use drugs or alcohol. The next time he saw Dalton was in August of 1992 when she was 32 years old and had been arrested for murder. Since 1992, he had become close to Dalton, saw her on a regular basis, and wrote to her when he needed to travel. He had sacrificed "just about everything to have this relationship, and I hope I get to continue it."

Reverend Romie Cervantes, who supervised the chaplains at Las Colinas, testified that she had known Dalton since 1992. At first, Dalton was "mean," profane, and argumentative. Reverend Cervantes met weekly with Dalton, and had watched her "grow into a beautiful Christian woman." Dalton "soak[ed] . . . up" "everything that we've taught her," and Reverend Cervantes believed her religious commitment was genuine. Because Reverend Cervantes was a volunteer, she considered her time valuable and thus spent it with people who "are hungry and [who] really want God, not just . . . somebody that's playing church in jail." Although Dalton had not shared the details of her past, she told Reverend Cervantes she had "done awful things" and had expressed remorse for "everything that she's done." Reverend Cervantes did not want Dalton to receive the death penalty because she had witnessed the difference Dalton made in other inmates' lives.

Charlene Gill, a church ministry volunteer, testified she led a Bible Study twice a month at Las Colinas. She had known Dalton since October 1992, or nearly two and a half years. Dalton had been faithful in her attendance, paid attention, and asked questions. She related well, often "lovingly," to her classmates. Dalton was strongly "committed to the Lord, and she's trying to live her life for him now."

Duetta Bellamy testified that she had been a Bible study teacher at Las Colinas for about 15 months. During that time Dalton had actively participated in the group and was kind and supportive to other members. Once when another inmate had a seizure, Dalton immediately comforted and prayed for her until the guards arrived. Dalton's cell mates who were in the group thought "very highly of her and look[ed] up to her as a . . .

witness of the Lord." Bellamy believed Dalton would be of assistance to other inmates as a lay minister.

In response to Dawn Crawford's testimony, on February 28 and March 2, 1995, Marion Pasas and Allan Cotten, licensed private investigators, conducted an experiment at Las Colinas. They were unable to locate rooms 168 and 169 in the B–1 housing area (the rooms testified to by Dawn Crawford) but did locate rooms 268 and 269.

Cotten entered room 268 and Pasas entered room 269, and the doors to each room were closed. Cotten spoke in a conversational tone in room 268. Pasas stood in different parts of room 269 but could not hear him. The two then switched rooms and repeated the experiment with the same result. Pasas then put her ear to the vent in room 268, which was not physically possible for her to do in room 269, and heard muffled voices and a woman yelling. Except for the woman who was yelling, Pasas could not distinguish any voice or understand their conversation. Pasas heard no sound through the call box. The call box in room 269 was located higher on the wall than the call box in room 268. Pasas and Allan did not bring a tape recorder.

Theresa Carbaugh, who had suffered a prior felony conviction for drug possession for sale, testified that in the fall of 1994 she had been incarcerated in the B–1 housing area at Las Colinas and shared a room with Dalton. Dalton was religiously devout, sensitive, caring, and thoughtful to others. The two studied scripture together, and Dalton encouraged Carbaugh to attend church and not to judge others.

Dalton never discussed her case with Carbaugh and, in particular, did not describe cutting up or mutilating a woman,

refer to anyone in her case as a "bitch," tell her that the victim was tied up and injected with acid, say that hearing someone scream was the greatest high she had ever experienced, mention an Indian reservation, or say that John-Boy should keep quiet.

On the wall of the room Carbaugh and Dalton shared, there was a small box through which inmates could contact deputies and deputies could at all times listen to inmates. The box was not used to listen to other inmates' conversations, and it was not possible to understand a conversation in the next room.

Dawn Crawford was incarcerated in the room next to Carbaugh and Dalton. In Carbaugh's opinion, Crawford was "a liar" and had a reputation for being a dishonest person.

Robin Wilson testified she was incarcerated in housing area B−2 at Las Colinas. She had suffered prior felony convictions for attempted robbery and grand theft, and had used various aliases, birth dates, and social security numbers. She testified that persons who spoke into the intercom speakers on the walls of the rooms in housing area B−2 could be heard by deputies in the coffee shop if the deputies' switch was on. The intercom did not need to be activated to be used, but a button could be pushed by an inmate to alert deputies that the inmate wanted to speak with them. Wilson also said that if she was in her room with the door locked, she could not hear normal conversation in a room next door through the intercom.

Gwyndolyn Coleman testified she had been incarcerated at Las Colinas since July 1994 and had suffered felony convictions for assault on a cohabitant, assault with a deadly weapon, robbery, and forgery. Coleman was the lead trustee for the B−1 housing area and also had access to the B−2 housing

area. Coleman believed Dalton to be compassionate because she regularly gave food items from the jail store to needy inmates, and she described Dalton as one who "mostly reads her Bible" and "minds her own business." Dalton had never spoken with Coleman about her case. Crawford had been housed in both the B–1 and B–2 housing areas, and had a reputation for being "deceitful, evil and a liar."

Judith Reeves testified that in 1994 she had managed an apartment building in which Crawford was a tenant for about three and a half months. At no time was Crawford honest with Reeves — "everything was upside down, wrong, a lie." Crawford also had a reputation for dishonesty in the community.

Jeannie Shim lived at the same apartment complex as Reeves and had met Dawn Crawford about one and a half years before her testimony. "[J]ust about everything [Crawford had] ever told [Shim] ha[d] turned out to be a lie." Crawford had also stabbed Shim and pled guilty to the crime, and had stolen from her.

Cameo Brooks testified that in September 1993, while incarcerated at Las Colinas, she was in the jail visiting room with Pamela Johnson waiting to be taken to court. Dalton entered the room and conversed with Brooks. While they spoke, Johnson "got hysterical," screamed for the deputies, and said, "I'm not supposed to be in the same room with this lady." Deputies removed Dalton. Dalton had neither threatened nor struck Johnson.

Brooks, Dalton, and Johnson were then taken on the bus to court. Dalton did not speak of Johnson while they rode and, in particular, did not threaten her or call her a "rat." Brooks

had previously suffered convictions for possession of a stolen vehicle and second degree burglary.

Michele Pease testified that she was incarcerated at Las Colinas. She had previously suffered convictions for grand theft and possession of a check with intent to defraud. Pease had lived in the same housing area as Dalton from October 1994 to February 1995, and the two had studied the Bible together nearly every day. When Pease spoke with Dalton in Dalton's room, the two did not discuss their cases but rather their children and the difficulties of being incarcerated. Although it was possible to hear voices in the room next door, it was not possible to discern what was being said.

The parties stipulated that Dalton had appeared in court 43 times between October 26, 1992, and February 6, 1995, when evidence was first introduced at trial.

### 3. *Rebuttal*

San Diego County Probation Officer Carol Roberts testified that in February 1987, she interviewed Dalton while preparing a probation report for her. Dalton denied having a substance abuse problem and said she had been attending Narcotics Anonymous meetings. In Dalton's written statement submitted to Roberts, Dalton "talked about making some life changes," said she had been "talking with a Christian drug program leader for Victory Outreach," a Christian residential treatment program, and wondered, "If God cannot show me . . . I wonder if it's possible for anyone or anything to help[?]" On March 7, 1987, Dalton was admitted to a substance abuse program called New Entra Casa.

The parties stipulated that between December 1992 and January 1995, Dalton had committed 12 rule violations at Las

Colinas that had resulted in disciplinary action. No criminal charges had been filed.

San Diego County District Attorney's Office Investigator David Decker testified that on March 2, 1995, he and Investigator Cooksey visited rooms 268 and 269 in the B−1 housing area at Las Colinas. One investigator went into room 268 and the other into room 269, and the doors to each room were closed. Although not aligned, the speaker boxes in each room were mounted back to back on the same six-inch thick cinder block wall. The speaker boxes were also used to monitor the room electronically. Investigators Decker and Cooksey were able to communicate through the "air space in the speaker."

On March 4, 1995, Investigators Decker and Cooksey returned to the rooms and successfully repeated their experiment while using a tape recorder. Decker started a foot from the speaker box, moved away and then back toward the box. The investigators also removed the speaker grills and observed a four-inch long hollow electrical conduit that connected the speaker boxes and conducted the sound. The tape made during this visit was played for the jury.

Investigator Cooksey also testified regarding the speaker experiment. On cross-examination, he said he had placed the tape recorder about one to two inches from the speaker box. When he interviewed Dawn Crawford on February 3, 1995, she had "referred to the device that she heard the conversation through as the vent."

Athena Shudde testified she was an attorney who had previously represented Mark Tompkins. On October 1, 1993, at a pretrial hearing attended by Tompkins and Dalton, Dalton spat in the direction of Tompkins.

## II. DISCUSSION

### A. Guilt Phase Issues

#### 1. *Jailhouse informant*

Dalton contends the trial court erred in admitting the hearsay statements of Mark Tompkins through the testimony of jailhouse informant Donald McNeely and in limiting her cross-examination of McNeely. We reject the claim.

Before trial Dalton filed a motion to preclude admission of Tompkins's statements to McNeely on the grounds that they were inadmissible under Evidence Code section 1230 and violated her right to confrontation. Dalton also asserted that because Baker would be testifying, the prosecution no longer needed "codefendants' hearsay statements in order to establish corpus." The trial court admitted the statements under Evidence Code section 1230 (as statements against interest), redacted the statements, including changing all plural personal pronouns to singular personal pronouns, and allowed the statements to be used to "establish that events occurred in the trailer," or "corpus," such as the use of electric shock, the "hot shot," and a knife, but not to implicate Dalton.

Before McNeely testified, Dalton again unsuccessfully objected, as relevant here, on the grounds raised before trial.

McNeely, who had suffered 12 California burglary convictions and four Missouri felony convictions, testified that for three months, from June to August of 1992, he had shared a cell at the San Diego County jail with Tompkins. As noted, McNeely testified that during their time as cellmates, Tompkins told McNeely he was "in on a murder charge" and called it a "torture slaying." (See *ante*, p. 11.) Tompkins said the victim was "Melanie May," and the murder occurred in June of 1988 in

a "house trailer" in the "Live Oak Springs, Boulevard area." Tompkins said that he was "really into violence," that he "tortured the hell out of her," and that "pain was the name of the game." In McNeely's view, Tompkins "seemed to enjoy it." Tompkins said the "original plan was to give Miss May a hotshot" and that Tompkins did so. Tompkins also said he had given May a "shock treatment," and McNeely believed he mentioned an electrical cord. Tompkins also mentioned a screwdriver, knife, and a heavy kitchen skillet, saying "they work wonders on the knees." Tompkins "got tired of it" and "just wanted it to end," so he stabbed May with a knife. Tompkins told McNeely he put May's body into a vehicle and took it to a nearby Indian reservation. He then dismembered the body so it would be more difficult to locate.

After cross-examining McNeely, Dalton unsuccessfully moved for a mistrial based on his testimony.

Investigator Cooksey testified that McNeely did not request, and he was not promised and did not receive, any benefit for testifying. On cross-examination, Investigator Cooksey agreed with defense counsel that Investigator Cooksey told McNeely that in exchange for his cooperation, a letter might be written by the district attorney's office to the sentencing judge advising the judge of McNeely's cooperation.

The trial court instructed the jury that McNeely was an "in-custody informant" and that his testimony "should be viewed with caution and close scrutiny."

### a. Statement against interest

Dalton asserts that "[i]ntroduction of Tompkins' unreliable hearsay statements . . . violated the state hearsay rule." We reject the contention.

47

Evidence Code section 1230 provides in relevant part: "Evidence of a statement by a declarant having sufficient knowledge of the subject is not made inadmissible by the hearsay rule if the declarant is unavailable as a witness and the statement, when made, . . . so far subjected him to the risk of . . . criminal liability . . . that a reasonable man in his position would not have made the statement unless he believed it to be true." "To demonstrate that an out-of-court declaration is admissible as a declaration against interest, '[t]he proponent of such evidence must show that the declarant is unavailable, that the declaration was against the declarant's penal interest when made and that the declaration was sufficiently reliable to warrant admission despite its hearsay character.' [Citation.] 'In determining whether a statement is truly against interest within the meaning of Evidence Code section 1230, and hence is sufficiently trustworthy to be admissible, the court may take into account not just the words but the circumstances under which they were uttered, the possible motivation of the declarant, and the declarant's relationship to the defendant.' " (*People v. Grimes* (2016) 1 Cal.5th 698, 711 (*Grimes*).) The determination of whether a statement was against the declarant's interest when made is reviewed for abuse of discretion. (*People v. Valdez* (2012) 55 Cal.4th 82, 143 (*Valdez*).)

Here, the trial court could reasonably have concluded that Tompkins's statement to his cellmate describing his torture and murder of May "so far subjected [Tompkins] to the risk of . . . criminal liability . . . that a reasonable man in [Tompkins's] position would not have made the statement unless he believed it to be true." (Evid. Code, § 1230.)

Dalton claims that Tompkins's statements were unreliable because McNeely and Tompkins both lacked

credibility. As to McNeely, "[w]e have previously rejected the argument that 'in considering the admissibility of evidence offered under' Evidence Code section 1230 'the trial court could properly consider the credibility of the in-court witness,' and observed that '[n]either the hearsay rule nor its exceptions are concerned with the credibility of witnesses who testify directly to the jury.'" (*People v. Rangel* (2016) 62 Cal.4th 1192, 1219 (*Rangel*).)

As to Tompkins, Dalton asserts that a "statement of one inmate bragging to another inmate about crimes committed is not necessarily against penal interest at the time or under the circumstances it was made." In her view, "[i]t appears that . . . . Tompkins was not confiding in McNeely so much as bragging or puffing" and that Tompkins "was in custody and wanted to be perceived of as tough." But Dalton's argument shows "'only that a court might perhaps have been able to arrive at the conclusion that [Tompkins's] statement did not so far subject him to the risk of criminal liability that a reasonable person in his position would not have made it unless he believed it to be true. [It] simply do[es] *not* show that a court was unable to arrive at the opposite conclusion. Therefore, [it does] not establish an abuse of discretion.'" (*Valdez, supra*, 55 Cal.4th at p. 144.)

As to this and other claims, Dalton alleges for the first time that the error complained of violated her federal constitutional rights. To the extent that in doing so she has "raised only a new constitutional 'gloss'" on a claim preserved below, that new aspect of the claim is not forfeited. (*People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 364 (*Bryant, Smith and Wheeler*).) At the same time, "'[n]o separate constitutional discussion is required, or provided, when

rejection of a claim on the merits necessarily leads to rejection of [the] constitutional theory . . . .' " (*Ibid.*)

### b. *Reliability*

Dalton contends that Tompkins's statements were unreliable and hence their admission was improper under *Ohio v. Roberts* (1980) 448 U.S. 56 (*Roberts*) and violated her right to due process. In *Crawford v. Washington* (2004) 541 U.S. 36 (*Crawford*), the United States Supreme Court overruled *Roberts*, "which had held that the confrontation right does not bar admission of the out-of-court statements of an unavailable witness if the statements 'bear[] adequate "indicia of reliability." ' Rejecting this approach, *Crawford* held that, in general, admission of 'testimonial' statements of a witness who was not subject to cross-examination at trial violates a defendant's Sixth Amendment right of confrontation, unless the witness is unavailable and the defendant had a prior opportunity for cross-examination. (*Crawford*, at pp. 59–60, 68.)" (*Rangel, supra,* 62 Cal.4th at p. 1214.)

Contrary to Dalton's assertion, the high court " 'has made clear that *Roberts, supra,* 448 U.S. 56, and its progeny are overruled for all purposes, and retain no relevance to a determination whether a particular hearsay statement is admissible under the confrontation clause.' " (*Rangel, supra,* 62 Cal.4th at pp. 1217–1218.) Rather, "a statement cannot fall within the Confrontation Clause unless its primary purpose was testimonial." (*Ohio v. Clark* (2015) 576 U.S. __, __-__ [135 S.Ct. 2173, 2179-2180]; *People v. Cortez* (2016) 63 Cal.4th 101, 129 (*Cortez*).) It " 'is the testimonial character of the statement that separates it from other hearsay that, while subject to traditional limitations upon hearsay evidence, is not subject to the

Confrontation Clause.'" (*Rangel*, at p. 1217, italics omitted, quoting *Davis v. Washington* (2006) 547 U.S. 813, 821.)

Here, Tompkins's statements to his cellmate "were not made to law enforcement officers, nor were they otherwise made under circumstances suggesting a primary purpose of creating evidence" for Dalton's prosecution. (*Rangel*, *supra*, 62 Cal.4th at p. 1217.) The statements therefore were not testimonial. (*Ibid.*; cf. *Ohio v. Clark*, *supra*, __ U.S. at pp. __−__ [135 S.Ct. 2173, 2181−2183] [three-year-old's statements to his preschool teachers not testimonial because they "clearly were not made with the primary purpose of creating evidence for [the defendant's] prosecution"].)

In her reply brief, Dalton appears to acknowledge that *Davis v. Washington*, *supra*, 547 U.S. 813, filed six months before her opening brief, foreclosed her claim that nontestimonial statements continue to be subject to the test in *Roberts*, *supra*, 448 U.S. 56. She therefore attempts to recast her confrontation clause claim as one under the due process clause, asserting: "While the full scope of *Davis* is not clear, it is wholly inconsistent with due process to admit into evidence at a capital trial the unreliable hearsay statement of a declarant who lacks credibility and is not available for cross-examination, through the testimony of a skilled con artist-informant."

We have rejected above Dalton's claim that Tompkins's statements were so unreliable they failed to satisfy the requirements of Evidence Code section 1230. (See *ante*, pt. II.A.1.a.) Dalton cites no additional compelling basis for concluding these statements were nonetheless so unreliable that their admission violated the due process clause.

Nor does Dalton cite any persuasive basis for concluding that McNeely's testimony recounting Tompkins's statements was so unreliable as to violate the due process clause. We conclude below that the challenged limitations on McNeely's cross-examination were either not erroneous or not prejudicial. (See *post*, pt. II.A.1.c.) Moreover, " ' "[a]lthough an appellate court will not uphold a judgment or verdict based upon evidence inherently improbable, testimony which merely discloses unusual circumstances does not come within that category. [Citation.] To warrant the rejection of the statements given by a witness who has been believed by a trial court, there must exist either a physical impossibility that they are true, or their falsity must be apparent without resorting to inferences or deductions. [Citations.] Conflicts and even testimony which is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends." ' " (*People v. Maciel* (2013) 57 Cal.4th 482, 519 (*Maciel*).) Here, nothing about McNeely's testimony was inherently unbelievable or implausible.

### c. *Restricted impeachment*

Dalton asserts that the trial court prejudicially precluded impeachment of McNeely with the prosecutor's characterization of him in a different case as a "manipulator" and with the circumstances underlying his prior felony and misdemeanor convictions. We reject the claim.

### 1) *Factual background*

Before McNeely's testimony in Dalton's case, he had previously been prosecuted for 12 counts of burglary by Deputy

District Attorney Jeff Dusek, the prosecutor in Dalton's case, and Deputy District Attorney Robert Phillips. In the prosecution's 1989 statement in aggravation in eight of McNeely's burglary cases, Deputy District Attorney Dusek described how McNeely dressed as an exterminator to gain entry to one of his wealthy victims' homes, went to the home when only a housekeeper was present, and stole jewelry worth $65,000. Deputy District Attorney Dusek stated: "This is perhaps one of the most sophisticated burglary series [of crimes] to come through this court," and although McNeely's "outward appearance[] and lifestyle[]" was not that of a "typical burglar," examination of his "soul and conscience" reveal a "confirmed thief and conman." He continued: "The only difference between this burglar and the vast majority is that this defendant is not satisfied with a 'nickel and dime haul,'" and "has the looks, brains, and wherewithal to make the big score. In fact, he scored big eight separate times."

McNeely pled guilty. In January 1990, he moved to withdraw his plea, attaching a supporting declaration by his mother. McNeely's mother stated that at the preliminary hearing, she had seen Deputy District Attorney Dusek showing what appeared to be photographs to individuals who appeared to be witnesses entering the courtroom, heard the witnesses say, "That is him," and therefore believed the prosecutor was showing the witnesses photographs of McNeely and "verifying that . . . this was the person who they were going to see in Court." In the prosecution's opposition to McNeely's motion to withdraw his plea, Deputy District Attorney Dusek described McNeely as a "manipulator" and a "desperate man" whose "day of judgment is near and [who] will resort to any tactic to postpone a lengthy prison sentence."

Before trial in this case, Dalton subpoenaed Deputy District Attorneys Dusek and Phillips as defense witnesses. The San Diego County District Attorney's Office moved to quash the subpoenas, and the trial court granted the motion. As to Deputy District Attorney Dusek, the court stated that no attorney involved in a case should be called as a witness without an "absolute compelling need," and no such need was demonstrated here because McNeely could be impeached with his prior convictions. Dusek's testimony would therefore be cumulative. The court also found Dusek had not stated an opinion as to McNeely's veracity in the statement in aggravation and that the statement in aggravation was inadmissible hearsay.

At trial, during his testimony on direct, McNeely testified he had previously suffered 12 California burglary convictions and four Missouri felony convictions for burglary and firearm theft. He also said he had come forward about Tompkins's statements because "I'm not a violent person myself, and . . . after hearing it over the course of days and weeks . . . it really got to me after awhile; and . . . you start the [*sic*] feel for this — ." Dalton's objection was sustained, but the court declined her request to strike the answer, stating, "The answer will stand."

On cross-examination, defense counsel asked, "[D]o you consider yourself to be a confirmed thief and con man?" McNeely replied, "I would say at one time, yeah, that[] . . . would have been appropriate. Prison has changed me somewhat." Counsel asked, "Would you agree with this statement about you, that you're a manipulator?" The trial court sustained the prosecutor's relevance objection. Counsel asked, "Mr. McNeely, are you a manipulator?" McNeely said, "I don't know. Some people may say that. . . . I wouldn't say it." Counsel

subsequently asked if during the felonies McNeely "posed as an exterminator." The trial court sustained the prosecutor's relevance objection. At sidebar, defense counsel explained that in their view McNeely was manipulating the court and had read Tompkins's documents and was simply testifying to what he read. They sought to ask McNeely about his method of operation in posing as an exterminator in eight of the burglaries and a drapery cleaner in the four other burglaries to obtain trust and access to money and jewelry, and to demonstrate "he is a manipulator" and "an imposter." The trial court denied the request on the ground that "the law of impeachment of prior felonies is you get to ask the nature of the felony and when it occurred; and I've allowed you to do that."

Dalton also sought to impeach McNeely with the circumstances surrounding his misdemeanor convictions. The trial court excluded the evidence, finding the convictions were remote in time, and would involve undue consumption of time given that McNeely could be impeached with at least 10 prior felony convictions. (Evid. Code, § 352.)

### 2) Analysis

#### (a) Subpoena

Dalton asserts the trial court erred in quashing her subpoena of Deputy District Attorney Dusek because his statements in the statement in aggravation and opposition to McNeely's motion to withdraw his plea were admissible as statements of a party-opponent under Evidence Code section 1220. Evidence Code section 1220 provides: "Evidence of a statement is not made inadmissible by the hearsay rule when offered against the declarant in an action to which he is a party in either his individual or representative capacity,

regardless of whether the statement was made in his individual or representative capacity." Dalton did not raise this ground of admissibility below, and it is therefore forfeited. (Evid. Code, § 354; *People v. Ervine* (2009) 47 Cal.4th 745, 779.)

Even if the issue was preserved, and assuming the statements were admissible under Evidence Code section 1220, Dalton fails to demonstrate that Deputy District Attorney Dusek should have been called as a witness. " 'Only in extraordinary circumstances should an attorney in an action be called as a witness, and before the attorney is called, defendant has an obligation to demonstrate that there is no other source for the evidence he seeks.' " (*People v. Linton* (2013) 56 Cal.4th 1146, 1186 (*Linton*).) In this case there was another source for the evidence Dalton sought, i.e., McNeely. That is, Dalton could have simply asked McNeely who had been the prosecutor in his burglary cases and what were the circumstances underlying those convictions. We therefore turn to Dalton's claim that her cross-examination of McNeely was improperly limited because she was precluded from eliciting the circumstances underlying his burglary convictions.

### (b) Imposter evidence

As noted, on cross-examination Dalton unsuccessfully sought to impeach McNeely with the circumstances underlying his 12 California burglary convictions. In particular, Dalton sought to demonstrate McNeely's insidious nature by eliciting testimony that he had successfully posed as an exterminator or drapery cleaner in order to gain entry to numerous homes of wealthy persons and steal their money and property. The trial court sustained objections to this line of questioning on the ground that a party could only impeach a witness with the

"nature of the felony and when it occurred," presumably relying on Evidence Code sections 787 and 788. Dalton contends this was error that violated her rights to confrontation and cross-examination, presentation of a defense, a fair trial, due process, and a reliable determination of guilt and penalty. We conclude any error in limiting the cross-examination was harmless. (*People v. Watson* (1956) 46 Cal.2d 818, 837 (*Watson*).)

Contrary to the trial court's ruling and to the Attorney General's position in this court, admission of relevant evidence of the circumstances underlying a felony conviction is no longer generally barred in criminal cases. It is true that Evidence Code section 787 provides: "Subject to Section 788, evidence of specific instances of his conduct relevant only as tending to prove a trait of his character is inadmissible to attack or support the credibility of a witness." And section 788 generally provides: "For the purpose of attacking the credibility of a witness, it may be shown by the examination of the witness or by the record of the judgment that he has been convicted of a felony." Before June 1982, these sections as well as former Code of Civil Procedure section 2051, the predecessor of section 788, had been interpreted to generally provide that although "the testimony of a witness may be impeached by proof that he has suffered the prior conviction of a felony," the "details and circumstances comprising the prior offenses are not admissible." (*People v. David* (1939) 12 Cal.2d 639, 646; see *People v. Wagner* (1975) 13 Cal.3d 612, 618; *People v. Smith* (1966) 63 Cal.2d 779, 790.)

In June 1982, the voters adopted Proposition 8, an initiative that amended the California Constitution to effect (among other things) criminal procedure reforms. (Ballot Pamp., Primary Elec. (June 8, 1982) text of Prop. 8, p. 33.) Proposition 8 added article I, former section 28, subdivision (d)

(now § 28, subd. (f)(2) (§ 28(f)(2))), the "Truth-in-Evidence" amendment, which provides in relevant part:  "Except as provided by statute hereafter enacted by a two-thirds vote of the membership in each house of the Legislature, relevant evidence shall not be excluded in any criminal proceeding, including pretrial and post conviction motions and hearings, or in any trial or hearing of a juvenile for a criminal offense, whether heard in juvenile or adult court.  Nothing in this section shall affect any existing statutory rule of evidence relating to privilege or hearsay, or Evidence Code Sections 352, 782 or 1103."  "Proposition 8 applies only to prosecutions for crimes committed on or after its effective date."  (*People v. Smith* (1983) 34 Cal.3d 251, 258.)

"By its plain terms, section 28[(f)(2)] requires the admission in criminal cases of all 'relevant' proffered evidence unless exclusion is allowed or required by an 'existing statutory rule of evidence relating to privilege or hearsay or Evidence Code, [s]ections 352, 782 or 1103,' or by new laws passed by two-thirds of each house of the Legislature."  (*People v. Wheeler* (1992) 4 Cal.4th 284, 292 (*Wheeler*), italics omitted.)  We have said it is "manifest" that the electorate intended to repeal "both judicially created and statutory rules restricting admission of relevant evidence in criminal cases . . . except insofar as section 28[(f)(2)] expressly preserves them."  (*People v. Harris* (1989) 47 Cal.3d 1047, 1081–1082; accord, *In re Freeman* (2006) 38 Cal.4th 630, 640, fn. 5 [section 28(f)(2) " 'supersedes all California restrictions on the admission of relevant evidence except those preserved or permitted by the express words of section 28[(f)(2)] itself' "].)  We have also observed that "section 28[(f)(2)] contains no . . . exception that would preserve the exclusionary rule of Evidence Code

sections 786–790, when the evidence relates to a witness's conduct, but is offered to attack or support the credibility of the witness." (*Harris,* at p. 1081.)

Thus, section 28(f)(2) abrogates Evidence Code section 787's prohibition on admission of specific instances of misconduct that are "relevant only as tending to prove a trait of [a witness's] character." (Evid. Code, § 787.) Evidence of circumstances underlying a conviction is admissible to impeach credibility if the proponent demonstrates that the evidence has "any tendency in reason" to disprove credibility. (Evid. Code, § 210; see *ibid.* [defining relevant evidence as "having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action" including "evidence relevant to the credibility of a witness"]; Evid. Code, § 780 ["the court or jury may consider in determining the credibility of a witness any matter that has any tendency in reason to prove or disprove the truthfulness of his [or her] testimony at the hearing . . ."].) Trial courts retain discretion to exclude such evidence under Evidence Code section 352 "if its probative value is substantially outweighed by the probability that its admission will . . . necessitate undue consumption of time or . . . create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." We disapprove of *People v. Casares* (2016) 62 Cal.4th 808, 830 (*Casares*) ["Under California law, the right to cross-examine or impeach the credibility of a witness concerning a felony conviction does not extend to the facts underlying the offense."]; *People v. Ardoin* (2011) 196 Cal.App.4th 102, 120; *People v. Szadziewicz* (2008) 161 Cal.App.4th 823, 842; *People v. Shea* (1995) 39 Cal.App.4th 1257, 1267; *People v. Santos* (1994) 30 Cal.App.4th 169, 176–177; *People v. Thomas* (1988)

206 Cal.App.3d 689, 700, fn. 6; and *People v. Heckathorne* (1988) 202 Cal.App.3d 458, 462, to the extent they are inconsistent with our opinion.

Here, certain statements by the trial court suggest it may have been unaware that it had discretion to admit the circumstances underlying McNeely's felony convictions. But even assuming such an error, there is no reasonable probability that a different outcome as to the conspiracy and murder counts and the torture-murder special-circumstance allegation (the matters to which McNeely's testimony was arguably relevant) would have resulted if the excluded line of questioning had been presented. (*Watson, supra*, 46 Cal.2d at p. 837; see *People v. Prince* (2007) 40 Cal.4th 1179, 1296−1297 (*Prince*).)

The defense theory was that McNeely had fabricated the conversations to which he testified after surreptitiously examining documents in Tompkins's case, such as his statements to others regarding his alleged involvement, copies of his codefendants' interviews, and press releases relating to his case that were available to McNeely in the cell he shared with Tompkins. According to Dalton, evidence that McNeely on 12 occasions had successfully impersonated an exterminator or a drapery hanger in order to gain access to wealthy persons' homes and steal their valuable property "suggest[ed] not only a proclivity to lie, but also an ability to do so quite well."

We do not agree that this evidence would have cast McNeely's credibility in a significantly different light. The jury was aware that McNeely had suffered 12 California burglary convictions and four Missouri felony convictions for burglary and firearm theft, and McNeely testified he had committed "probably a few more" burglaries. The specifics of McNeely's

burglaries might have illustrated more vividly his intelligence and skill in deception, but would not have left the jury with a materially different impression of his credibility. The mere existence of these 16 felony convictions and additional unadjudicated crimes cast doubt on McNeely's veracity because " 'it is undeniable that a witness' moral depravity of any kind has "some tendency in reason" [citation] to shake one's confidence in his honesty.' " (*Wheeler*, *supra*, 4 Cal.4th at p. 295.) We have also recognized that the commission of numerous crimes involving moral turpitude "may be more probative of credibility than a single crime." (*People v. Clark* (2011) 52 Cal.4th 856, 932.) Moreover, McNeely agreed with defense counsel that at one time he had been a "confirmed thief and con man," but believed prison had changed him "somewhat." He further conceded "[s]ome people" might describe him as a "manipulator."

In addition, when McNeely was asked if he had developed "some sort of friendship or relationship" with Tompkins, McNeely called him an "acquaintance" and said they shared not "quite a friendship" but "kind of a bond." McNeely agreed with defense counsel that Tompkins "didn't want to talk about his case to other people" and apparently warned other inmates not to discuss their cases. These circumstances tended to undermine the probative value of McNeely's testimony that Tompkins had enthusiastically and repeatedly for three months divulged to McNeely intimate details of his torture and murder of May. As noted, the trial court instructed the jury that McNeely was an "in-custody informant" and that his testimony "should be viewed with caution and close scrutiny."

Nor did McNeely's testimony materially bear on the charges of conspiracy and murder or on the torture-murder

special-circumstance allegation.  As to the charges of conspiracy and murder, the comments by Tompkins that McNeely conveyed did not refer to or implicate Dalton.  Moreover, as to conspiracy, although Tompkins referred to a "plan," no details as to how or when that plan was developed were provided by McNeely's testimony.  As to murder, Dalton was connected to the crime by evidence that she covered May in a sheet and bound her to a chair and prepared four or five hypodermic needles of battery acid for the purpose of killing her, told Laurie Carlyle that she had been involved in May's murder and that May had been killed with battery acid, and told Patricia Collins that she had killed May because May "was a rat" who "deserved to die" (*ante*, pp. 9−10, 23−24).

As to the special circumstance allegation of torture murder, we have said that torture is the infliction of " ' "pain and suffering in addition to death." ' " (*People v. Edwards* (2013) 57 Cal.4th 658, 716 (*Edwards*).)  "The torture-murder special-circumstance allegation requires an ' "intent to cause cruel or extreme pain and suffering for the purpose of revenge, extortion, persuasion, or for any sadistic purpose." ' [Citation.]  Unlike torture murder, it also requires an intent to kill and, at the time of [May's] murder, required 'proof of the infliction of extreme physical pain no matter how long its duration' on a living victim. (Former § 190.2,  subd. (a)(18),  as  added  by  Prop. 7,  § 6, approved by voters, Gen. Elec. (Nov. 7, 1978); [citations].)  It does not require a premeditated and deliberate intent to torture [citation], a causal relationship between the torturous act and death [citation], or proof the victim subjectively experienced pain [citation]. 'Distilled, the statutory language requires intent to kill, intent to torture, and infliction of an extremely painful act upon a living victim.' " (*Edwards*, at p. 718).

The statements by Tompkins that McNeely recounted did not refer to Dalton, so they were not relevant to her intent to kill or to her intent to cause cruel or extreme pain and suffering for a sadistic purpose. Although the statements were relevant to whether May had suffered the infliction of extreme physical pain while alive, they were cumulative to other evidence of this element. Dalton told Carlyle that May had been killed with battery acid, and the prosecution expert testified that if battery acid were injected into a person's vein, it would be "much more painful" than a Charley-horse. Baker testified that after Dalton injected a syringe of battery acid into May's leg, Dalton told Baker that May was suffering. Baker further testified that she (Baker) hit May on the head with a cast iron frying pan with such force she broke the bottom of the pan. Tompkins stabbed May twice to kill her and may have also hit her with a breaker bar.

In addition, Fedor testified that the cord to her bedroom chandelier had been cut and that part of the plastic protective covering was melted, exposing the electrical wire, while the other end was apparently still plugged into an outlet and several extension cords had been either tied into shapes or together. She also found a screwdriver with blood, hair, and scalp material on it. The jury could reasonably infer based on Fedor's testimony that these objects were used in the attack on May. Further, Baker testified that she saw a screwdriver but could not recall what it was used for, and that she did not see an extension cord with "bare" ends or see an extension cord used against the person in the chair. From this testimony, the jury could reasonably infer that the injuries from the cords and the screwdriver were inflicted on May before Baker and Tompkins returned home or at a time when May was alive. Finally, May

was bound; although restraint of a victim is not dispositive, it is one circumstance for the jury to consider in determining whether a victim was tortured. (See *People v. Elliot* (2005) 37 Cal.4th 453, 468, fn. 4.) Thus, the statements by Tompkins that McNeely recounted were cumulative to other evidence on the issue of whether extreme physical pain was inflicted on May while she was alive.

In sum, we conclude that any error in limiting McNeely's cross-examination was harmless as to the conspiracy and murder charges and as to the torture-murder special-circumstance allegation. (*Watson, supra,* 46 Cal.2d at p. 837.) For the same reasons, we reject Dalton's further claim that the trial court's limitation of McNeely's cross-examination violated her constitutional right to confrontation. " ' "[A] criminal defendant states a violation of the Confrontation Clause by showing that he was prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness, and thereby, 'to expose to the jury the facts from which jurors . . . could appropriately draw inferences relating to the reliability of the witness.' " [Citation.] However, not every restriction on a defendant's desired method of cross-examination is a constitutional violation. Within the confines of the confrontation clause, the trial court retains wide latitude in restricting cross-examination that is repetitive, prejudicial, confusing of the issues, or of marginal relevance. . . . Thus, unless the defendant can show that the prohibited cross-examination would have produced 'a significantly different impression of [the witnesses'] credibility' [citation], the trial court's exercise of its discretion in this regard does not violate the Sixth Amendment. [Citation.]' " (*Linton, supra,* 56 Cal.4th at p. 1188.) Even assuming the trial court had

exercised its discretion to allow impeachment of McNeely with the circumstances underlying his 12 California burglary convictions, no significantly different impression of his credibility would have resulted here.

### (c). *Misdemeanor convictions*

Dalton further contends the trial court abused its discretion in precluding cross-examination as to evidence of the circumstances surrounding McNeely's misdemeanor convictions. She does not delineate what those underlying circumstances were or why they were important. Thus, even assuming that the trial court erred in precluding cross-examination as to these circumstances, Dalton fails to demonstrate that such cross-examination " 'would have produced "a significantly different impression of [the witness's] credibility." ' " (*People v. Dement* (2011) 53 Cal.4th 1, 52 (*Dement*).)

### d. Corpus delicti

Dalton asserts the prosecutor improperly relied on Tompkins's out-of-court statements to prove the corpus delicti of the charged crimes because hearsay statements of an accomplice cannot be used to prove corpus. We conclude that the corpus delicti of murder and torture was established by Fedor's testimony.

In the memorandum in support of Dalton's motion to exclude "confessions prior to proof of the corpus delicti," she asserted that "the corpus must be proven independently and without consideration to defendant's or codefendant's extrajudicial statements." She also asserted that "[p]roof of the corpus delicti includes both proof of the alleged homicide, . . . [and] also proof of the special circumstances." The trial court

instructed the jury: "No person may be convicted of a criminal offense unless there is some proof of each element of the crime independent of any admission made by her outside of this trial."

"To convict an accused of a criminal offense, the prosecution must prove that . . . a crime actually occurred." (*People v. Alvarez* (2002) 27 Cal.4th 1161, 1164.) "[T]he corpus delicti or body of the crime . . . cannot be proved by *exclusive* reliance on the defendant's extrajudicial statements." (*Id.*, p. 1165.) "The independent proof may be circumstantial and need not be beyond a reasonable doubt, but is sufficient if it permits an inference of criminal conduct, even if a noncriminal explanation is also plausible. [Citations.] There is no requirement of independent evidence 'of every physical act constituting an element of an offense,' so long as there is some slight or prima facie showing of injury, loss, or harm by a criminal agency. [Citation.] In every case, once the necessary quantum of independent evidence is present, the defendant's extrajudicial statements may then be considered for their full value to strengthen the case on all issues." (*Id.*, p. 1171.)

Tompkins's out-of-court statements, which referenced no other perpetrator, were relevant to the charge of murder and to the torture-murder special-circumstance allegation, but not to the charge of conspiracy to commit murder. The Attorney General contends that the "corpus delicti rule does not apply to special circumstances" because in 1990, two years after May was murdered, the voters passed Proposition 115, which provided in part that the "corpus delicti of a felony-based special circumstance enumerated in paragraph (17) of subdivision (a) of Section 190.2 need not be proved independently of a defendant's extrajudicial statement." (§ 190.41, added by Prop. 115, as approved by voters, Primary Elec. (June 5, 1990) § 11.) Dalton

was charged with torture-murder under section 190.2, subdivision (a)(18), not a special circumstance under subdivision (a)(17), and we have in any event held that section 190.41 cannot constitutionally be applied to crimes "committed before the measure's effective date." (*Tapia v. Superior Court* (1991) 53 Cal.3d 282, 297–298.)

We have also held that the corpus delicti requirement applies to special circumstance findings that "require proof of some crime other than the murder in question." (*People v. Hamilton* (1989) 48 Cal.3d 1142, 1175.) Here that crime — torture under section 206 — was also enacted by Proposition 115 in 1990, and so was not a separate crime when May was murdered, although the torture-murder special-circumstance allegation required proof of similar elements. (§ 206, added by Prop. 115, as approved by voters, Primary Elec. (June 5, 1990) § 13; see *Edwards*, *supra*, 57 Cal.4th at p. 718 [delineating the elements of torture-murder at the time of May's murder].)

Even assuming the prosecutor was required to satisfy the corpus delicti requirement for both murder and the torture-murder special-circumstance allegation, the Attorney General correctly asserts that Fedor's testimony did so. Fedor testified that when she returned to the trailer on the afternoon of June 26, 1988, Dalton and Baker were present, but May was not. The trailer was in disarray, Baker was washing the kitchen floor with shampoo, and clothes, sheets, towels, and blankets Fedor had thrown on her bed were missing. When Fedor asked Dalton where these items were, Dalton explained she had accidentally cut herself, "got blood all over," and the items were taken to be washed. Fedor found a "dripping wet" bloody pillow in the trash can outside of the trailer, and after Dalton showered, Fedor noticed the soap bar was bloody. Fedor

subsequently found a screwdriver with what appeared to be blood, hair, and scalp material on it. She also discovered that the cord to her bedroom chandelier had been cut and that part of the plastic protective covering was melted, exposing the electrical wire, and the other end was apparently still plugged into an outlet. In addition, several extension cords had been either tied into shapes or together. (See *ante*, pp. 14–16.)

Thus, unlike *Jones v. Superior Court* (1979) 96 Cal.App.3d 390, 397, on which Dalton relies (and without addressing the validity of that case), the corpus delicti of the crimes charged here was not established solely by Tompkins's out-of-court statements. Fedor's testimony was prima facie evidence that May had been killed that was independent of Tompkins's and Dalton's statements. Fedor's testimony also permitted an inference — independent of these statements — that May had been tortured.

Dalton further claims the trial court erred in failing to instruct the jury that Tompkins's statements were admissible only to establish the corpus or that the crime occurred, and that its failure to do so allowed the prosecutor to rely on Tompkins's statements "to establish Dalton's guilt." We reject the claim. Dalton did not request such an instruction, and the trial court had no duty to so instruct on its own motion. (*Valdez, supra*, 55 Cal.4th at p. 139.) To the extent Dalton asserts admission of Tompkins's statements violated her Sixth Amendment right to confront the witnesses against her, we have concluded above that Tompkins's statements were not testimonial. (See *ante*, pt. II.A.1.b.)

### e.  Undue prejudice

Dalton contends McNeely's testimony was unduly prejudicial under Evidence Code section 352.  Assuming the claim is preserved, we reject it.

Although Dalton asserts the probative value of McNeely's testimony was "slight," she also asserts that Tompkins's statements "should have been excluded because they were 'so [rife] with condemning facts against [her] that they [were] devastating or crucial to [her] case.'"  We rejected a substantially similar argument in *Valdez*:  "[T]he test for prejudice under Evidence Code section 352 is not whether the evidence in question undermines the defense or helps demonstrate guilt, but is whether the evidence inflames the jurors' emotions, motivating them to use the information, not to evaluate logically the point upon which it is relevant, but to reward or punish the defense because of the jurors' emotional reaction."  (*Valdez, supra,* 55 Cal.4th at p. 145.)  Here, Dalton does not suggest how Tompkins's statements, which did not mention Dalton, prejudiced her in this manner.

### 2.  Further cross-examination issues

Dalton contends that the trial court improperly limited her cross-examination of prosecution witnesses Joanne Fedor, Sheryl Baker, Kandy Koliwer, Fred Eckstein, Jeanette Bench, Judy Brakewood, Patricia Collins, Phyllis Cross, Laurie Carlyle, and Pamela Johnson, in violation of her rights to confrontation, to present a defense, a fair trial, due process of law, and a reliable determination of guilt and penalty.  We conclude there was no prejudicial error.

### a. *Joanne Fedor*

Dalton asserts the trial court erroneously precluded Dalton from cross-examining Fedor regarding her pending charges of grand theft and forgery, and from impeaching Fedor with the conduct underlying her four misdemeanor convictions.

Before Fedor's testimony, the trial court ruled that Dalton could not impeach Fedor with the conduct underlying her 1982 misdemeanor convictions for forgery, petty theft, and possession of a hypodermic needle because they were too remote and would require an undue consumption of time, or with the conduct underlying her 1983 misdemeanor battery conviction because the crime did not involve moral turpitude. The court subsequently ruled that defense counsel could not impeach Fedor with her pending charges of grand theft and forgery, stating, "[I]t's obviously not usable for impeachment, since it's pending and she may be found not guilty." The charges had been filed in August 1994, and the preliminary hearing was scheduled to be held 10 days after Fedor's February 1995 testimony in Dalton's case. The prosecutor said he had not "interceded on her behalf in any way . . . to affect the charges, her custody status, any disposition, anything whatsoever."

Dalton contends that cross-examination on the pending charges would have demonstrated Fedor had a motivation to lie in her testimony. The Attorney General agrees that a witness may be impeached with pending charges but appears to contend that the trial court exercised its discretion in limiting the cross-examination as to the pending charges. The record appears otherwise.

Even assuming that the trial court erred in summarily precluding cross-examination on the pending charges, however,

Dalton fails to demonstrate that cross-examination as to these charges " 'would have produced "a significantly different impression of [the witness's] credibility." ' " (*Dement, supra,* 53 Cal.4th at p. 52.) Fedor was impeached by the circumstance that Deputy Wilson examined her trailer immediately after Dalton and the others left, yet he saw no blood or cut electrical cords and was not shown items she testified were in or near the trailer, such as the bloody bar of soap. Two subsequent forensic searches that same year revealed no evidence of blood in the trailer, and the heater and knife Fedor deemed suspicious tested negative for the presence of blood. Fedor was further impeached by her methamphetamine use generally and on the day of May's murder, by evidence she regularly supplied her 14-year-old babysitter with methamphetamine, and by Deputy Wilson's description of her on the night of the murder as akin to "somebody who was mentally ill." Although Fedor testified that Dalton had spent the night a "couple weeks" before June 26, 1988, she acknowledged she had previously told law enforcement that on June 26, 1988, she had not seen Dalton since 1981. Indeed, Fedor was deemed so lacking in credibility by the prosecutor that he called numerous witnesses to, in his words, "corroborate[]" her testimony. For these same reasons, Dalton fails to demonstrate the trial court abused its discretion in denying impeachment of Fedor concerning the circumstances underlying her misdemeanor convictions.

### b. Sheryl Baker

Dalton asserts the trial court erroneously precluded Dalton from cross-examining Baker regarding a prior juvenile adjudication and certain prior convictions. We reject the claim.

The trial court precluded cross-examination of Baker with (1) the true finding in her 1980 juvenile adjudication for forgery because it was not a serious or violent offense, (2) the conduct underlying her 1983 misdemeanor conviction of receipt of stolen property, 1984 misdemeanor conviction for weapon possession, and 1986 or 1988 misdemeanor theft conviction because they were too remote and their probative weight was outweighed by the consumption of time, (3) her 1990 misdemeanor conviction for possession of a controlled substance because it was not a crime of moral turpitude, (4) her 1986, 1988, and 1989 misdemeanor convictions respectively for loitering, false representation to a police officer, and possession of hypodermic needles because they were not crimes of moral turpitude and because their probative weight was outweighed by the consumption of time, and (5) her 1989 misdemeanor conviction for receipt of stolen property because the court had admitted her 1987 felony conviction for receipt of stolen property and hence the misdemeanor conviction had little probative value and would consume undue time.

At trial, Baker testified she had suffered a 1987 felony conviction for grand theft auto. Moreover, Baker was impeached by her admitted role in May's murder and the favorable terms of her second-degree murder guilty plea. She was further impeached by the fact that she would not be sentenced until after her testimony in Dalton's case, by her failure to inform law enforcement about the murder for nearly four years and then only after she learned she had been apparently caught on tape describing the murder to a friend, and by her testimony that she used a significant amount of methamphetamine during the time she observed the events to which she testified. Her cross-examination consumes more than 40 pages of the reporter's

transcript. Dalton fails to demonstrate that cross-examination as to the prior convictions and juvenile adjudication " 'would have produced "a significantly different impression of [the witness's] credibility." ' " (*Dement, supra*, 53 Cal.4th at p. 52.)

"Moreover, '[a]s a general matter, the ordinary rules of evidence do not impermissibly infringe on the accused's right to present a defense.' " (*Dement, supra*, 53 Cal.4th at p. 52.) Dalton was "given considerable leeway to challenge [Baker's] veracity and suggest [her] motivation to lie. [Dalton] was not precluded from attempting to demonstrate that [Baker] was not worthy of belief; [s]he was merely precluded from proving it with time-consuming and remote evidence that was not obviously probative on the question." (*Ibid*.)

### c. *Patricia Collins*

Dalton contends the trial court erred by precluding Dalton from cross-examining Patricia Collins regarding her prior convictions and limiting cross-examination regarding her role as an informant. We reject the claim.

The trial court precluded cross-examination regarding Collins's 1987 and 1988 convictions for possession of a controlled substance because they were not crimes of moral turpitude and the 1987 offense was too remote. It also excluded her 1990 conviction for firearm possession because it was not an offense involving moral turpitude. The trial court instructed the jury that Collins was an "in-custody informant" and that her testimony "should be viewed with caution and close scrutiny."

At trial, Collins was impeached by her 1986 felony conviction for conspiracy to manufacture methamphetamine. She was also impeached by the fact that, in part to avoid being blamed for May's murder, she had agreed to cooperate with law

enforcement. In November 1988, Collins engaged in secretly taped telephone conversations with Baker, and Collins was released from jail 15 days early as a benefit for this cooperation. Collins was further impeached by her methamphetamine use from 1988 to 1991 and her use of numerous aliases. Dalton fails to demonstrate that cross-examination as to the circumstances underlying her convictions " 'would have produced "a significantly different impression of [the witness's] credibility." ' " (*Dement*, *supra*, 53 Cal.4th at p. 52.)

Dalton further contends the trial court "improperly restricted cross-examination of Collins regarding her possible prior work as an informant in other cases, including work with . . . [Police Officer] Lusardi, with whom she worked in this case and for whom she tape-recorded telephone conversations with Sheryl Baker." The claim is not further elaborated, and to support this assertion, Dalton simply cites to two pages of the record. On the first page, defense counsel asked Collins on cross-examination, "Miss Collins, before this date when you made a phone call for Mr. Lusardi, you had a prior relationship with him, is that correct?" The prosecutor's objection on the grounds of relevance, beyond the scope, and Evidence Code section 352, was sustained. Defense counsel then asked, "Well, you had worked with Mr. Lusardi before on cases; is that correct?" Collins replied, "No." Dalton does not explain in what way she believes the cross-examination was curtailed.

On the second cited page, defense counsel asked, "Miss Collins, you had an interview[] with a Detective Wisniewski, Mr. Lusardi, and Mr. Samms; isn't that correct?" Collins replied, "I don't recognize the names." Counsel asked, "[O]n March 15, 1989; isn't that correct? Three law enforcement officers up there?" Collins again replied, "I don't recognize the

names." Counsel asked, "And if Detective Wisniewski indicated that you were an informant for the Metropolitan Homicide Task Force, would that be a truth or lie?" The prosecutor successfully objected that the question misstated the evidence and that it addressed a time period after Collins "did the phone calls." Defense counsel then asked, "Miss Collins, do you consider yourself an informant?" She replied, "No." Counsel asked, "You gave information while you were in jail; is that correct?" Collins replied, "Yes." Defense counsel then said, "Nothing further," and the witness was excused. Again, it is not clear in what way Dalton believes the cross-examination was improperly restricted.

### d. *Kandy Koliwer*

Kandy Koliwer had been appointed to represent May in June 1987 after May and Bobby's three children were removed from the couple's home. On cross-examination at trial, defense counsel asked Koliwer, "You were certainly aware that . . . May did have a methamphetamine drug problem, weren't you." The trial court sustained the prosecutor's objection on the grounds of relevance and lack of personal knowledge. Defense counsel then said, "I have no further questions."

Dalton contends the trial court erroneously sustained the prosecutor's objection because Koliwer had testified about May's devotion to her children and, in Dalton's view, believed that "regular drug use was not an issue in the case she was handling for May." Dalton contends Koliwer's "knowledge, or lack of knowledge, regarding May's drug use would certainly relate to her credibility and reliability as a witness about May."

But Koliwer testified on cross-examination that a condition of May's getting her children back in 1987 was that

she remain drug-free.  She further testified that according to allegations in the petition filed in court by the Department of Social Services, May's children were again removed in June 1988 — the month May disappeared — from her home in part because May had been arrested for possession of a controlled substance and had been away from the home for three days before the social worker's visit.  Furthermore, Koliwer testified that May's children were improperly supervised and that drug-related activities appeared to be occurring at the home.  Dalton fails to demonstrate that cross-examination as to Koliwer's personal knowledge of May's drug use " 'would have produced "a significantly different impression of [the witness's] credibility." ' "  (*Dement*, *supra*, 53 Cal.4th at p. 52.)

### e.   Fred Eckstein

On cross-examination of Fred Eckstein, defense counsel asked, "[W]ere your parents using methamphetamine?"  The trial court sustained the prosecutor's objection on the grounds of relevance and speculation.  Dalton contends this ruling was erroneous because Fred's mother, Kathy Eckstein, had testified about seeing small spots of dried blood, a soap bar with teeth marks, and a knotted extension cord in Fedor's trailer, and hence Fred's "observations of his mother's use of methamphetamine around the time of her alleged observations would have been important impeaching evidence of Kathy's credibility and powers of observation."  No error appears.  Kathy Eckstein testified that she was using methamphetamine during this period, but not on a regular basis.  Kathy's reliability as a witness was further diminished by the circumstance that she did not call law enforcement to report seeing blood in Fedor's trailer.  Her reliability was also called into question by her confusion about some basic facts:  she was not sure of the year

or month these events occurred, believed it started to get dark in June at about 5:00 p.m., and noted that at the time of her testimony in February it got dark "later around 6:30" p.m. Dalton fails to demonstrate that cross-examination as to Fred's knowledge of his mother's drug use " 'would have produced "a significantly different impression of [his mother's] credibility." ' " (*Dement, supra,* 53 Cal.4th at p. 52.)

### f. Judy Brakewood

Dalton asserts that the trial court precluded cross-examination regarding Brakewood's 1989 concealed weapon possession conviction because it was not a crime of moral turpitude. Dalton makes no effort to explain why this was erroneous. Moreover, Brakewood was impeached by the fact that at the time of the events to which she testified, she had been a methamphetamine dealer and was injecting three-quarters of a gram to one gram of methamphetamine a day. She was further impeached by her failure to come forward about the 1988 conversation until she read a 1992 newspaper article that recounted Investigator Cooksey's testimony, apparently at the preliminary hearing, that " 'May was then injected with a hot shot of battery acid' " and that Tompkins said he " 'took May's body to an Indian reservation.' "

Dalton further asserts without elaboration that "[a]lthough counsel attempted to question [Brakewood] about her sales of methamphetamine, the court cut [counsel] off." She cites two record pages, only one of which contains an objection. On this page, Brakewood testified that she started selling methamphetamine in 1987 and was selling this drug in 1988. When defense counsel asked Brakewood how often she sold methamphetamine, the trial court sustained the prosecutor's

objection under Evidence Code section 352. Dalton makes no effort to explain how the frequency with which Brakewood sold methamphetamine " 'would have produced "a significantly different impression of [the witness's] credibility." ' " (*Dement, supra*, 53 Cal.4th at p. 52.)

### g. *Bench, Cross, Carlyle, and Johnson*

As to Jeanette Bench, Phyllis Cross, Laurie Carlyle, and Pamela Johnson, Dalton simply lists the prior convictions on which she sought to cross-examine the witnesses and notes the trial court's reasons for precluding admission of each one. She makes no effort to demonstrate that the trial court's rulings regarding each of these prior convictions was an abuse of discretion. Rather, she broadly asserts: "The court's rulings unduly restricted [Dalton's] right to cross-examine witnesses, violating her rights to confrontation and cross-examination, to a fair trial, to due process of law, to present a defense, and to a reliable determination of both guilt and penalty. [Citations.] The perceived volume, breadth and recidivist nature of the witnesses' prior convictions and conduct was severely and qualitatively diminished by the court's rulings. There is a reasonable probability that the suppressed impeachment evidence would have affected the jurors' assessment of each individual witness's credibility, which would have diminished the strength of the prosecution's case in general. The suppression of the impeachment evidence was prejudicial, and this Court must reverse the convictions, special circumstance findings and death judgment." Such general allegations fail to demonstrate that "the 'cross-examination would have produced "a significantly different impression of [the witness's] credibility." ' " (*Dement, supra*, 53 Cal.4th at p. 52.)

### h. Cumulative prejudice

Dalton asserts that even if any individual error in restricting cross-examination of these witnesses was not prejudicial, the errors were prejudicial as cumulated. We have assumed error, but concluded there was no prejudice, in the restriction of McNeely's and Fedor's cross-examination. Nor do we conclude these assumed errors were cumulatively prejudicial.

### 3. Nottoli statements

Dalton contends the trial court erred in admitting Judy Brakewood's testimony regarding Steven Nottoli's statements because they did not qualify as an adoptive admission, were irrelevant, and were unduly prejudicial. (Evid. Code, § 1221.) We conclude there was no error.

### a. Factual background

Before Brakewood testified, Dalton unsuccessfully objected to the testimony on the ground that it was irrelevant because Brakewood was not certain whether the conversation occurred in the spring of 1987 or 1988, and that it was unduly prejudicial under Evidence Code section 352. In response, the prosecutor said that the conversation occurred after the alleged murder and that Brakewood would testify Dalton was "excited about the murder, about having taken the body . . . to an Indian reservation; that battery acid was used and it was fun torturing the victim."

Brakewood's actual testimony diverged from the prosecutor's representation. Brakewood testified that in 1988, she was living in El Cajon and knew Dalton. In 1992, she had read a newspaper article about a case that caused her to recall a conversation she had previously had with Dalton.

Brakewood testified that after receiving a call from Nottoli, also known as "Streaker," she brought drugs to a green van parked at a 7-Eleven store in Spring Valley. The van was older, and the doors opened but did not slide. In the van were two persons: Nottoli and a woman Brakewood did not recognize. Nottoli was in the driver's seat, and Brakewood and the unidentified woman were sitting on the floor of the van because there was no back seat. Dalton was "not in the van at this time" because she was speaking on a telephone. Brakewood was "making it up," meaning preparing the drugs for use.

The prosecutor asked, "While Kerry Dalton was gone, did you have a conversation?" Brakewood replied, "Yes, I did." After establishing that Dalton eventually returned to the van, the prosecutor then asked, "[W]here did [Dalton] go in the van?" Brakewood replied, "She went into the passenger seat," and confirmed that Brakewood was near Dalton and could hear her when she spoke in the van. The prosecutor asked, "What did she say?" Brakewood replied, "She came in on the . . . tail end of a conversation; and she said, 'Yep, we really fucked that girl up.'" Brakewood described Dalton as "[e]xuberant, excited, happy," but said Dalton did not provide any details about what she meant.

The prosecutor then asked, "Was [Dalton] there when Mr. Nottoli said anything about what . . . really fucked her up, then?" Brakewood replied, "I don't think that she was in there at the time." The prosecutor asked, "When the two of them were still there, was anything else said about the girl?" Brakewood replied that while she was preparing the drugs, Nottoli "was mentioning to me how . . . they had —" Defense counsel objected on the ground of hearsay. The trial court overruled the objection, stating, "It's foundational." Brakewood said,

"[Nottoli] had told me how that — that they had shot up this girl with battery acid and — and burned her."  Brakewood did not recount any explanation by Nottoli of who "they" were.  Defense counsel objected, stating:  "Your honor, I ask that it be stricken.  It's hearsay.  It's not foundational."  The trial court said, "Let me hear the next question first."  The prosecutor asked Brakewood, "Did Miss Dalton acknowledge or say anything about that conversation?"  Brakewood replied, "And directly after that, 'Yeah, we really fucked that girl up.' "  The trial court then overruled the hearsay objection.  When the prosecutor subsequently asked whether Dalton was present when Nottoli described the location of the body, Brakewood replied, "I don't believe so."

On cross-examination, Brakewood testified that she received Nottoli's call late at night in the spring of 1988.  While Brakewood was with Nottoli in the green van, Dalton was speaking on a telephone (presumably a pay phone) that was located about 10 to 15 feet away from the van.  Brakewood did not recall whether the van windows were open.  While Dalton was away and on the phone, Brakewood and Nottoli had a conversation in which he mentioned battery acid and an Indian reservation.  Dalton came in on the tail end of the conversation and said, " 'We really fucked that girl up.' "  Dalton provided no details, and Brakewood did not know who they were talking about or when the girl had been "fucked . . . up."

Brakewood identified the 1992 newspaper article she had read.  The article mentioned Dalton, Tompkins, and Baker, and recounted Investigator's Cooksey's testimony (apparently at the preliminary hearing) that " 'May was then injected with a hot shot of battery acid,' " and that Tompkins said he " 'took May's body to an Indian reservation.' "

Brakewood and Nottoli met in the summer of 1987 and had dated until the end of that year. In 1988, Brakewood was a drug dealer who injected three-quarters of a gram to one gram of methamphetamine a day.

On redirect, the prosecutor established that Brakewood's conversation with Nottoli had occurred in May or June of 1988. At that time, her drug use did not prevent her from satisfying her responsibilities in managing an attorney's office.

No evidence was introduced at trial linking Nottoli to May's disappearance or murder. Nottoli was called by the defense and denied making the statements, denied hearing Dalton say, "Yep, we really fucked that girl up," denied ever driving a green van, and denied ever being in a white van (the color van Nottoli possessed in February 1988) with Brakewood and Dalton. Nottoli and Brakewood had been friends but had a falling out in December 1987 after traveling to Boston together, and Nottoli had not seen her since that time. Nottoli and Dalton were friends and had been physically intimate, but Nottoli had not seen her since 1988. Nottoli had suffered prior felony convictions for grand theft auto, burglary, robbery, forgery, and receiving stolen property. He became addicted to drugs while serving in Vietnam, and in the late 1980's he used methamphetamine.

In closing argument, the prosecutor said: "Nottoli is talking about the battery acid and burns" and "the defendant says, 'Yeah, we really fucked up that woman. We really got her.'" The prosecutor also said: "Did [the torture] happen? Yes it did. . . . Judy Brakewood told you how giddy [Dalton] was when the discussion came up in that . . . van out in Spring

Valley; happy, excited, exuberant. 'Yeah, we really fucked up that bitch.' She was proud of it."

### b. *Analysis*

Evidence Code section 1221 provides: "Evidence of a statement offered against a party is not made inadmissible by the hearsay rule if the statement is one of which the party, with knowledge of the content thereof, has by words or other conduct manifested his adoption or his belief in its truth." "In determining whether a statement is admissible as an adoptive admission, a trial court must first decide whether there is evidence sufficient to sustain a finding that: (a) the defendant heard and understood the statement under circumstances that normally would call for a response; and (b) by words or conduct, the defendant adopted the statement as true." (*People v. Davis* (2005) 36 Cal.4th 510, 535; Evid. Code, §§ 403, 1221.) If so, the jury then determines whether these preliminary facts actually occurred. (See Assem. Com. on Judiciary com., 29B pt. 1B West's Ann. Evid. Code (2011 ed.) foll. § 403, p. 18 ["the jury must finally decide whether the preliminary fact exists"].)

As an initial matter, we conclude that Dalton's statement on its own, " 'Yep, we really fucked that girl up,' " and her accompanying exuberance were admissible as a party statement under Evidence Code section 1220. We further conclude that this statement by Dalton manifested her adoption of Nottoli's inculpatory statements.

Although the record fails to precisely reflect what the "tail end" of the conversation was, that is, what portion of the conversation Dalton heard, her statement upon entering the van demonstrated awareness of the topic of conversation and, in

particular, Nottoli's statement that the victim had been burned and injected with battery acid. Brakewood testified, "[Nottoli] had told me . . . that they had shot up this girl with battery acid . . . and burned her." Defense counsel objected, and the court said it would "hear the next question first" apparently before ruling. The prosecutor asked, "Did [Dalton] acknowledge or say anything about that conversation?" Brakewood replied, "And directly after that, 'Yeah, we really fucked that girl up.' "

The jury could reasonably infer that Brakewood used the phrase "[a]nd directly after that" in reference to Nottoli's statement that "they" had injected a girl with battery acid and burned her. This evidence is sufficient to "sustain a finding that: (a) the defendant heard and understood the statement under circumstances that normally would call for a response; and (b) by words or conduct, the defendant adopted the statement as true." (*People v. Davis*, *supra*, 36 Cal.4th at p. 535; Evid. Code, §§ 403, 1221.) We therefore conclude the court acted within its discretion in implicitly admitting Nottoli's statements as Dalton's adoptive admission, and their weight was for the jury to decide in light of all the other evidence, including Nottoli's denial the conversation ever occurred.

Dalton further contends that Brakewood's testimony was irrelevant and unduly prejudicial under Evidence Code section 352. At the time the trial court ruled, that is, before Brakewood's testimony, the evidence was relevant to the torture-murder special-circumstance allegation given Baker's testimony that Dalton had injected the victim with battery acid. Although Brakewood may have been uncertain of the date of her conversation with Nottoli before her testimony, this uncertainty went to the weight and not the admissibility of the evidence. (*People v. Merriman* (2014) 60 Cal.4th 1, 57 (*Merriman*) ["the

reliability of a witness's testimony is a matter for the jury to decide and therefore concerns the weight of the evidence, and not its admissibility"].)  Likewise, the circumstance that Dalton's statement " 'Yep, we really fucked that girl up' " could have "meant many and various things" does not render it irrelevant given one possible meaning was as a reference to May's murder.  (See *People v. Lewis* (2008) 43 Cal.4th 415, 502 (*Lewis*) [rejecting argument that the amplifier found in the defendant's car should not have been admitted because a witness testified only that it resembled the relevant amplifier, " '[m]illions of other amplifiers could also have looked like the amplifier[] in question,' " and the prosecutor failed to compare brand name, serial numbers, and wattage].)

Nor was the probative value of the evidence of Brakewood's testimony substantially outweighed by the probability that its admission would "create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."  (Evid. Code, § 352.)  The jury was required to decide if May had been tortured, and the court's ruling was within its discretion at the time it was made.

### 4.  *State of mind evidence*

Dalton contends that the trial court erred when it permitted Nina Tucker to offer a lay opinion of May's state of mind based on hearsay.  There was no error.

### a.  *Factual background*

As explained, Nina Tucker testified that in December 1987, she was the San Diego County Child Protective Services worker assigned to the May family.  (See *ante*, pp. 26−27.)  At that time, May and Bobby had custody of their three minor children under a reunification plan.  May made about three

court appearances, was present when Tucker visited the Mays' home, and telephoned Tucker about three times. On June 10, 1988, Tucker, a social worker, and a law enforcement officer again removed the children from May's home. May subsequently admitted to Tucker she had been abusing drugs and neglecting her children.

On June 24, May called Tucker and said she wanted to get her children back, was tired of being on the street, and wanted to make changes in her lifestyle. Tucker asked May to call her so they could meet at 9:00 a.m. the following Monday (June 27). May seemed pleased, but Tucker did not see or hear from her again. Tucker believed that May loved and was responsive to her children, and gave no indication she would abandon them. May had "verbalized" to Tucker that she "loved her children very much."

### b. Analysis

Dalton contends the trial court improperly permitted Tucker to state a lay opinion based on hearsay. A " 'lay witness may offer opinion testimony if it is rationally based on the witness's perception and helpful to a clear understanding of the witness's testimony.' (*People v. Leon* (2015) 61 Cal.4th 569, 601; see Evid. Code, § 800.) 'By contrast, when a lay witness offers an opinion that goes beyond the facts the witness personally observed, it is held inadmissible.' " (*People v. Jones* (2017) 3 Cal.5th 583, 602.) Here, Tucker's opinion that May loved and was responsive to her children and wanted to keep them was based on her personal observations of and conversations with May over a six-month period, and was properly admitted. "[A] witness may testify about objective behavior and describe behavior as being consistent with a state of mind." (*People v.*

*Chatman* (2006) 38 Cal.4th 344, 397.) Indeed, although Tucker's testimony was admitted as a lay opinion, it was her job as May's Child Protective Services worker to observe and draw conclusions regarding May's engagement with and attitude towards her children.

Dalton claims the trial court erred in allowing Tucker to recount May's June 24, 1988 hearsay statement to Tucker that she wanted to get her children back, was tired of being on the street, and wanted to make changes in her lifestyle. The statement was not hearsay, but circumstantial evidence of May's then existing state of mind that gave rise to the inference she would not abruptly abandon her children. This inference in turn supported the prosecution theory May was dead. (See *Merriman, supra,* 60 Cal.4th at p. 71 [murder victim's earlier statement that the defendant had sexually assaulted her was not admitted for its truth but for the nonhearsay purpose of demonstrating that the victim would not have consented to sexual activity with the defendant on the night of the murder]; *People v. Green* (1980) 27 Cal.3d 1, 23, fn. 9 [describing the difference between testimonial use of state of mind evidence, which is hearsay, and circumstantial use of such evidence, which is not hearsay].)

Dalton contends that the "circumstances under which May made the statements to Tucker indicate a lack of trustworthiness" and hence were inadmissible under the Evidence Code section 1250 state of mind exception to the hearsay rule. Again, "[t]he evidence was admitted for a purpose other than for the truth of the matter asserted, and therefore need not have met the reliability requirements of a hearsay exception." (*Merriman, supra,* 60 Cal.4th at p. 72, and cases cited.) Dalton's challenge to the reliability of May's statement

to Tucker, "at most, goes to the weight of the evidence, and not its admissibility." (*Ibid*.) We further reject Dalton's claims that Tucker's testimony erroneously "collaterally operated as victim impact evidence" because it "engendered great sympathy for the victim and her family," or "distorted the fact-finding process to such an extent that the resulting verdict could not have possessed the reliability required by the Eighth Amendment."

Dalton asserts that because Tucker was employed by Child Protective Services and had initiated judicial proceedings to remove May's children, "May's statements were testimonial" and their introduction violated Dalton's Confrontation Clause rights. Dependency proceedings are civil in nature, and "[b]ecause *Crawford* is based on the Sixth Amendment right to confrontation, its rule has not been extended to civil proceedings." (*People v. Sanchez* (2016) 63 Cal.4th 665, 680, fn. 6; see *In re James F.* (2008) 42 Cal.4th 901, 915 [detailing differences between criminal and dependency proceedings]; *In re Sade C.* (1996) 13 Cal.4th 952, 959−960, 991−992 [noting reasons criminal defendants and parents in dependency proceedings are not similarly situated].)

### 5. Baker's statements

Dalton contends that the trial court erred in admitting Sheryl Baker's March 4, 1992 redacted statement to police. We conclude there was no error.

#### a. Factual background

Baker gave videotaped statements to police on March 4, 1992, and July 5, 1994, and testified at the 1995 trial. After her trial testimony, the prosecutor sought to play for the jury much of Baker's 1992 statement as either prior consistent statements (Evidence Code sections 791, 1236) or inconsistent statements

(Evidence Code sections 770, 1235). Dalton opposed the motion. The trial court granted the motion, redacting the statement to remove any reference to Baker giving a blood sample, an incident in an El Cajon motel room, and Dalton belonging to a gang or cult. The court further allowed Dalton to play for the jury — over the prosecutor's objection — much of Baker's 1994 statement.

Before opening statements, the trial court instructed the jury: "[S]tatements of the lawyers during the course of the trial are not evidence. . . . Questions the attorneys ask a witness are, likewise, not evidence. The question is only relevant to your consideration if the question gives meaning to the answer that the witness gives. It's the answer to the question that's evidence." Before the redacted tape of Baker's 1992 statement was played, the trial court instructed the jury: "We're going to be playing a videotape here momentarily. . . . [W]hen we get to the playing of the tape there'll be an investigator on there asking questions. The same admonition I gave you earlier about statements of counsel not being evidence applies to statements of the investigator on the tape. The statements of the investigator on the tape are relevant to your determination of the facts in this matter only in that the question gives meaning to the answer that's given by the person on the tape; so that same admonition applies."

### b. Analysis

#### 1) Prior consistent statements

Evidence Code section 791 provides: "Evidence of a statement previously made by a witness that is consistent with his testimony at the hearing is inadmissible to support his credibility unless it is offered after: [¶] . . . [¶] (b) An express or

implied charge has been made that his testimony at the hearing is recently fabricated or is influenced by bias or other improper motive, and the statement was made before the bias, motive for fabrication, or other improper motive is alleged to have arisen."

Dalton contends that Baker's March 1992 statement was inadmissible under Evidence Code section 791 as a prior consistent statement because her motive to fabricate arose before she gave the statement. On cross-examination of Baker, defense counsel explored the details of her 1994 plea agreement and established that under the deal she would not be sentenced until after her testimony in Dalton's case. Defense counsel's questioning of Baker " 'raised an implicit charge that the "deal" provided [Baker] with an additional motive to testify untruthfully. This, in turn, entitled the prosecution to show that [the accomplice's] testimony was consistent with the recorded statement [she] gave shortly after [her] arrest but before the "deal" was consummated, that is, before the subsequent, specific motive to fabricate arose.' " (*People v. Jones* (2003) 30 Cal.4th 1084, 1106 (*Jones*).)

Dalton contends that Baker was also motivated to minimize her role in May's murder during her March 1992 statement so that she would receive a "good deal." But we have held that Evidence Code section 791 does not require a witness to be free from all possible bias at the time of her prior consistent statement. Rather, "a prior consistent statement is admissible if it was made before the existence of any one or more of the biases or motives that, according to the opposing party's express or implied charge, may have influenced the witness's testimony." (*People v. Hayes* (1990) 52 Cal.3d 577, 609; see *People v. Ainsworth* (1988) 45 Cal.3d 984, 1014 ["That there may always have been present a motive to fabricate does not deprive

a party of his right to show that another motive, suggested by the evidence, did not also affect his testimony"].) The circumstance that Baker may have been motivated to be untruthful during her March 1992 statement so that she would receive a favorable plea bargain was simply a factor the jury could consider when deciding what weight to give that statement. (*Jones*, *supra*, 30 Cal.4th at p. 1107.)

Dalton further contends that our long-standing precedent in this area is inapplicable because Baker's "one and only motive to fabricate her account of the events was to receive favorable treatment by the prosecution." For purposes of Evidence Code section 791, however, our cases treat fear of voiding a plea bargain as a motivation to fabricate that arises at the time the plea bargain is entered into, and as a different motivation from the more general "desire to obtain leniency at defendant's expense." (*People v. Andrews* (1989) 49 Cal.3d 200, 210; see *Jones*, *supra*, 30 Cal.4th at p. 1107.) For this reason, *People v. Coleman* (1969) 71 Cal.2d 1159, on which Dalton relies, and which involved only one motivation, is distinguishable. (*Andrews*, at pp. 210–211 [distinguishing *Coleman*].)

### 2) Prior inconsistent statements

As Dalton acknowledges, portions of Baker's 1992 statement were admissible as prior inconsistent statements. At trial, Baker testified that the person under the sheet made no sound during the attack, and Baker did not know whether the person was alive when Baker and Tompkins returned to the trailer. She was impeached by her 1992 statement in which she said that May had spoken during the attack. Baker further testified that she did not clean in the kitchen and did not clean

any floors, and she was impeached with her 1992 statement in which she said she cleaned some blood off the kitchen floor.

Dalton asserts that because Baker was impeached by certain statements in her 1992 statement during her testimony, the trial court should have exercised its discretion under Evidence Code section 352 and precluded the prosecutor from then playing for the jury the redacted videotape of her 1992 interview that contained these inconsistent statements. She contends that playing the videotape was repetitious, cumulative, and gave undue weight to the statements. Even assuming the trial court had discretion to exclude the redacted videotape on this basis, we discern no possible undue prejudice from the jury hearing these few statements a second time. (See Evid. Code, §§ 770, 1235; *People v. Chism* (2014) 58 Cal.4th 1266, 1294 [" 'A statement by a witness that is inconsistent with his or her trial testimony is admissible to establish the truth of the matter asserted in the statement under the conditions set forth in Evidence Code sections 1235 and 770.' "].) Moreover, as discussed above, the remaining portions of the redacted videotape were relevant to demonstrate Baker's prior consistent statement to police before she negotiated her plea agreement.

### 3) *Evidence Code section 352*

Dalton contends that admission of Baker's 1992 statement was unduly prejudicial under Evidence Code section 352. In particular, she claims the probative value of the statement was substantially outweighed by the probability that its admission would "create substantial danger of undue prejudice" (Evid. Code, § 352) because the officers' "interview techniques minimized Baker's role, involved leading questions, introduced unsupported and inadmissible aggravating information, . . .

misled and confused the jurors with false and extraneous evidence," and contained "inadmissible victim impact evidence."

As set forth above, the court instructed the jury that the investigator's statements were not evidence and were relevant only to the extent they gave meaning to Baker's answers. We presume the jury understood and followed that instruction. (*People v. Romero and Self* (2015) 62 Cal.4th 1, 28 (*Romero and Self*).)

### 6. *Expert testimony*

Dalton contends that the trial court erred in allowing Dr. Brian Blackbourne, a pathologist, to testify generally as an expert on the effect of battery acid and electrical current on the human body because the testimony lacked foundation, was irrelevant, and was unduly prejudicial. We reject the claim.

### a. *Foundation*

Dalton asserts Dr. Blackbourne's testimony lacked foundation because "there was absolutely no evidence concerning the use" of electricity and battery acid. Foundation for Dr. Blackbourne's testimony regarding the effect of battery acid on the human body appears in Baker's testimony that Dalton showed her several syringes filled with what she told Baker was battery acid and that Dalton subsequently injected this substance into May. In addition, Dalton told Carlyle that May had been killed by battery acid.

Foundation for Dr. Blackbourne's testimony regarding the effect of electricity on the human body appears in Fedor's testimony that after Deputy Wilson's visit on June 26, 1988, she found the cord to her bedroom chandelier had been cut and the other end was still "plugged in" (apparently to an outlet). On the cut end of the cord, part of the plastic protective covering

was melted, exposing the electrical wire. Although the record is not entirely clear, Fedor also found at least one extension cord in the shape of a figure eight. Another extension cord was tied in the shape of two figure eights with a different cord connecting the two figure eights.

### b. Relevance

Dalton asserts Dr. Blackbourne's testimony was irrelevant because the "jurors did not need an expert to explain to them that electric shock and acid cause pain." Evidence Code section 801 "qualifies a matter as the proper subject for expert testimony if it is 'sufficiently beyond common experience that the opinion of an expert would assist the trier of fact.' That is not to say, however, that the jury need be wholly ignorant of the subject matter of the expert opinion in order for it to be admissible. [Citation.] Rather, expert opinion testimony ' "will be excluded only when it would add *nothing at all* to the jury's common fund of information, i.e., when 'the subject of inquiry is one of such common knowledge that [people] of ordinary education could reach a conclusion as intelligently as the witness' " [citation]. ' " (*People v. Jones* (2012) 54 Cal.4th 1, 60.)

Here, Dr. Blackbourne explained that acid injected into a vein would be more painful than when it was injected into a muscle. He also explained that electricity can have a local effect on the area where it is applied, or can cause electrocution if it goes to the brain or heart. Hence Dr. Blackbourne's "medical expertise provided additional insight above and beyond the jury's general knowledge" in the area of whether these injuries — *if inflicted* — were extremely painful within the meaning of the torture-murder special-circumstance allegation. (*Edwards*, *supra*, 57 Cal.4th at p. 709.)

Dalton further contends Dr. Blackbourne's testimony was irrelevant because the issue as to the torture-murder special-circumstance allegation was whether Dalton intended to inflict pain, not whether Dr. Blackbourne believed the acts caused pain. As noted, at the time of May's murder the prosecutor was required to prove the infliction of extreme physical pain on a living person. (*Edwards*, *supra*, 57 Cal.4th at p. 718; see *ante*, pt. II.A.1.c.2.b.) Dr. Blackbourne's testimony was relevant to this issue.

### c. Evidence Code section 352

Dalton asserts that Dr. Blackbourne's expert testimony was unduly prejudicial under Evidence Code section 352. " 'Evidence is substantially more prejudicial than probative' " under Evidence Code section 352 " 'if, broadly stated, it poses an intolerable "risk to the fairness of the proceedings or the reliability of the outcome [citation]." ' " (*People v. Riggs* (2008) 44 Cal.4th 248, 290.) No such intolerable risk was present here.

We have rejected above Dalton's claim that Dr. Blackbourne's testimony did not assist the jury in understanding the effects of battery acid and electricity on the human body. (See *ante*, pt. II.A.6.b.) Nor, contrary to Dalton's assertion, did Dr. Blackbourne testify that a victim would suffer a "prolonged and painful death" when inflicted with electric shock and battery acid. Moreover, the trial court instructed the jury that simply because the court permitted a hypothetical question to be asked did not mean the court had found "all the assumed facts have been proved. It only determines that those assumed facts are within the probable or possible range of the evidence. It is for you, the jury, to find from all the evidence whether or not the facts assumed in a hypothetical question

have been proved." We presume the jury followed this instruction. (See *Romero and Self, supra*, 62 Cal.4th at p. 28.)

### 7. *Blood evidence*

Dalton contends the trial court erroneously admitted over her objection evidence of the presence of blood in Fedor's former trailer. We conclude any erroneous admission of this evidence was not prejudicial.

### a. *Factual background*

At the preliminary hearing, Investigator Cooksey testified that in September and November 1988, the trailer had been unsuccessfully searched by law enforcement for the presence of blood. On August 12, 1991, Investigator Cooksey, along with crime technician Gary Dorsett and serologist Annette Peer, again searched Fedor's former trailer for the presence of blood. In August 1991, Fedor no longer lived in the trailer, and it was occupied by a different tenant. Spots from the living room and master bedroom that tested presumptively positive for the presence of blood were collected on a later date, and six samples were sent to the Serological Research Institute in Richmond, California, for analysis by forensic serologist Gary Harmor.

Harmor testified that many of the blood samples from the trailer were small. He could not determine the age of the blood stains. Nor could he identify their species origin; he testified they could have come from any mammal. ABO blood testing indicated some samples were type O blood and others were type A blood; all mammals have ABO blood groups. About 48 percent of the white human population has type O blood, and about a third has type A blood. DNA testing produced no results. May and Tompkins had type A blood, and Dalton and Baker had type O blood.

Before trial, Dalton unsuccessfully moved to exclude the blood evidence on the grounds that the evidence was irrelevant, speculative, and unduly prejudicial under Evidence Code section 352. At trial, the trial court granted Dalton a standing objection to evidence of blood in Fedor's former trailer.

Substantially similar evidence to that presented at the preliminary hearing was presented at trial. (See *ante*, pts. I.A.1.d.3., I.A.2.a.) In addition, evidence was introduced that the heater and knife Fedor gave Darlene Burns tested negative for the presence of blood.

Fedor testified that before she moved into the trailer, it had been an illegal drug laboratory, and while she lived there on many occasions before and after June 1988, friends visited and used methamphetamine by injecting it with a syringe. Fedor and Baker testified that when they injected methamphetamine, blood would get into the syringe. Baker said she would at times clear the syringe by pressing the blood out, noting, "[Y]ou could squirt it anywhere." She said, "I sure have," when asked if she had seen other people shoot the blood into the room in which they were using methamphetamine.

Fedor moved out of the trailer around March 1989. Between the time Fedor moved out of the trailer and the 1991 forensic testing, the trailer was occupied by a series of at least three different renters.

### b. *Analysis*

Dalton contends that the 1991 blood evidence was not relevant and that its probative value was substantially outweighed by its prejudice. Even assuming the blood evidence should not have been admitted, there is no reasonable probability the verdict would have been different absent this

error given the blood evidence's weak probative value. Thus, as the jury was fully apprised, a search of Fedor's trailer on the night of the 1988 murder uncovered no evidence of blood; two searches by law enforcement forensic experts later in 1988 also uncovered no evidence of blood; the 1991 search uncovered minute samples of blood but the prosecution expert could not determine either the age of the blood or whether it was of human origin, several different tenants had occupied the trailer between the time of the 1988 murder and the 1991 search, and the presence of blood in the trailer could be explained by the clearing of blood in hypodermic needles. Much of this evidence was also before the court when it correctly ruled before trial that the evidence was not unduly prejudicial.

For these same reasons, we reject Dalton's further claim that her rights to due process and to reliable fact finding in a capital case were violated by admission of the 1991 blood evidence. Dalton asserts that the blood evidence suggested a "link between Dalton and a bloody torture-murder that otherwise was supported by no physical evidence." Even if correct, such a weak and attenuated link was not, as Dalton contends, " 'so inflammatory as to prevent a fair trial.' "

Dalton also asserts that the prosecutor argued that "[w]hen the people who had the time, took the time, had the equipment, used the equipment, went back, they found evidence of this torture, of this blood-letting. They found the drops of blood around the room, and the pictures are here." The prosecutor also argued that the blood evidence "corroborate[d]" Baker's testimony. Dalton contends that the erroneous admission of the 1991 blood evidence thus allowed the prosecutor to rely on irrelevant and prejudicial evidence. We have concluded, however, that the evidence was not prejudicial.

### 8. *Mistrial motion*

Dalton contends that the trial court erred in denying her mistrial motion. We disagree.

During Fedor's testimony on direct, Fedor interjected, "Does she have to stare at me the whole time?" Defense counsel objected, and the court advised Fedor, "Just don't look at her." Fedor responded, "Your honor, she molested my kids." The court struck the comment and admonished Fedor, "Don't talk like that." Defense counsel asked to approach the bench, and the court said, "No, that was just stricken." Counsel said, "Well, I would like to go on the record," and the court replied that could be done during the recess. The court then admonished the jury: "[I]f you heard her last comment, disregard it. It is stricken."

At the next recess, Dalton moved for a mistrial. The court denied the motion and admonished the witness, "Don't mention anything like that again in front of this jury."

The following morning, the trial court with the parties' agreement questioned each juror and three alternate jurors individually as to whether he or she had heard Fedor's comment regarding her children that had been struck from the record. If the juror had heard the comment, the court told the juror that the comment was a completely unfounded allegation and asked the juror whether he or she could follow the court's admonition and give Dalton a fair trial. Each juror who heard the comment stated he or she could disregard it and give Dalton a fair trial.

Following the questioning, the trial court inquired whether Dalton was still moving for a mistrial. Defense counsel said, "Yes, your honor." The motion was denied.

" ' "A mistrial should be granted if the court is apprised of prejudice that it judges incurable by admonition or instruction.

[Citation.] Whether a particular incident is incurably prejudicial is by its nature a speculative matter, and the trial court is vested with considerable discretion in ruling on mistrial motions. [Citation.]" [Citation.] A motion for a mistrial should be granted when " ' "a [defendant's] chances of receiving a fair trial have been irreparably damaged." ' " ' (*People v. Collins* (2010) 49 Cal.4th 175, 198.)" (*Edwards, supra,* 57 Cal.4th at p. 703.) We conclude here that Fedor's assertion Dalton had molested her children was not "so incurably prejudicial that a new trial was required." (*People v. Ledesma* (2006) 39 Cal.4th 641, 683.)

Fedor's isolated comment was brief and not solicited by the prosecutor's questioning. Moreover, the trial court went to great lengths to ensure Dalton was not prejudiced by Fedor's statement. The court immediately struck the comment, admonished the jury to disregard it, and admonished Fedor, "Don't talk like that." The following day, each juror was privately questioned by the court in the presence of counsel and asked if he or she had heard Fedor's comment. Every juror who heard the comment or part of the comment was admonished that the allegation was completely unfounded, and stated he or she could disregard the comment and give Dalton a fair trial. On this record, the trial court did not abuse its discretion in denying the mistrial motion.

### 9. Conspiracy

#### a. Statute of limitations

Dalton contends that her conviction for conspiracy to commit murder (Penal Code § 182) must be reversed because that crime is subject to a three-year statute of limitation, but the information charging her was filed more than three years after

June 26, 1988, the date of May's murder, which was the last overt act and the object of the conspiracy. We reject the claim.

A claim that a charge was filed outside the statute of limitation can be raised at any time "if the charging document indicates on its face that the charge is untimely," and there has been no express waiver of the statute of limitations. (*People v. Williams* (1999) 21 Cal.4th 335, 338.) The Attorney General points to no such waiver here. The relevant limitation periods here are found in Penal Code sections 799−801. These sections were repealed and reenacted in 1984 in response to recommendations made by the California Law Revision Commission. (Sen. Com. on Judiciary, Analysis of Assem. Bill No. 2764 (1983−1984 Reg. Sess.) as amended May 16, 1984, p. 2; Recommendation Relating to Statutes of Limitation for Felonies (Jan. 1984) 17 Cal. Law Revision Com. Rep. (1984) pp. 313−324 (Commission Report).) Before 1984, "most felonies [were] subject to a three year period of limitation," and the "crimes for which there [was] no period of limitation [were] specified." (Assem. Com. on Criminal Law and Public Safety, Analysis of Assem. Bill No. 2764 (1983−1984 Reg. Sess.) as amended May 7, 1984, pp. 2−4.) "The Commission's primary recommendation [was] that felony statutes of limitation should generally be based on the seriousness of the crime as reflected by classification of the crime as a felony, a misdemeanor or an infraction, and by the term of imprisonment imposed for the offense." (*Id.*, at p. 1.) "To implement this basic recommendation" (*ibid.*), Assembly Bill 2764 repealed and then reenacted the statutes of limitation that were then in effect in 1988 when Dalton was alleged to have conspired to murder May.

Thus, in 1988 when the conspiracy is alleged to have occurred (and currently in § 799, sub. (a)), section 799 provided,

"an offense punishable by death or by imprisonment in the state prison for life or for life without possibility of parole, or for the embezzlement of public money," has no statute of limitations. (Stats. 1984, ch. 1270, § 2, p. 4335.) Section 800, which applies to offenses punishable by imprisonment in the state prison for eight years or more, "[e]xcept as provided in Section 799," provided a statute of limitation of six years. (Stats. 1984, ch. 1270, § 2, p. 4335.) Section 801 provided, "[e]xcept as provided in Sections 799 and 800, prosecution for an offense punishable by imprisonment in the state prison shall be commenced within three years after commission of the offense." (Stats. 1984, ch. 1270, § 2, p. 4335.) "An offense is deemed punishable by the maximum punishment prescribed by statute for the offense, regardless of the punishment actually sought or imposed." (§ 805, subd. (a).)

In 1988 (and currently in § 182, subd. (a)), section 182 provided that "in the case of conspiracy to commit murder, . . . the punishment shall be that prescribed for murder in the first degree," which at that time was 25 years to life. (Stats. 1983, ch. 1092, § 247, p. 4026; Stats. 1987, ch. 1006, § 1, p. 3367; see *People v. Cortez* (1998) 18 Cal.4th 1223, 1226 [conspiracy to commit murder is necessarily conspiracy to commit premeditated first degree murder, and "is therefore punishable in the same manner as first degree murder pursuant to the provisions of Penal Code section 182."].) Thus, the language of sections 182 and 799 is clear that because conspiracy to commit murder is punishable by 25 years to life in prison, it has no limitation period. (*People v. Sconce* (1991) 228 Cal.App.3d 693, 701, fn. 3 ["there is no statute of limitations applicable to the crime of conspiracy to commit murder in California"].)

In contending that the applicable statute of limitations for conspiracy to commit murder is three years under section 801, Dalton relies on the 1984 Commission Report and on the legislative history of unpassed bill Senate Bill No. 951 (2013−2014 Reg. Sess.). Because the language of sections 182 and 799 is unambiguous, we need not consider these materials. (*People v. Valencia* (2017) 3 Cal.5th 347, 357 [if the statutory " 'language is clear and unambiguous there is no need . . . to resort to indicia' " of the Legislature's intent].)

Dalton also relies on dicta in *People v. Prevost* (1998) 60 Cal.App.4th 1382, and *People v. Milstein* (2012) 211 Cal.App.4th 1158. In *Prevost*, a case involving convictions for conspiracy to commit a misdemeanor, the court broadly stated that "[c]riminal conspiracy is governed by a three-year statute of limitations," and if a person were "charged with conspiracy to commit certain offenses like murder, where the underlying offense is not governed by a statute of limitations, the three-year statute of limitations for conspiracy would govern." (*Prevost*, at p. 1401; see *id.* at pp. 1387−1388, 1390, fn. 3.) *Prevost* relied on *People v. Crosby* (1962) 58 Cal.2d 713, a case decided long before the 1984 reenactment of sections 799−801, at a time when most felonies were governed by a three-year statute of limitation. (*Prevost*, at p. 1401; see Commission Report, *supra*, at p. 307 [in and before January 1984, "most felonies [were] subject to a three-year" statute of limitation.]; see also Assem. Com. on Criminal Law and Public Safety, Analysis of Assem. Bill No. 2764, *supra*, at p. 4.) Although we cited *Prevost* with approval in *People v. Johnson* (2013) 57 Cal.4th 250, 262, we did so not in deciding the issue of the applicable statute of limitations for conspiracy to commit

murder, which was not before us, but for the proposition that "it is possible to conspire to commit a misdemeanor."

Likewise, in *People v. Milstein*, the court held that the statute of limitation for conspiracy to defraud by false pretenses or false promises, proscribed by section 182, subdivision (a)(4), was "governed by the three-year limitations period generally applicable to criminal conspiracies," not the four year period for crimes involving fraud or a breach of fiduciary obligation. (*People v. Milstein*, *supra*, 211 Cal.App.4th at p. 1164; see *id*. at pp. 1163−1165.) *Milstein* also relied on a pre-1984 case of this court and on the statement in *Prevost* quoted above for the proposition that even in cases of conspiracy to commit murder, the three-year statute of limitations applied. (*Milstein*, at pp. 1167−1168.) We disapprove *People v. Milstein* (2012) 211 Cal.App.4th 1158 and *People v. Prevost* (1998) 60 Cal.App.4th 1382, to the extent they are inconsistent with this opinion.

In sum, in 1988 the allegation that Dalton conspired to commit murder had no statute of limitation. Hence, the filing of the information four and a half years after May's murder, which was the last overt act and the object of that conspiracy, was timely.

### b. *Sufficiency of the evidence*

Dalton contends that no substantial evidence supports her conspiracy conviction. We reject the claim.

" 'When considering a challenge to the sufficiency of the evidence to support a conviction, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence — that is, evidence that is reasonable, credible, and of solid value — from which a

reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' (*People v. Lindberg* (2008) 45 Cal.4th 1, 27.) We determine 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' (*Jackson v. Virginia* (1979) 443 U.S. 307, 319.) In so doing, a reviewing court 'presumes in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.' (*People v. Kraft* (2000) 23 Cal.4th 978, 1053.) The same standard of review applies to the sufficiency of the evidence supporting special circumstance findings." (*Edwards*, *supra*, 57 Cal.4th at p. 715.)

" 'Conspiracy requires two or more persons agreeing to commit a crime, along with the commission of an overt act, by at least one of these parties, in furtherance of the conspiracy.' " (*People v. Homick* (2012) 55 Cal.4th 816, 870.) " 'Evidence is sufficient to prove a conspiracy to commit a crime "if it supports an inference that the parties positively or tacitly came to a mutual understanding to commit a crime. [Citation.] The existence of a conspiracy may be inferred from the conduct, relationship, interests, and activities of the alleged conspirators before and during the alleged conspiracy." ' " (*Maciel*, *supra*, 57 Cal.4th at pp. 515−516; *Homick*, at p. 870 [the element of agreeing to commit a crime "must often be proved circumstantially"].)

" 'One who conspires with others to commit a felony is guilty as a principal. (§ 31.) " 'Each member of the conspiracy is liable for the acts of any of the others in carrying out the common purpose, i.e., all acts within the reasonable and probable consequences of the common unlawful design.' [Citations.]" [Citation.]' (*In re Hardy* (2007) 41 Cal.4th 977,

1025−1026.) '[A]ll conspiracy to commit murder is necessarily conspiracy to commit premeditated and deliberated first degree murder.' " (*Maciel*, *supra*, 57 Cal.4th at p. 515, italics omitted.)

Significant to the conspiracy conviction was Baker's testimony to the following: After Fedor was taken to the honor camp, Tompkins and Baker were at the house of Baker's drug dealer in Lakeside. Tompkins left for about 10 minutes to telephone Dalton, returned in a "panic," and told Baker "something happened" and "[w]e have to get back up there." As they drove, Tompkins said "things just happen and to go with the flow," and "things happen for a reason." (See *ante*, p. 8.) When Baker and Tompkins returned to the trailer, May was in a chair in the kitchen covered with a sheet and bound. Dalton was upset and told Baker that Baker did not "know what happened when [she] was gone, and something had happened, and that they were going to kill" May. Dalton had prepared several syringes of battery acid and injected one into May. Baker hit May with a heavy pan, and Tompkins stabbed and killed May.

The jury could reasonably infer based on these circumstances that during the telephone call between Tompkins and Dalton, Tompkins learned something had gone awry while Dalton and May were at the trailer and conspired with Dalton to kill May. (See *People v. Jurado* (2006) 38 Cal.4th 72, 121; *Maciel*, *supra*, 57 Cal.4th at p. 516.) Because the object of the conspiracy was to kill May, her "murder satisfied the element of an overt act committed in furtherance of the conspiracy." (*Maciel*, at p. 518; see *Jurado*, at p. 121 ["Commission of the target offense in furtherance of the conspiracy satisfies the overt act requirement."].)

Dalton argues that Baker's testimony is not corroborated as required by section 1111. Evidence corroborating Baker's testimony was required for each count as to which Baker was an accomplice as a matter of law. (See *Romero and Self*, *supra*, 62 Cal.4th at p. 40.) We have explained that under section 1111, "the corroboration must connect the defendant to the crime *independently* of the accomplice's testimony." (*Romero and Self*, *supra*, 62 Cal.4th at p. 36.) " 'The entire conduct of the parties, their relationship, acts, and conduct may be taken into consideration by the trier of fact in determining the sufficiency of the corroboration.' [Citations.] The evidence 'need not independently establish the identity of the victim's assailant' [citation], nor corroborate every fact to which the accomplice testifies [citation], and ' "may be circumstantial or slight and entitled to little consideration when standing alone." ' " (*Id.* at p. 32.)

The Attorney General generally asserts that lack of corroboration is not properly raised on appeal because "the jury decided the facts, and already resolved inconsistencies in favor of the judgment." Contrary to the Attorney General's assertion, "[t]he requirement that accomplice testimony be corroborated is an ' "exception[]" ' to the substantial evidence' rule. [Citation.] It is based on the Legislature's determination that ' "because of the reliability questions posed by" ' accomplice testimony, such testimony ' "by itself is insufficient as a matter of law to support a conviction." ' " (*Romero and Self*, *supra*, 62 Cal.4th at p. 32.) For this reason, "[t]he trier of fact's determination on the issue of corroboration" is not binding on the reviewing court if the "corroborating evidence . . . does not reasonably tend to connect the defendant with the commission of the crime." (*People v. McDermott* (2002) 28 Cal.4th 946, 986.)

We first conclude Baker's testimony regarding May's murder was corroborated. Dalton's statement to Carlyle that she, Baker, and Tompkins were involved in May's murder, and her response to Collins that May "was a rat" who "deserved to die" when Collins asked Dalton why she had killed May, connected Dalton to May's murder independent of Baker's testimony. (*Romero and Self, supra*, 62 Cal.4th at p. 36; *People v. Davis* (1930) 210 Cal. 540, 558 (*Davis*) [a "defendant's own statements and admissions, made in connection with other testimony" may corroborate an accomplice's testimony].) Baker's testimony was further corroborated by Fedor's testimony that Dalton, May, Baker, and Tompkins had been at her trailer during the relevant time period, that Dalton was upset because May had held a yard sale that included Dalton's belongings and had acted controlling toward May, that Dalton was left alone in the trailer with May before May's disappearance, and that when Fedor returned late that afternoon, May was gone and Dalton told her she had cut herself and the bloody linens and clothes had been taken to be washed. (See *ante*, pp. 4−5, 7, 14−16.)

As to the conspiracy to commit murder, it is not clear as a preliminary matter whether the trial court properly instructed the jury that Baker was an accomplice as a matter of law. As the Attorney General notes, the prosecutor conceded at the hearing on the motion for acquittal that Baker was not part of a conspiracy and "she should probably be removed from that conspiracy."

Assuming Baker was an accomplice as to a conspiracy to murder May, we have said that the "*existence* of a conspiracy may be proved by uncorroborated accomplice testimony; corroboration of accomplice testimony is needed only to connect

the defendant to the conspiracy." (*People v. Price* (1991) 1 Cal.4th 324, 444 (*Price*), italics added.) Here, the jury could reasonably infer the existence of a conspiracy to kill May from Baker's testimony that Tompkins left the Lakeside home they were visiting for about 10 minutes to make a telephone call, returned in a "panic," told Baker "something happened" and "[w]e have to get back up there," and as they drove, said "things just happen and to go with the flow," and "things happen for a reason." When Baker and Tompkins returned to the trailer, May was in a chair in the kitchen covered with a sheet and bound, and was shortly thereafter killed. These facts demonstrate the existence of a conspiracy between Tompkins and someone else to kill May.

Moreover, Baker's testimony regarding Dalton's involvement in the conspiracy to kill May was corroborated. Dalton was independently linked to the conspiracy by her statement to Carlyle that she, Baker, and Tompkins were involved in the murder of May in the "Live Oaks" area, and that May had been killed by battery acid. (*Romero and Self*, *supra*, 62 Cal.4th at p. 36; *Davis, supra,* 210 Cal. at p. 558.) This statement corroborated Baker's testimony that when she and Tompkins returned to Fedor's trailer (located in the Live Oak Springs Trailer Park), Dalton had already prepared several syringes of battery acid and subsequently injected one into May. The circumstance that Dalton had already prepared the syringes suggests planning and an agreement between Tompkins and Dalton to kill May.

Fedor also corroborated Baker's testimony by stating that when she returned to her trailer between 5:00 and 5:30 p.m. on the afternoon of June 26, 1988, it was in disarray, May was gone, and Dalton and Baker were cleaning items from the

trailer. (*Prince, supra*, 40 Cal.4th at p. 1257 [accomplice's testimony was corroborated in part by the accomplice's and defendant's presence together shortly after the crime].) In addition to placing Dalton at the murder scene shortly after Tompkins and Baker had returned from Lakeside, Fedor further testified that Tompkins and George then returned to the trailer, and Dalton, Tompkins, Baker, and George left in the same truck that evening. (*People v. Williams* (2013) 56 Cal.4th 630, 679 [evidence of the defendant's "flight after the crimes were committed supports an inference of consciousness of guilt and constitutes an implied admission, which may properly be considered as corroborative of the accomplice testimony"].)

In sum, substantial evidence supports the conspiracy to commit murder conviction. The judgment as to this count nonetheless must be modified. The trial court erred in imposing (and staying) a death sentence based upon the conspiracy conviction (Count I) because conspiracy to commit murder does not render a defendant death eligible. (*People v. Vieira* (2005) 35 Cal.4th 264, 294; *People v. Lawley* (2002) 27 Cal.4th 102, 171−172; *People v. Hernandez* (2003) 30 Cal.4th 835, 864–870.) The Attorney General concedes the sentence was unauthorized, and the parties agree that the proper sentence is 25 years to life. (§ 1260; see *Vieira* at p. 294; *Lawley*, at pp. 171−172.) Since the object of the conspiracy was to kill May, the reduced sentence must be stayed under section 654. (*Lewis, supra*, 43 Cal.4th at p. 539 ["under section 654, defendant may not be punished for both the underlying crimes and the conspiracy, because there was no showing that the object of the conspiracy was any broader than commission of the underlying crimes"].) We direct the trial court to issue an amended abstract of judgment

reflecting a sentence of imprisonment for 25 years to life, stayed pursuant to section 654, on the conspiracy count.

### 10. Additional sufficiency of the evidence claims

Dalton further contends that no substantial evidence supports her conviction for first degree murder or the true findings for the lying in wait and torture-murder special-circumstance allegations. We conclude substantial evidence supports her conviction for first-degree murder and the torture-murder special-circumstance true finding, but that no substantial evidence supports the lying in wait special circumstance true finding.

#### a. First degree murder

"Three categories of evidence are helpful to sustain a finding of premeditation and deliberation in a murder case: (1) planning activity; (2) motive; and (3) manner of killing." (*People v. San Nicolas* (2004) 34 Cal.4th 614, 658 (*San Nicolas*).) These factors are simply a "framework to assist reviewing courts in assessing whether the evidence supports an inference that the killing resulted from preexisting reflection and weighing of considerations," and do "not refashion the elements of first degree murder or alter the substantive law of murder in any way." (*People v. Thomas* (1992) 2 Cal.4th 489, 517.)

Here, substantial evidence supports the jury's finding that Dalton premeditated May's murder. The circumstance that Dalton covered May in a sheet and bound her to a chair, and prepared four or five hypodermic needles of battery acid for the purpose of killing her, demonstrates planning and a manner of killing that supports a finding of premeditation and deliberation. (*San Nicolas*, *supra*, 34 Cal.4th at pp. 658–659; *People v. Bolin* (1998) 18 Cal.4th 297, 332.) Evidence of Dalton's

belief that May had stolen from her and shared a hypodermic needle while suffering from hepatitis provided a motive for her to kill May. We have rejected above Dalton's claim that Baker's testimony lacked corroboration. (See *ante*, pt. II.A.9.b.)

### b. *Lying in wait*

At the time of May's murder, the "lying-in-wait special circumstance required an intentional killing, committed under circumstances that included a physical concealment or concealment of purpose; a substantial period of watching and waiting for an opportune time to act; and, immediately thereafter, a surprise attack on an unsuspecting victim from a position of advantage." (*People v. Stevens* (2007) 41 Cal.4th 182, 201, fn. omitted (*Stevens*); see *People v. Sandoval* (2015) 62 Cal.4th 394, 415.) "The factors of concealing murderous intent, and striking from a position of advantage and surprise, 'are the hallmark of a murder by lying in wait.' " (*Stevens*, at p. 202.) "Concealment of purpose is not by itself 'sufficient to establish lying in wait' because 'many "routine" murders are accomplished by such means.' " (*Sandoval*, at p. 416.)

The prosecutor introduced no evidence of such a surprise attack on May. Sheryl Baker testified that other than Dalton's statement that May "tried to get away or something," Baker did not know and was never told what had happened at the trailer while she and Tompkins were gone. Nor did the prosecutor introduce any other evidence of what happened before Baker and Tompkins returned to the trailer. May's body was never found and hence cannot provide any evidence of how she was subdued.

In sum, nothing but speculation supports the special circumstance finding that Dalton killed May while lying in wait,

and we therefore vacate it. Double jeopardy principles preclude retrial of this special circumstance allegation. (*Burks v. United States* (1978) 437 U.S. 1, 18 ["the Double Jeopardy Clause precludes a second trial once the reviewing court has found the evidence legally insufficient"]; *People v. Thompson* (1980) 27 Cal.3d 303, 332–333 [insufficient evidence supported the jury's special circumstance allegation findings, "those findings must be set aside, and further proceedings on these allegations are barred by the double jeopardy clause"].)

For this reason, we need not address Dalton's further contention that the lying in wait special circumstance is unconstitutional.

### c. Torture-murder

Dalton contends that no substantial evidence supports the jury's torture-murder special-circumstance true finding and that the trial court erred in denying her motion for acquittal on this ground after the close of the prosecution's case-in-chief. The trial court also denied Dalton's motion for a new trial on this ground.

" 'The standard applied by a trial court in ruling upon a motion for judgment of acquittal pursuant to section 1118.1 is the same as the standard applied by an appellate court in reviewing the sufficiency of the evidence to support a conviction, that is, "whether from the evidence, including all reasonable inferences to be drawn therefrom, there is any substantial evidence of the existence of each element of the offense charged." ' [Citation.] 'The purpose of a motion under section 1118.1 is to weed out as soon as possible those few instances in which the prosecution fails to make even a prima facie case.' [Citations.] The question 'is simply whether the

prosecution has presented sufficient evidence to present the matter to the jury for its determination.' [Citation.] The sufficiency of the evidence is tested at the point the motion is made. [Citations.] The question is one of law, subject to independent review." (*Stevens*, *supra*, 41 Cal.4th at p. 200.)

As noted, torture is the infliction of " ' "pain and suffering in addition to death." ' " (*Edwards*, *supra*, 57 Cal.4th at p. 716.) The torture-murder special-circumstance allegation "requires an ' "intent to cause cruel or extreme pain and suffering for the purpose of revenge, extortion, persuasion, or for any sadistic purpose." ' [Citation.] . . . [I]t also requires an intent to kill and, at the time of [May's] murder, required 'proof of the infliction of extreme physical pain no matter how long its duration' on a living victim." (*Id.* at p. 718; *ante*, pt. II.A.1.c.2.b.)

We conclude substantial evidence exists — and existed at the close of the prosecution's case-in-chief — to demonstrate these elements. Dalton's intent to kill was demonstrated by her statement to Baker that they were going to kill May by injecting battery acid and her action in then injecting the victim with that substance. The infliction of extreme physical pain while May was alive was demonstrated by Tompkins's statements that he "tortured the hell out of [May]" before killing her and that "pain was the name of the game," Dalton's injection of May with battery acid and her statement that May was suffering after the injection, Fedor's discovery of a cut and melted cord, cords tied together, and a screwdriver with blood, hair, and scalp material on it, the perpetrators' use of a heavy kitchen skillet on May before stabbing her to death, and Baker's first statement to police in which she said May had spoken before she was killed.

Dalton's intent to cause May cruel or extreme pain and suffering for the purpose of revenge, extortion, persuasion, or for any sadistic purpose was demonstrated by Dalton's statements and the circumstances surrounding the murder. (*People v. Mungia* (2008) 44 Cal.4th 1101, 1137, italics omitted ["The intent to torture 'is a state of mind which, unless established by the defendant's own statements (or by another witness's description of a defendant's behavior in committing the offenses), must be proved by the circumstances surrounding the commission of the offense' "]; *People v. Cole* (2004) 33 Cal.4th 1158, 1172, 1214 [the defendant's statements after the murder that he was angry with the victim and wanted to kill her permit an inference of intent to inflict extreme pain]; *People v. Wilson* (2008) 44 Cal.4th 758, 804, italics omitted ["[T]he torture-murder special circumstance requires proof that the defendant h[er]self intended to torture the victim"].)

Here, May was covered with a sheet and bound to a chair, and hence unable to see her assailants or resist their attack. (*People v. Hajek and Vo* (2014) 58 Cal.4th 1144, 1188 ["to establish an intent to torture [citation], it is appropriate to consider whether the victim was bound and gagged, or was isolated from others, thus rendering the victim unable to resist a defendant's acts of violence."]; see *Edwards, supra,* 57 Cal.4th at p. 717 [evidence that the victim had been bound and gagged and had a hood placed over her head "suggest[s] a methodical and prolonged attack rather than an explosion of violence"].) These physical limitations heightened the terror of any inflicted violence.

Dalton's injection of May with battery acid, a substance that the prosecution expert testified would be quite painful if injected into a vein, indicates an intent to make her suffer.

Indeed, Dalton falsely told May she was giving her a sedative to calm her, thus lowering May's guard and adding shock to her ensuing pain. Although Dalton told Baker the substance would kill May "instantly" and appeared to express concern that May was suffering as a result of the injection, the jury was not required to credit these statements or to view them as negating Dalton's intent at the time she injected May. (*People v. Williams* (1992) 4 Cal.4th 354, 364 ["a trier of fact is permitted to credit some portions of a witness's testimony, and not credit others"].) The jury could discount this testimony in light of other evidence that Dalton had prepared four or five syringes of battery acid, thus indicating she did not in fact believe a single injection would kill May, Dalton's anger and controlling behavior toward May on the day of the murder, Dalton's later exuberance in telling Brakewood, " 'Yeah, we really fucked that girl up' " in response to Nottoli's description of shooting up a girl with battery acid and burning her, and Dalton's motivation to have Baker participate in the attack so that Baker would also be culpable and hence not implicate Dalton.

### 11. Asserted prosecutorial misconduct

#### a. Guilty plea

Dalton contends that the prosecutor committed prejudicial misconduct during closing argument in relying on Baker's guilty plea and that the trial court erred in failing to give the jury a limiting instruction on its own motion regarding the use of the plea. We disagree.

"A prosecutor commits misconduct when his or her conduct either infects the trial with such unfairness as to render the subsequent conviction a denial of due process, or involves deceptive or reprehensible methods employed to persuade the

trier of fact." (*People v. Avila* (2009) 46 Cal.4th 680, 711.) "As a general rule a defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion — and on the same ground — the defendant made an assignment of misconduct and requested that the jury be admonished to disregard the impropriety." (*People v. Samayoa* (1997) 15 Cal.4th 795, 841 (*Samayoa*).) "When attacking the prosecutor's remarks to the jury, the defendant must show that, '[i]n the context of the whole argument and the instructions' [citation], there was 'a reasonable likelihood the jury understood or applied the complained-of comments in an improper or erroneous manner.'" (*People v. Centeno* (2014) 60 Cal.4th 659, 667 (*Centeno*).)

At trial, Baker testified she had pled guilty to second-degree murder in exchange for testifying at trial against Dalton. The prosecutor also agreed to other terms, including notifying the Department of Corrections or Board of Prison Terms of Baker's cooperation and her level of culpability in Dalton's case, requesting she serve her prison time out of state, and transporting her to and from court separately from Dalton. Baker had not yet been sentenced at the time of her testimony.

Dalton does not contend that evidence of Baker's plea agreement was improperly introduced. Evidence of Baker's plea agreement bore on her credibility and was properly before the jury to show Baker's possible bias and motivation to testify. (See *Price, supra*, 1 Cal.4th at p. 446.) Indeed, defense counsel began Baker's cross-examination by exploring the details of the plea agreement and introduced Baker's second statement to police — in which her counsel delineated the terms of the plea agreement — in the defense case.

Dalton asserts that the prosecutor improperly relied on the plea agreement during closing argument. The prosecutor said: "Sheryl Baker is another eye witness. . . . She participated. . . . She knows this woman is dead. . . . Not only that, she put her money where her mouth is. She pled guilty to the murder of Irene Melanie May. She knows what happened."

Dalton asserts that this argument was improper because the prosecutor used the plea as evidence that the murder occurred. Dalton did not object to the prosecutor's argument or seek an admonition. She now contends that any such objection would have been futile because the trial court had previously ruled that Tompkins's guilty plea was admissible to demonstrate the corpus delicti of murder. Although the prosecutor ultimately decided not to introduce Tompkins's plea, Dalton asserts that defense counsel had no reason to anticipate an objection to the prosecutor's reliance on Baker's plea to show corpus would prevail.

Assuming that the claim is preserved and that Dalton is correct that Baker's plea could not be used as substantive evidence a murder had occurred in a prosecution against someone other than Baker, no prejudice is apparent. Contrary to Dalton's assertion, the guilty plea was not the "only evidence that a crime even occurred." Rather, in addition to Dalton's statements to Laurie Carlyle that she had been involved in May's murder and that May had been killed with battery acid, and Dalton's statement to Patricia Collins that she had killed May because May "was a rat" who "deserved to die," the corpus delicti of murder was established by Baker's lengthy testimony at trial and statements to police, May's disappearance, and Fedor's testimony regarding May's absence and the state of

Fedor's trailer when she returned home on the evening of June 26, 1988.

Dalton also contends the prosecutor's statement infringed on Dalton's presumption of innocence because it implied that Dalton's "failure to act similarly to Baker and plead guilty implied that Dalton did not want to take responsibility for her actions." The reasonable import of the prosecutor's remarks was that Baker would not have pled guilty to second-degree murder if May were not in fact dead. There is no reasonable likelihood the jury would have construed the remarks as referring implicitly to Dalton.

Baker also challenges the prosecutor's remark that "[May] was alive. Sheryl Baker tells you she was alive, and she pled guilty to murder, which tells you she was alive when she got back and did what she did." The prosecutor also said that Baker "pled guilty to murder, not mutilating a corpse." Dalton contends that these remarks improperly rely on the plea as evidence May "was alive when she was injected, hit and stabbed." Dalton did not object to the prosecutor's argument or seek an admonition.

Assuming that the claim is preserved, and that there is a reasonable likelihood the jury so understood the prosecutor's comments, there is no prejudice. Any inference from Baker's guilty plea that May was alive when Baker and Tompkins returned was cumulative to Baker's March 1992 statement to police. In Baker's first statement to police in March 1992, which was played for the jury, she told officers May had said, "I don't wanna die," and "[p]lease don't kill me, I'm sorry."

Dalton also challenges the prosecutor's argument that Baker's "guilty plea corroborates what she says." Dalton did not

object to the prosecutor's argument or seek an admonition, and no exception to the general rule requiring an objection and request for admonition applies. The claim is therefore forfeited. (*Samayoa, supra*, 15 Cal.4th at p. 841.)

On the merits, Dalton is correct that Baker's guilty plea does not corroborate her testimony. As we observed earlier, under section 1111, "the corroboration must connect the defendant to the crime *independently* of the accomplice's testimony." (*Romero and Self, supra*, 62 Cal.4th at p. 36; see *ante*, pt. II.A.9.b.) Baker's plea did not connect Dalton to May's murder. (See *People v. Cummings* (1993) 4 Cal.4th 1233, 1322 [nontestifying codefendant's guilty plea did not corroborate accomplice's testimony that the defendant was involved in the crime].) Again, however, no prejudice is apparent. The trial court correctly instructed the jury on the evidence necessary to corroborate Baker's testimony, and we presume it followed that instruction.

Dalton asserts, relying on *United States v. Halbert* (9th Cir.1981) 640 F.2d 1000, that the trial court erred in failing to instruct the jury on its own motion that Baker's guilty plea could be used only to assess her credibility. We rejected a substantially similar argument in *People v. Williams, supra*, 56 Cal.4th at p. 668, and Dalton cites no persuasive reason to revisit our conclusion. In any event, for the reasons stated above, even assuming the trial court had such a duty, we see no prejudice from failing to so instruct.

### b. *Burden of proof and presumption of innocence*

Dalton contends the prosecutor committed misconduct in his rebuttal closing argument by telling the jury Dalton's presumption of innocence was gone and by diluting and

trivializing the People's burden of proof. We conclude Dalton forfeited this argument by failing to object at trial, and even assuming the claim was preserved, there was no prejudicial prosecutorial misconduct.

### 1) Factual background

Because the prosecutor's challenged remarks occurred in his rebuttal closing argument, we first recount defense counsel's argument.

### (a) Defense counsel

During Dalton's closing argument, defense counsel spent significant time on the prosecution's burden of proof beyond a reasonable doubt. He stated: "Ladies and gentlemen, when we started this case at the beginning, . . . I indicated to you that the evidence in this case would not prove [Dalton] guilty beyond a reasonable doubt. You've heard the evidence in this case. In a moment you'll hear the law from the judge. . . . [A]fter you have listened to the law in this case and apply it to the evidence in this case, I think that you will find that Kerry Dalton has not been proven guilty of the charges against her."

Defense counsel asserted: "[O]ne of the most important instructions that the judge will give you and that you've been told already by the judge is the standard, the standard by which you judge." "Basically, it says that: A defendant in a criminal action is presumed to be innocent until the contrary is proved, and in the case of a reasonable doubt whether her guilt is satisfactorily shown, she is entitled to a verdict of not guilty. This presumption places upon the People the burden of proving her guilty beyond a reasonable doubt." "There's three separate concepts here. . . . . The first one is the concept of presumption of innocence. . . . Our law says that that person who has been

accused, Kerry Dalton, is presumed to be innocent; and it wraps around Kerry Dalton a . . . protective shield, that presumption of innocence, and that shield remains there unless it is torn away beyond a reasonable doubt. . . . [U]nless that shield is torn away beyond a reasonable doubt, the shield remains, and she is entitled to your verdict of not proven guilty."

Defense counsel continued: "The second concept that is discussed in this instruction is the idea of the burden of proof. That burden of proof places upon the prosecution the burden of proving guilt beyond a reasonable doubt. . . . . [N]owhere does the law place on Kerry Dalton the responsibility of having to prove herself not guilty." "[T]he third concept here is the standard of proof, and that standard of proof is proof beyond a reasonable doubt. In the law we refer to this as the highest standard of proof, proof beyond a reasonable doubt."

Defense counsel then read the instruction the jury would receive defining reasonable doubt. (See *post*, pt. II.A.11.b.1.c.) Apparently using a chart that included the words "not guilty" on it, defense counsel explained that the instruction meant that if the prosecution demonstrated that the evidence was evenly divided as to guilty or not guilty, then Dalton was entitled to a verdict of not guilty. Counsel then discussed the standard of preponderance of the evidence in civil cases, and said that if "[i]t's more likely than not that the defendant committed the crime . . . [t]here's still reasonable doubt, and the defendant is entitled to a verdict of not guilty." Counsel made similar arguments for standards of "[p]robably guilty" and clear and convincing evidence. Defense counsel defined reasonable doubt as "that state . . . of the evidence above all of these which leaves the minds of the jurors in the condition they cannot say they feel an abiding conviction — an abiding conviction — to a moral

certainty — a moral certainty — of the truth of the charge. And that concept of moral certainty applies to a discussion that we had back when we were asking questions during voir dire, and that was if you were sitting where Kerry Dalton is sitting, how would you want to be judged? If you have to make decisions in your life that are the most important decisions, wouldn't you want to use the concept of a moral certainty before you would act? If not, there is reasonable doubt; and if there's reasonable doubt, then there has not been proof beyond a reasonable doubt and Kerry Dalton is entitled to your verdict of not proven guilty."

Defense counsel continued: "[T]o find a person guilty, you have to certify that that person has been proven guilty. To find a person not guilty or not proven guilty, you're only saying that you have not been presented evidence beyond a reasonable doubt, because, once again, there is no burden of proof on the defense and there is no burden of proof on Kerry Dalton's part to have to prove that she did not commit this crime. Now, that's the law, and that's what the judge will give you; and basically that's essential as a foundation to go through the evidence and discuss what you have heard in this case. That wasn't discussed this morning. It's the basic foundation in looking at the evidence in this case, because no one is asking you to say, well, you know . . . 'I'm disturbed by some of this evidence. I'm concerned with some of this evidence. Some of this evidence certainly indicates guilt.' That's not your job. Your job is to look at all the evidence; and unless there is proof beyond a reasonable doubt to a moral certainty, then Kerry Dalton is entitled to your verdict of not proven guilty. Now, that's part of the law."

Toward the end of defense counsel's argument, he returned to the issue of the prosecutor's burden of proof: "If there is 99 percent proof beyond a reasonable doubt, there is

one percent reasonable doubt that Irene May may have died, if she died, of natural causes, then the law requires a finding of not guilty because proof beyond a reasonable doubt has not been made. . . . Again, the prosecution has the burden of proof, the prosecution has the burden to remove all proof that there is a presumption of innocence to take away the shield to present proof beyond a reasonable doubt." "What I ask you to do is to understand that this is not a game, is to ask you that this is not about name calling and calling people evil. This is a situation where Kerry Dalton deserves to be judged the way that you would be judged. That this is a lasting decision. It is not a decision for today or for tomorrow, next week, next month, next year. It is a lasting decision. And that the law requires that there be proof beyond a reasonable doubt of the charges against Miss Dalton which are conspiracy to commit murder, and murder. Based on the evidence in this case, Kerry Dalton has not been proven guilty and that is why we ask you for your verdict of not guilty as to the charges against her."

### *(b) Prosecutor*

In rebuttal, the prosecutor argued: "Counsel made comments regarding the presumption of innocence and, truly, the defendant had it . . . when we started this case. Now that the evidence is here, now that you heard it all, it is gone. The evidence shattered that presumption of innocence. It only lasts until the evidence of guilt has been shown. It has been shown. She's no longer protected by that presumption."

The prosecutor continued: "The defendant spent a great deal of time and perhaps every other sentence talking about reasonable doubt and had this chart for you. Certainly I have to prove my case beyond a reasonable doubt. That's why we

spent so much time picking a jury, when people thought maybe beyond a shadow of a doubt, anything beyond that."

The prosecutor then discussed the chart used by defense counsel: "This was the chart they gave you. Man, we got not guilty all over this thing. We don't even have the courage to put guilt up there when it does get to reasonable doubt. And this is perhaps a little misleading."

The prosecutor then apparently showed the jury his chart, saying: "Let me give you another one, not formal, not fancy, handwritten, but another way of looking at it. Using this as kind of like a thermometer — and don't worry about the gaps between all these. That doesn't mean anything. The law doesn't tell you anything about what the gap is between them, but those are standards of proof that can be or could be established or required; and when you hear the instructions regarding reasonable doubt, you'll hear about possible doubt and imaginary doubt. Certainly, if there's no proof, the defendant is . . . innocent. That's the way we start the case. There's no . . . evidence. Will you vote now? She's got to be not guilty. She's presumed innocent. We work our way up the thermometer. If we get to preponderance of the evidence, that's not enough in a criminal case. That's not enough. She's still not guilty. If I can only establish beyond clear and convincing evidence, that's not enough. But . . . when we get to proof beyond a reasonable doubt, that is enough. Reasonable doubt. Subject to reason; not guesses, not hopes, not hunches, not attorneys' arguments. And we can still go above that. The law could require more than that, but it doesn't. I do not have to prove the case beyond a possible doubt. I don't. You'll hear that. You saw that in this chart. I do not have to prove this case beyond an imaginary doubt. Anybody can come up with some imaginary doubt; we heard an

hour of it.  I do not have to prove the case beyond a shadow of a doubt.  That is not the same thing as reasonable doubt, make no mistake about that; and I do not have to eliminate all doubt."

The prosecutor argued:  "Drunk driving, petty theft, car thefts, robberies, rapes, murders, it's the same standard in them all.  That's all I have to establish.  I've gone way beyond that in this case.  The defendant scared the daylights out of Jeanette Bench.  When she spoke with her out at . . . Las Colinas, threatened her, called her names, told her what was going to happen to her.  Don't let the same thing happen to you.  Don't let the same thing happen to you as to what your job your function is.  It's the same job, the same function as any jury in any criminal case; and don't let the attorneys, myself included, convince you of what the evidence is or shouldn't be or what is reasonable doubt and what isn't."

The prosecutor then said, "Let me give you an example.  Those of you that are married, or . . . living with somebody. . . .  Comes the end of the evening, TV show is over, it's time to go to bed; time to lock up the house, turn out the lights and go to bed.  It's your job to do that.  You go over and you lock the door, turn the TV off.  You switch the lights out.  You do it that way every night, because that's your job and you do it.  You go up.  You get ready for bed.  You climb in bed and your wife says, 'Did you turn that light off?  Did you turn that light off?'  And now you're a big dummy.  You never turn it off, you big goof ball.  You forgot your socks the other day.  You probably didn't turn it out.  And all of a sudden, she starts creating a reasonable doubt in your mind, . . . or it's not reasonable, because when you went to bed you knew you turned it out.  Don't let me create that doubt; don't let him create that doubt.  The guy goes downstairs and, sure enough, the lights were off and the doors were locked.  You knew

what you had done. You did it right. You did it conscientiously, just like you'll do it in this case."

The prosecutor continued: "Great deal was spent about circumstantial evidence, and circumstantial evidence is dynamite stuff, and it just about has to be circumstantial evidence in a case like this." He then discussed the lack of probity of the blood evidence, and said: "Circumstantial evidence, though, what's the reasonable interpretation? That's all we're looking for. What is reasonable? What isn't? And the good thing . . . about circumstantial evidence — let's wipe out the blood. Let's get rid of the blood, assuming the blood is garbage, cross it off. Okay? Now look at the rest. Look at the rest of the circumstantial evidence. That's what you do with circumstantial evidence, you have to look at [it] in totality. If one or two or some of you don't buy into one of it, discard it. Look at what else you have. 'Do I still have enough?' That's all we're talking about, is what's reasonable. Is this the reasonable interpretation?"

### (c) Jury Instructions

After arguments were concluded, the trial court instructed the jury: "[Y]ou must determine the facts from the evidence received in this trial and not from any other source." "If anything concerning the law said by the attorneys in their arguments . . . conflicts with my instructions on the law, you must follow my instructions . . . . Statements made by the attorneys during the trial are not evidence . . . ."

On the issue of Dalton's presumed innocence and the prosecutor's burden of proof, the court instructed the jury: "A defendant in a criminal trial is presumed to be innocent until the contrary is proved, and in the case of a reasonable doubt

whether her guilt is satisfactorily shown, she's entitled to a verdict of not guilty. This presumption places upon the people the burden of proving her guilty beyond a reasonable doubt. Reasonable doubt is defined as follows: It is not a mere possible doubt; because everything relating to human affairs, and depending upon moral evidence, is open to some possible or imaginary doubt. It's that state of the case which, after the entire comparison and consideration of the evidence, leaves the minds of the jurors in that condition that they cannot say they feel an abiding conviction, to a moral certainty, of the truth of the charge." The written instructions were given to the jury for its deliberations.

### 2) Analysis

Dalton did not object to the prosecutor's argument or seek an admonition, and no exception to the general rule requiring an objection and request for admonition applies. The claim is therefore forfeited. (*Samayoa, supra,* 15 Cal.4th at p. 841.) Even assuming that the claim is preserved and that portions of the prosecutor's argument constituted misconduct, there is no reasonable probability that a result more favorable to Dalton would have occurred absent the error. (*Watson, supra,* 46 Cal.2d at p. 837.) For this reason, we further reject Dalton's claim that trial counsel was ineffective in failing to object.

"[T]he Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." (*In re Winship* (1970) 397 U.S. 358, 364.) A "defendant is entitled to the presumption of innocence until the contrary is found by the jury" (*People v. Booker* (2011) 51 Cal.4th 141, 185 (*Booker*)), and is "entitled to have his guilt or innocence

determined solely on the basis of the evidence introduced at trial" (*Taylor v. Kentucky* (1978) 436 U.S. 478, 485). "We have recognized the 'difficulty and peril inherent'" in the "use of reasonable doubt analogies or diagrams in argument," and have discouraged such "'"experiments"'" by prosecutors. (*Centeno*, *supra*, 60 Cal.4th at p. 667.)

Dalton contends that the prosecutor committed misconduct by (1) telling the jury Dalton's presumption of innocence "is gone," (2) urging the jury to convict Dalton based on a "reasonable" account of the evidence rather than proof beyond a reasonable doubt, (3) using a chart that placed the beyond a reasonable doubt standard below what he argued were four higher standards, and (4) trivializing the burden of proof and deliberative process by comparing them to someone lying in bed wondering if he had remembered to turn off the lights and lock the door.

As to the first two challenged instances, we conclude there was no misconduct. In telling the jury that Dalton's presumption of innocence was gone, it appears that the prosecutor "simply argued the jury should return a verdict in his favor based on the state of the evidence presented." (*Booker*, *supra*, 51 Cal.4th at p. 185.) Likewise, the prosecutor's comments that "when we get to proof beyond a reasonable doubt, that is enough," that "[r]easonable doubt" was "[s]ubject to reason; not guesses, not hopes, not hunches, not attorneys' arguments," and that circumstantial evidence should be considered in its totality and reasonably interpreted, merely urged the jury to "reject impossible or unreasonable interpretations of the evidence," which "is permissible." (*Centeno*, *supra*, 60 Cal.4th at p. 672.)

More troubling is the prosecutor's "example" of a person in bed wondering if he forgot to turn off the lights and lock the door. Dalton asserts "the analogy equated proof beyond a reasonable doubt to everyday decision-making in a juror's own life." (See *People v. Nguyen* (1995) 40 Cal.App.4th 28, 36 ["prosecutor's argument that people apply a reasonable doubt standard 'every day' and that it is the same standard people customarily use in deciding whether to change lanes trivializes the reasonable doubt standard"].) It appears from the record, however, that the prosecutor used this analogy as an example of the confidence the jury should feel in its ability to conscientiously consider the evidence to determine whether Dalton was guilty, not as a definition of reasonable doubt. Such analogies are ill-advised because of their potential to confuse, if not mislead, the jury, which, unlike a reviewing court, cannot leisurely examine the prosecutor's transcribed words.

As to the prosecutor's use of a chart, we observe that the beyond a reasonable doubt standard is generally not susceptible to pictorial depiction on a chart or a diagram. Although we have previously stopped short of "categorically disapproving the use of reasonable doubt . . . diagrams in argument" (*Centeno*, *supra*, 60 Cal.4th at p. 667), we caution that the use of such charts or diagrams to explain the standard presents a significant risk of confusing or misleading the jury and that it is better practice not to use such visuals.

Nonetheless, any misconduct in the prosecutor's use of the chart or the bedtime example here was not prejudicial. It is "significant that defense counsel emphasized the court's instructions on reasonable doubt numerous times during closing argument." (*Cortez*, *supra*, 63 Cal.4th at p. 132.) Moreover, the trial court's correct instructions defining reasonable doubt were

read to the jury *after* the prosecutor's rebuttal argument, and so the prosecutor's chart and example were not the "last explanation of reasonable doubt the jury heard." (*People v. Cowan* (2017) 8 Cal.App.5th 1152, 1154.) "We presume that jurors treat the court's instructions as a statement of the law by a judge, and the prosecutor's comments as words spoken by an advocate in an attempt to persuade." (*People v. Clair* (1992) 2 Cal.4th 629, 663, fn. 8.) Indeed, the court's instructions informed the jury that "[i]f anything concerning the law said by the attorneys in their arguments . . . conflicts with my instructions on the law, you must follow my instructions," and that "[s]tatements made by the attorneys during the trial are not evidence . . . ." The court also gave the written instructions to "the jury to consult during deliberations." (*Cortez, supra,* 63 Cal.4th at p. 131.)

### 12. *Instructional error*

#### a. *Accomplice testimony*

Dalton contends the trial court erroneously failed to instruct the jury that Tompkins was an accomplice as a matter of law and that his testimony could not corroborate the testimony of another accomplice. Tompkins did not testify, nor were his "out-of-court statements made under questioning by police or under other suspect circumstances." (*People v. Carrington* (2009) 47 Cal.4th 145, 190; see *People v. Williams* (1997) 16 Cal.4th 153, 245–246.) "Hence no instruction under section 1111 was required." (*Maciel, supra,* 57 Cal.4th at p. 529.)

Dalton further contends that the trial court erroneously failed to instruct the jury that Baker's testimony could not be corroborated by Tompkins's statements because Tompkins was

also an accomplice. (See *Rangel*, *supra*, 62 Cal.4th at p. 1222 [testimony of one accomplice cannot corroborate that of another accomplice].) Even assuming for the sake of argument that Tompkins had been an accomplice under section 1111, the purpose of the corroboration rule is to require evidence independent of the accomplice testimony that links the defendant to the crime. (*Romero and Self*, *supra*, 62 Cal.4th at p. 32.) Here, Tompkins's statements merely recounted the circumstances of the crime. They did not refer to Dalton and therefore did not link her to the crime, and hence could not have been relied on by the jury to corroborate Baker's testimony that Dalton was involved.

### b. *Motive*

Baker testified that on June 25, 1988, when she was helping May move, Dalton came by and angrily said much of the furniture in the apartment was hers and she was looking for some jewelry. Dalton later found some of her jewelry in May's purse, became angry, and made May perform certain household chores. Dalton contends that the trial court erroneously failed to sua sponte instruct the jury that Dalton's "oral statement of motive" before the murder should be viewed with caution.

The trial court instructed the jury: "Motive is not an element of the crimes charged and need not be shown," but "you may consider motive . . . as a circumstance in this case. Presence of motive may tend to establish guilt. Absence of motive may tend to establish innocence. You will therefore give its presen[ce] or absence, as the case may be, the weight to which you find it to be entitled." The court further instructed the jury: "An admission is a statement made by the defendant other than at her trial which does not by itself acknowledge her guilt of the

crimes for which such defendant is on trial, but which statement tends to prove her guilt when considered with the rest of the evidence. . . .   Evidence of an oral admission of the defendant should be viewed with caution."

These instructions collectively conveyed to the jury the concept that Dalton's oral statement of motive, which might tend to establish her guilt, should be viewed with caution. Moreover, the broad language "a statement made by the defendant *other than at her trial*" would include the time period before the offense.  (Italics added.)

In a related claim, Dalton contends that the motive instruction allowed the jury to find her guilty of murder based solely on evidence of her motivation and thereby lessened the prosecutor's burden of proof beyond a reasonable doubt and shifted the burden of proof to Dalton to prove her innocence.  We previously have rejected similar claims and do so again here. (See *People v. Thompson* (2016) 1 Cal.5th 1043, 1122–1124; *People v. Nelson* (2016) 1 Cal.5th 513, 552–553, and cases cited (*Nelson*).)

### c.   *Consciousness of guilt*

Dalton contends the trial court erred in instructing the jury in the language of CALJIC Nos. 2.03 and 2.06, which respectively allow a jury to consider a defendant's willfully false or deliberating misleading statements, and attempts to suppress evidence, as circumstances tending to show a consciousness of guilt.  We have repeatedly rejected claims similar to Dalton's that these instructions improperly duplicate the circumstantial evidence instructions, are partisan and argumentative, or permit the jury to irrationally infer guilt.

(*People v. Jones* (2013) 57 Cal.4th 899, 971 [CALJIC No. 2.03]; *Dement*, *supra*, 53 Cal.4th at pp. 52–53 [CALJIC No. 2.06].)

Dalton notes, as did the defendant in *Dement*, that many of this court's cases have cited the protective nature of the consciousness of guilt instructions. (See *Dement*, *supra*, 53 Cal.4th at p. 53, fn. 27, citing *People v. Jackson* (1996) 13 Cal.4th 1164, 1224 [the "cautionary nature of the instructions benefits the defense, admonishing the jury to circumspection regarding evidence that might otherwise be considered decisively inculpatory"].) Dalton "asserts we abandoned this 'rationale' in *People v. Seaton* (2001) 26 Cal.4th 598, 673, when we held that error in *not* giving a consciousness of guilt instruction was harmless because the instruction 'would have benefited the prosecution, not the defense.' It is not, however, inconsistent to observe that an instruction that informs the jury it may consider certain evidence as tending to show a consciousness of guilt benefits the prosecution while at the same time noting that language in the instruction limiting that consideration protects the defendant." (*Dement*, at p. 53, fn. 27.)

### d. *Bolstering credibility*

The trial court instructed the jury in the language of CALJIC No. 2.13: "Evidence that on some former occasion a witness made a statement or statements that were inconsistent or consistent with his or her testimony in this trial, may be considered by you not only for the purpose of testing the credibility of the witness, but also as evidence of the truth of the facts as stated by the witness on such former occasion. If you disbelieve a witness'[s] testimony that he or she no longer remembers a certain event, such testimony is inconsistent with

a prior statement or statements by him or her describing that event." Dalton contends this instruction impermissibly bolstered Baker's credibility by: (1) "telling the jurors only that they could consider those prior inconsistent statements for their 'truth,' but not telling them that they could also consider those statements for their 'falsity' "; and (2) "telling the jurors to consider the prior statements as evidence of the truth of 'the facts' as stated by the witness on those former occasions, by definition it strongly implied to them that the prior statements were factual." We have previously rejected a substantially similar claim, and Dalton cites no persuasive reason to revisit our conclusion. (See *People v. Wilson* (2008) 43 Cal.4th 1, 20–21.)

### e.  *Reasonable doubt*

Dalton contends the trial court's instructions in the language of CALJIC Nos. 1.00, 2.01, 2.02, 2.21.1, 2.21.2, 2.22, 2.27, 2.51, 2.90, 8.20, 8.83, and 8.83.1 undermined and diluted the requirement of proof beyond a reasonable doubt. Dalton advances no persuasive reason to reconsider our prior rejection of substantially similar challenges to these instructions, and we decline to do so. (See *Romero and Self, supra*, 62 Cal.4th at p. 43; see *People v. Delgado* (2017) 2 Cal.5th 544, 572−574; *Grimes, supra*, 1 Cal.5th 698, 723–725 [rejecting challenge to CALJIC No. 8.83]; *Nelson, supra*, 1 Cal.5th at pp. 553–554 [rejecting challenge to CALJIC Nos. 2.01, 2.02, 8.83 and 8.83.1]; *Casares, supra*, 62 Cal.4th at p. 831 [CALJIC No. 2.01 did not "create an impermissible mandatory presumption by requiring the jury to draw an incriminatory inference whenever such an inference appeared 'reasonable' unless the defense rebutted it by producing a reasonable exculpatory interpretation"]; *Bryant, Smith and Wheeler, supra,* 60 Cal.4th at p. 437 [rejecting

challenge to CALJIC Nos. 1.00, 2.01, 2.02, 2.21.2, 2.21.2, 2.22, 2.27, 2.51, 2.90, and 8.20]; *People v. Carey* (2007) 41 Cal.4th 109, 129 [CALJIC Nos. 2.02, 8.83 and 8.83.1 did not inform jury it could find the defendant guilty if he " 'reasonably appeared' " to be guilty].)  Moreover, as Dalton acknowledges, she requested the trial court use the version of CALJIC No. 2.90 that contained the language "moral evidence" and "moral certainty" that she now challenges rather than the revised version.

## B. Penalty Phase Issues

### 1. Crawford's testimony

Dalton contends that the trial court erroneously admitted Dawn Crawford's testimony regarding Dalton's description of May's murder.  (See *ante*, p. 36.)  We disagree.

Crawford testified that she heard Dalton say she had participated in a murder.  Dalton referred to the victim as "the bitch" and said she had owed Dalton $80.  The victim was tied and injected with battery acid.  Dalton said that "hearing her scream was the greatest high that she has ever experienced." The victim was stabbed in the head and "cut up and mutilated." Dalton mentioned an Indian reservation.  Dalton also mentioned a woman named "John-Boy" and said "John-Boy better keep quiet."  During the conversation, Dalton was "laughing . . . like it was no big deal."

Dalton contends the testimony was improper evidence of her lack of remorse.  Although a prosecutor may not argue lack of remorse as an aggravating factor, Dalton cites no basis for excluding evidence of a defendant's statements regarding the capital offense that may indicate a lack of remorse.  Rather, Dalton's statement that "hearing [May] scream was the greatest high that she has ever experienced" was an admission and was

properly admitted as a circumstance of the crime. (§ 190.3, factor (a); *People v. Cain* (1995) 10 Cal.4th 1, 77–78 [the detective's question related to the defendant's emotions during the burglary, and the "defendant's answer tended to show his attitude at that time"].) Contrary to Dalton's assertion, the circumstance that she made this statement six years after the crime does not render it unreliable or inadmissible.

Dalton further contends that the trial court abused its discretion by not excluding Crawford's testimony under Evidence Code section 352. Contrary to her assertion, the evidence was not unduly prejudicial merely because it was "devastating" to Dalton's case. Nor, contrary to Dalton's assertion, was the evidence collateral, confusing, or unduly time-consuming simply because Dalton chose to call numerous witnesses to rebut it.

### 2. *Spitting*

Dalton contends that the trial court erred in admitting rebuttal evidence Dalton spat in the direction of then codefendant Tompkins during a pretrial hearing. (See *ante*, p. 46.) Even assuming admission of this evidence was erroneous, we conclude there is no reasonable possibility the penalty verdict would have been different absent this evidence. The behavior was incidental in comparison to the capital crimes and other evidence of Dalton's unadjudicated criminal activity.

### 3. *Asserted instructional error*

Dalton contends the trial court erroneously refused to give requested defense instructions. We have previously rejected substantially similar claims and do so again here.

Dalton's first requested instruction provided: "Life without the possibility of parole and death mean just that. You

must assume, for purposes of determining the penalty, that either sentence will be carried out.  If you sentence Ms. Dalton to life without the possibility of parole, she will spend the balance of her [natural] life in prison with no possibility of parole."  There was no error.  (*People v. Letner and Tobin* (2010) 50 Cal.4th 99, 206 [disapproving of instructing a penalty phase jury to " 'assume' or 'presume' that the sentence will be carried out"].)

Dalton also requested instructions on mitigation and the role of mercy and sympathy that provided:  (1) "The mitigating circumstances which I have read for your consideration are given to you merely as examples of some of the factors that you may take into account as reasons for deciding not to impose a death sentence upon Kerry Lyn Dalton.  You should not limit your consideration of mitigating circumstances to these specific factors.  You may also consider any other circumstance presented as reasons for not imposing the death sentence."  (2) "The mitigating circumstances that I have read for your consideration are given merely as examples of some of the factors that a juror may take[] into account as reasons for deciding not to impose a death sentence in this case.  A juror should pay careful attention to each of those factors.  Any one of them may be sufficient, standing alone, to support a decision that death is not the appropriate punishment in this case.  But a juror should not limit his or her consideration of mitigating circumstances to specific factors.  [¶]  A juror may also consider any other circumstances relating to the case or to the defendant as shown by the evidence as reasons for not imposing the death penalty.  [¶]  A mitigating circumstance does not have to be proved beyond a reasonable doubt.  A juror may find that a mitigating circumstance exists if there is any evidence to

support it no matter how weak the evidence is. [¶] Any mitigating circumstance may outweigh all the aggravating factors. [¶] A juror is permitted to use mercy, sympathy and/or sentiment in deciding what weight to give each mitigating factor." (3) "In determining the appropriate penalty for Kerry Lyn Dalton, you may consider as a circumstance in mitigation her potential for rehabilitation and leading a useful and meaningful life while incarcerated." (4) "You may recommend a life sentence without finding the existence of an alleged statutory mitigating circumstance and even should you find beyond a reasonable doubt the existence of an alleged statutory aggravating circumstance. In other words, you may, in your good judgment, recommend a life sentence for any reason at all that you see fit to consider." Dalton's alternative requested instruction provided: "However, it is not essential to a decision to impose a sentence of life imprisonment without possibility of parole that you find mitigating circumstances. You may spare the life of Kerry Lyn Dalton for any reason you deem appropriate and satisfactory." (5) "In determining whether to sentence Kerry Lyn Dalton to life imprisonment without the possibility of parole or to death, you may decide to exercise mercy on behalf of Ms. Dalton." (6) "If the mitigating evidence gives rise to compassion or sympathy for the defendant, the jury may, based upon such sympathy or compassion alone, reject death as a penalty."

We conclude the trial court did not err in refusing these requested instructions. The United States Supreme Court has held a trial court is not required to instruct the jury that mitigating factors need not be proved beyond a reasonable doubt. (*Kansas v. Carr* (2016) 577 U.S. __, __ [136 S.Ct. 633, 642] ["our case law does not require capital sentencing courts 'to

affirmatively inform the jury that mitigating circumstances need not be proved beyond a reasonable doubt' "]; accord, *Samayoa, supra*, 15 Cal.4th at p. 862.)

The remaining portions of the requested instructions were cumulative to instructions given. The trial court instructed the jury it could consider "[a]ny other circumstance which extenuates the gravity of the crime[,] even though it is not a legal excuse for the crime[,] and any sympathetic or other aspect[] of the defendant's character or record that the defendant offers as a basis for a sentence less than death, whether or not related to the offense[] for which she is on trial." The court defined a "mitigating circumstance" as "any fact, condition or event which . . . does not constitute a justification or excuse for the crime in question[,] but may be considered as an extenuating circumstance in determining the appropriateness of the death penalty," and explained, "[y]ou are free to assign whatever moral or sympathetic value that you deem appropriate to each and all of the various factors that you are permitted to consider."

### 4. *Constitutionality of the death penalty statute*

Dalton contends California's death penalty statute and implementing instructions are constitutionally invalid in numerous respects. We have repeatedly rejected similar claims, and Dalton provides no persuasive reason to revisit our decisions.

"[T]he California death penalty statute is not impermissibly broad, whether considered on its face or as interpreted by this court." (*People v. Dykes* (2009) 46 Cal.4th 731, 813.) We further "reject the claim that section 190.3, factor (a), on its face or as interpreted and applied, permits

arbitrary and capricious imposition of a sentence of death." (*Ibid.*; see *Tuilaepa v. California* (1994) 512 U.S. 967, 975–976, 978.)

"The death penalty statute does not lack safeguards to avoid arbitrary and capricious sentencing . . . or constitute cruel and unusual punishment on the ground that it does not require either unanimity as to the truth of aggravating circumstances or findings beyond a reasonable doubt that an aggravating circumstance (other than Pen. Code, § 190.3, factor (b) or (c) evidence) has been proved, that the aggravating factors outweighed the mitigating factors, or that death is the appropriate sentence." (*Rangel*, *supra*, 62 Cal.4th at p. 1235.) Nothing in *Hurst v. Florida* (2016) 577 U.S. __ [136 S.Ct. 616], *Cunningham v. California* (2007) 549 U.S. 270, *Blakely v. Washington* (2004) 542 U.S. 296, *Ring v. Arizona* (2002) 536 U.S. 584, or *Apprendi v. New Jersey* (2000) 530 U.S. 466, affects our conclusions in this regard. (*Rangel*, at p. 1235, fn. 16.)

"No burden of proof is constitutionally required, nor is the trial court required to instruct the jury that there is no burden of proof. [Citations.]" (*Dement*, *supra*, 53 Cal.4th at p. 55.) The trial court need not instruct that there is a presumption of life, that if the mitigating factors outweigh the aggravating factors the jury should impose a sentence of life imprisonment without the possibility of parole, or that a jury need not be unanimous in finding the existence of a mitigating factor. (*People v. Williams* (2016) 1 Cal.5th 1166, 1204; *People v. Adams* (2014) 60 Cal.4th 541, 581; *People v. Moore* (2011) 51 Cal.4th 1104, 1139–1140.) The trial court was not required to delete inapplicable factors from CALJIC No. 8.85 (*People v. Watson* (2008) 43 Cal.4th 652, 701), or "instruct that the jury can consider certain statutory

factors only in mitigation." (*People v. Valencia* (2008) 43 Cal.4th 268, 311.) "Written findings by the jury during the penalty phase are not constitutionally required, and their absence does not deprive defendant of meaningful appellate review." (*People v. Mendoza* (2011) 52 Cal.4th 1056, 1097.)

The jury may properly consider a defendant's unadjudicated criminal activity. (*People v. Martinez* (2010) 47 Cal.4th 911, 968.) The language "so substantial" and "warrants" in CALJIC No. 8.88 is not impermissibly vague. (*Romero and Self, supra,* 62 Cal.4th at p. 56.) "Use of the adjectives 'extreme' and 'substantial' in section 190.3, factors (d) and (g) is constitutional." (*Dement, supra,* 53 Cal.4th at p. 57.)

"The federal constitutional guarantees of due process and equal protection, and against cruel and unusual punishment [citations], do not require intercase proportionality review on appeal." (*People v. Mai* (2013) 57 Cal.4th 986, 1057.) "Moreover, 'capital and noncapital defendants are not similarly situated and therefore may be treated differently without violating' a defendant's right to equal protection of the laws, due process of law, or freedom from cruel and unusual punishment." (*People v. Carrasco* (2014) 59 Cal.4th 924, 971.) " 'The death penalty as applied in this state is not rendered unconstitutional through operation of international laws and treaties.' " (*People v. Jackson* (2016) 1 Cal.5th 269, 373.)

### 5. *Cumulative prejudice*

Dalton contends the cumulative effect of guilt and penalty phase errors requires us to reverse the judgment. Having concluded no substantial evidence supports the lying in wait special-circumstance true finding, we vacate that finding. We have also concluded that the trial court erred in imposing the

death penalty for Dalton's conviction of conspiracy to commit murder. We have assumed error in the trial court's preclusion of impeachment of McNeely with the facts underlying his felony convictions, and of Fedor with her pending charges, in the admission of evidence of blood in Fedor's former trailer and of Dalton spitting in the direction of Tompkins, in certain aspects of the prosecutor's guilt phase closing argument, and in the trial court's failure to instruct on its own motion that Baker's guilty plea could only be used to assess her credibility. These errors and assumed errors, whether considered individually or cumulatively, do not require reversal of Dalton's murder or conspiracy convictions, nor do they require us to vacate the personal use of a deadly weapon true finding.

## CONCLUSION

For the reasons above, we vacate as unauthorized the death sentence imposed (and stayed) on the conspiracy to commit murder count (Count I). We further vacate the lying in wait special-circumstance true finding. We remand to the trial court, and direct the court to state on an amended abstract of judgment a sentence of imprisonment for 25 years to life, stayed pursuant to section 654, on the conspiracy count (Count I), and to strike the lying in wait special-circumstance true finding. We affirm the judgment, as modified, in all other respects.

**LIU, J.**

**We Concur:**

**CANTIL-SAKAUYE, C. J.**
**CHIN, J.**
**CORRIGAN, J.**
**CUÉLLAR, J.**
**KRUGER, J.**
**GROBAN, J.**

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** People v. Dalton

_____

**Unpublished Opinion**
**Original Appeal** XXX
**Original Proceeding**
**Review Granted**
**Rehearing Granted**

_____

**Opinion No.** S046848
**Date Filed:** May 16, 2019

_____

**Court:** Superior
**County:** San Diego
**Judge:** Michael D. Wellington and Thomas J. Whelan

_____

**Counsel:**

Michael J. Hersek and Mary K. McComb, State Public Defenders, under appointment by the Supreme Court, Denise Anton and Jolie Lipsig, Deputy State Public Defenders, for Defendant and Appellant.

Edmund G. Brown, Jr., and Xavier Becerra, Attorneys General, Dane R. Gillette, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Holly Wilkens, Pat Zaharopoulos and Christen Somerville, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Jolie Lipsig
Deputy State Public Defender
770 L Street, Suite 1000
Sacramento, CA 95814
(916) 322-2676

Christen Somerville
Deputy Attorney General
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102-7004
(415) 510-3856